# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| PALETERIA LA MICHOACANA, INC. *et al.*, | : | | |
| | : | | |
| Plaintiffs & Counter-Defendants, | : | Civil Action No.: | 11-1623 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 114, 116, 119, 128 |
| | : | | |
| PRODUCTOS LACTEOS TOCUMBO S.A. | : | | |
| DE C.V., | : | | |
| | : | | |
| Defendant & Counter-Claimant. | : | | |

## MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT;
GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT; DENYING DEFENDANT'S MOTION TO STRIKE; AND DENYING PLAINTIFFS'
MOTION *IN LIMINE***

## I. INTRODUCTION

Before the Court is a highly contested trademark action that raises complex factual and

legal issues. This case arrived here when Plaintiffs, Paleteria La Michoacana, Inc. and Paleteria

La Michoacana, LLC (collectively, "PLM"), brought suit against Defendant Productos Lacteos

Tocumbo S.A. De C.V. ("PROLACTO") challenging a decision by the Trademark Trial and

Appeal Board ("TTAB") regarding various registered and unregistered trademarks used to sell

"Mexican-style" ice cream bars, called paletas, and other frozen ice cream treats. PROLACTO

responded by filing a counterclaim that asserts several counts against PLM under various

sections of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, as well as District of Columbia common

law. PLM and PROLACTO each filed motions for partial summary judgment in which they

seek a ruling on most counts in the complaint and counterclaim. Upon consideration of the

parties' motions, the memoranda in support thereof and opposition thereto, and the voluminous

evidentiary record submitted by both parties to supplement their summary judgment filings, the Court will grant in part and deny in part each party's motion.

## II. BACKGROUND

At the heart of this action is a fight over the right to use certain trademarks in the sale of paletas — which are "Mexican-style" ice cream bars traditionally made from fruit, spices, and nuts, and sold in trucks and supermarkets — and other similar frozen ice cream treats within the United States. PROLACTO and PLM dispute, whether for factual reasons or on evidentiary grounds, nearly all of the hundreds of "facts" proffered to support their respective motions for summary judgment. Nonetheless, after wading through the extensive evidentiary records provided by both parties to support their motions, the Court finds that the following background facts have been established. To the extent additional relevant and material facts remain in dispute, those factual discrepancies are discussed in more detail as they arise throughout this Memorandum Opinion.

PROLACTO is a family-owned company founded in Mexico in 1992. The family that founded the company has a long history of operating ice cream stores ("paleterias") and selling ice cream and fruit bars in various cities and towns throughout Mexico stretching back to the 1940s. PROLACTO's historic use and ownership in Mexico of the marks at issue is largely in dispute and mostly irrelevant to the legal issues at hand, but beginning in 1995, PROLACTO started successfully registering with the Mexican Institute of Intellectual Property many of these marks, including the term "LA MICHOACANA NATURAL."[1] A few years later, PROLACTO

---

[1]  "Michoacán" is the name of one of the thirty-one states that, along with the Federal District, comprise the thirty-two Federal Entities of Mexico. It is located along the coast in western Mexico. Michoacán is home to a sizeable population of Purépecha Indian people, whose women's traditional folkloric dress commonly consists of hair braids on each side, a white

2

began entering licensing agreements in the United States with close family members of the company's founding directors.  Through these agreements, PROLACTO authorized the licensees to use within the United States some of the marks PROLACTO had been using and registering in Mexico.  The evidentiary record shows that PROLACTO has not produced, advertised, or sold its ice cream products directly to consumers inside the United States, and the company has not directly operated any stores within the country.  Instead, PROLACTO's use of the disputed marks inside the United States arises through its licensing agreements.[2]

The first license occurred in 1999, when Rigoberto Fernandez, with permission from PROLACTO, opened a paleteria called LA MICHOACANA in Homestead, Florida.  In April 2001, Fernandez and his sister, Mary Fernandez, opened a second paleteria under the same name in West Palm Beach, Florida, where they used PROLACTO's Mexican marks for the sale of ice cream products.  In October 2002, again through a license with PROLACTO, Mary Fernandez opened a paleteria under the name Michoacana Natural Ice Cream in Rosenberg, Texas, a suburb of Houston.  Sometime between 2004 and 2006, Mary Fernandez opened a second licensed store in Houston.  She ultimately added several additional ice cream parlors in Houston over the next few years, although the exact number and timing is disputed.  Finally, in July 2009, PROLACTO licensed the opening of a Michoacana Natural Ice Cream store in Sonoma, California, which makes and sells paletas, ice cream, and drinks on site.  PROLACTO's California licensee has not operated any other ice cream parlors in the Sonoma area since July 2009.  PROLACTO has no licensees in the District of Columbia or any other state not discussed herein.

---

blouse, a pink skirt, and sandals — hence the origin of the "Indian Girl" design at issue in this case.

[2]    The exact nature and legal significance of these licensing agreements remains in dispute, including the level of control and supervision PROLACTO has exercised over its licensees.

Turning to PLM's history, in 1991 brothers Ruben Gutierrez and Ignacio Gutierrez started an ice cream business called Paleteria Michoacana as an informal partnership in the city of Turlock, which is in northern California. Shortly after Ignacio Gutierrez was married, in April 1999, the Gutierrez brothers dissolved their partnership, and from late April 1999 until 2002, Ignacio Gutierrez operated the Paleteria Michoacan ice cream business as a sole proprietorship in the same location in Turlock, California. In 2002, Ignacio Gutierrez created a California corporation known as Paleteria La Michoacana, Inc. and served as its president, sole shareholder, and sole director from 2002 until early 2011, at which time Paleteria La Michoacana, LLC, as assignee of the assets of Paleteria La Michoacana, Inc., took over the business.

PLM's products are made in a factory in California before being distributed throughout various parts of the country, where they are sold at large club stores like Costco, supermarkets like Wal-Mart, Hispanic grocery stores like El Super and Vallarta, drug stores like Walgreens, and a variety of other retail outlets. PLM has not sold products directly to consumers in Florida. And like PROLACTO, PLM's products are not sold or distributed in the District of Columbia, although PLM's goods are sold in numerous other states across the country. In fact, although they both sell products within the same broad category of frozen ice cream treats, PROLACTO's licensee's goods and PLM's goods cross paths in limited geographical areas within the United States, namely Texas, where PLM has distributed ice cream products such as paletas since sometime in 2005, and northern California, where the respective parties' goods are sold in the same general area within one mile or so. In at least one instance, the companies' goods are sold at the very same store in Houston.

Finally, the parties' ice cream products are relatively inexpensive treats typically purchased on impulse. For example, PLM's four ounce single serve fruit and ice cream bars sell

at retail for approximately $0.89 to $1.19, while PLM's three ounce bars are sold at retail in packages of six for between $2.49 to $4.49. Paletas sold by PROLACTO's United States licensees are slightly more expensive at a retail price of approximately $1.75 to $2.00 each, but they are larger than PLM's bars and still remain inexpensive consumer items typically purchased on impulse.

### A. Marks In Dispute

As noted in the introduction, this action involves a dispute between PLM and PROLACTO over the right to use certain registered and unregistered marks during the sale of ice cream products in the United States. The central marks at issue include the so-called Indian Girl design, as well as marks bearing various forms of the word "Michoacán." Below is a graphic displaying some of the marks in dispute between the companies:

| Sample of Marks in Dispute | |
|---|---|
| **PLM's Trademark: Registration No. 3,210,304** | **PROLACTO's Trademark: Registration No. 3,249,113** |
|  |  |
| **PLM's Trademark: Registration No. 2,905,172** | **PROLACTO's Trademark: Registration No. 2,830,401** |
|  | LA FLOR DE MICHOACAN |



| PLM's Trademark: Registration No. 2,968,652 | PROLACTO's Application Serial No. 78,954,490 |
| PLM's Application Serial No. 77,451,471 | PROLACTO's Application Serial No. 78,771,243 |

### B. Procedural History

Before arriving at this Court, PROLACTO filed a petition with the TTAB to cancel PLM's trademark No. 3,210,304 for the mark LA INDITA MICHOACANA and design, shown above, for use on ice cream and fruit products, namely fruit bars. The TTAB granted PROLACTO's petition, finding a likelihood of confusion between several, but not all, of PROLACTO's marks and PLM's registered trademark. *See generally Productos Lacteos Tocumbo S.A. De C.V. v. Paleteria La Michoacana, Inc.*, 98 U.S.P.Q.2d 1921, 2011 WL 2161071 (TTAB May 20, 2011) ("TTAB Decision"). The TTAB's decision is discussed with more detail in the ensuing sections.

On June 11, 2012, PLM filed a second amended complaint in which it asserted four causes of action against PROLACTO regarding the TTAB decision and other issues in the fight to use the various registered and unregistered marks. First, PLM seeks reversal of the TTAB decision cancelling its registered trademark No. 3,210,304. *See* 2d Am. Compl., ECF No. 40, at ¶¶ 42-48. Second, PLM seeks declaratory judgment that there is no likelihood of confusion

between its mark and PROLACTO's lone registered mark. *See id.* ¶¶ 49-51. Third, PLM asserts a Lanham Act trademark infringement claim under 15 U.S.C. § 1114 against PROLACTO for its use of the Indian Girl design with LA INDITA MICHOACANA and separate use of the Indian Girl mark standing alone. *See id.* ¶¶ 52-56. Finally, PLM seeks cancellation of PROLACTO's registered trademark No. 3,249,113, also shown above. *See id.* ¶¶ 57-61.

On June 29, 2012, PROLACTO filed its answer to the second amended complaint and asserted a variety of trademark counterclaims against PLM, including Lanham Act claims for federal trademark infringement, unfair competition, passing off, false advertising, false association, and false designation. *See* Answer 2d Am. Compl. & Countercls., ECF No. 41, at ¶¶ 43-52. PROLACTO also asserted Lanham Act claims to cancel two of PLM's registered marks on the basis of fraud and abandonment, *see id.* ¶¶ 64-87, as well as a claim for trademark infringement under District of Columbia common law. *See id.* ¶¶ 53-59. Finally, PROLACTO brought a Lanham Act federal trademark dilution claim against PLM. *See id.* ¶¶ 60-63.

### C. Motions For Summary Judgment

Now before the Court are the parties' motions for summary judgment in which they seek a decision on nearly every claim in the complaint and counterclaim. Upon a searching examination of the parties' filings, the attached exhibits, the relevant case law, and the entire record herein, the Court finds that it can resolve a number of issues at this stage because no dispute of material fact exists. The Court therefore will enter the following rulings: (1) granting summary judgment in favor of PLM on counterclaim Count I; (2) granting summary judgment in favor of PLM limiting counterclaim Count II for trademark infringement to the Houston, Texas, market; (3) granting summary judgment in favor of PROLACTO on counterclaim Count II for false advertising on the elements of falsity, deceptiveness, and interstate commerce; (4) granting

summary judgment in favor of PLM on counterclaim Count III; (5) granting summary judgment in favor of PLM on counterclaim Count IV; (6) granting summary judgment in favor of PLM on counterclaim Counts V, VI, and VII; and (7) granting summary judgment in favor of PLM on the question of whether PROLACTO is entitled to any form of monetary relief for its trademark counterclaims.

There exist, however, numerous other issues that cannot be dealt with at summary judgment because contested factual questions remain for a fact-finder to decide. The Court therefore also makes the following rulings on the parties' motions: (1) denying summary judgment as to both parties on complaint Count I; (2) denying summary judgment as to both parties on counterclaim Count II for trademark infringement on the question of whether PROLACTO has established secondary meaning for its marks; (3) denying summary judgment as to both parties on counterclaim Count II for false designation, passing off, false association, and unfair competition; (4) denying summary judgment as to PLM on its arguments that laches prevents PROLACTO from bringing counterclaim Count II for false advertising, and that PROLACATO lacks prudential standing for its false advertising claim; and (5) denying summary judgment to both parties on counterclaim Count II for false advertising on the elements of materiality and injury.

### III.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [thus] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When Rule 56 is invoked, the moving party has the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of persuasion at trial, its burden "may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party has met its burden, to defeat the motion the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id*. at 324 (citation omitted). Although the Court must view this evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *see Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23-24 (D.C. Cir. 2013), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his position — "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Anderson*, 477 U.S. at 252. Moreover, the nonmoving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

When both parties file cross-motions for summary judgment, "each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006); *Nuzzo v. FBI*, No. 95-CV-1708, 1996 WL 741587, at *1 (D.D.C. Oct. 8, 1996) ("When both parties in a cause of action move for summary judgment, each party must carry its own burden."). Finally, the Court notes that "[c]redibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted). Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Id.* (citation omitted).

## IV. ANALYSIS

The Court now turns to the merits of the motions for summary judgment. As suggested above, the parties seek judgment on numerous counts in the complaint and counterclaim. Specifically, PLM seeks the following relief through its motion: (1) judgment in its favor on counterclaim Count I for infringement on PROLACTO's registered trademark; (2) judgment limiting counterclaim Count II exclusively to the Houston, Texas, market; (3) judgment preventing PROLACTO from recovering monetary relief in any form on all of its counterclaims; (4) judgment in its favor on counterclaim Count II for false advertising; (5) judgment in its favor on counterclaim Count III for District of Columbia common law trademark infringement; (6) judgment in its favor on counterclaim Count IV for federal trademark dilution; and (7) judgment in its favor on counterclaim Counts V, VI, and VII for cancellation of PLM's registered Indian Girl trademarks on the basis of fraud and abandonment.

In response, PROLACTO requests that the Court grant the following relief: (1) judgment in its favor on all of counterclaim Count II for various Lanham Act violations; (2) judgment in its favor on counterclaim Count III for District of Columbia common law trademark infringement; (3) judgment in its favor on complaint Count I affirming the TTAB decision; (4) judgment in its favor on counterclaim Count I overturning the TTAB decision as to PROLACTO's registered trademark; (5) judgment in its favor on counterclaim Counts V and VI for cancellation of PLM's

registered Indian Girl trademarks; and (6) judgment in its favor on counterclaim Count IV for federal trademark dilution.[3]  The Court addresses each issue below.

**A. Complaint Count I: Appeal Of TTAB Decision Cancelling PLM's Registered Mark**

Upon PROLACTO's petition before the TTAB, the board cancelled PLM's registered trademark No. 3,210,304 for the LA INDITA MICHOACANA and design after finding that the mark was sufficiently similar to PROLACTO's unregistered Indian Girl mark, as well as PROLACTO's marks for LA MICHOACANA, LA MICHOACANA NATURAL, and LA MICHOACANA NATURAL and design, such that consumer confusion was likely to occur.  *See generally* TTAB Decision.  PLM filed the initial complaint in this Court seeking judicial review of that decision and arguing, in particular, that it has evidence contradicting the TTAB's conclusion regarding priority use of the marks.  *See generally* 2d Am. Compl., ECF No. 40. PROLACTO moves for summary judgment affirming the TTAB decision to cancel PLM's mark. *See* Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 116-1, at 37.

---

[3]        PROLACTO also has filed a motion to strike various portions of the declaration of Ariel Fox Johnson, PLM's counsel, and associated exhibits.  *See generally* Def.'s Mot. Strike, ECF No. 128.  "At summary judgment, material will be disregarded only if it 'cannot be presented in a form that would be admissible in evidence' at trial."  *Ali v. D.C. Gov't*, 810 F. Supp. 2d 78, 83 (D.D.C. 2011) (quoting Fed. R. Civ. P. 56(c)(2)).  Thus, to defeat summary judgment, a nonmovant "is not required to produce evidence in a form that would be admissible at trial," so long as the evidence is "capable of being converted into admissible evidence." *Gleklen v. Democratic Congr. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000); *see also Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 38 (D.C. Cir. 1987); *Richards v. Option One Mortg.*, No. 08 Civ. 0007, 2009 WL 2751831, at *1 n.3 (D.D.C. 2009) (explaining that hearsay statements may be converted into admissible evidence if a witness with personal knowledge can testify to them at trial).

First, the Court notes that much of the evidence PROLACTO moves to strike through its motion is not relied on in this Memorandum Opinion, thus making those aspects of the motion moot.  Second, for the remaining limited set of evidence that the Court finds relevant, the Court is satisfied that PLM has met its burden of demonstrating that the evidence is admissible or can be made admissible at trial.  The Court therefore denies PROLACTO's motion to strike.

1.  Standard Of Review For A TTAB Decision

Section 21 of the Lanham Act permits a party dissatisfied with a TTAB decision to appeal to the United States Court of Appeals for the Federal Circuit or to bring a civil action in federal district court. *See* 15 U.S.C. § 1071(a), (b); *see also Material Supply Int'l, Inc. v. Sunmatch Indus. Co., Ltd.*, 146 F.3d 983, 989 (D.C. Cir. 1998). In the latter case, the district court acts as a quasi-appellate court to the TTAB and applies a hybrid standard of review, affording deferential treatment to the board's factual findings but confronting legal questions *de novo. See Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans, Inc.*, 511 F. Supp. 2d 1, 6 (D.D.C. 2007); *see also Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 852 (2d Cir. 1988) ("The section 1071(b) action in a district court is not, strictly speaking, an 'appeal' at all, but an independent judicial proceeding provided as an alternative to a direct appeal to the Federal Circuit[.]"); *Smith v. Entrepreneur Media, Inc.*, No. 2:12-CV-2184, 2013 WL 2296077, at *5 (E.D. Cal. May 24, 2013) ("[W]hile new evidence and new issues may be introduced in the district court, an appeal of a decision by the TTAB is a unique procedure because, unlike a true *de novo* proceeding, findings of fact made by the TTAB are given great weight and are not upset unless supported by substantial evidence.").

A court reviews the TTAB's findings of fact under the "substantial evidence" standard, which requires a court to defer to the factual findings made by the TTAB unless new evidence "carries thorough conviction." *Material Supply Int'l*, 146 F.3d at 990 (citing 3 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition ("McCarthy on Trademarks") § 21:20, at 21-24 (4th ed. 1997); *see also Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*, 729 F. Supp. 2d 246, 251 (D.D.C. 2010); *Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 517 F. Supp. 2d 1, 4 (D.D.C. 2007). "Substantial evidence," as described by the Supreme Court,

is "'more than a mere scintilla of evidence'" and requires "'such relevant evidence as a reasonable mind would accept as adequate' to support a conclusion."  *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003) (quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

Importantly, the party seeking to overturn a TTAB decision may present new evidence and raise new issues, which a court must review *de novo*.  *See Aktieselskabet AF 21. Nov. 2001*, 525 F.3d at 13 (the district court "may consider both new issues and new evidence that were not before the TTAB"); *see also CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 674 (7th Cir. 2001) (explaining that a district court's review of a TTAB decision is *de novo* when parties assert new claims); *Smith*, 2013 WL 2296077, at *5 (explaining that "new evidence and new issues may be introduced in the district court" on appeal of a TTAB decision).  Thus, to prevail on appeal, PLM must either raise a new issue compelling a different result, or show that the TTAB's findings were unsupported by substantial evidence or contrary to "new evidence carr[ying] thorough conviction."  *Guantanamera*, 729 F. Supp. 2d at 251; *see also Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, No. CIV. 08-2764, 2011 WL 3240456, at *3 (D. Md. July 27, 2011).

## 2.  TTAB Factual Findings And Legal Conclusions

At the TTAB proceeding, the board found that PROLACTO had established priority use over PLM for the following marks: LA MICHOACANA (words only); LA MICHOACANA NATURAL (words only); LA MICHOACANA NATURAL (and design); design of an Indian Girl doll holding an ice cream; LA FLOR DE MICHOACAN (words only); LA FLOR DE MICHOACAN (and design); and LA MICHOACANA NAURAL (and design).  *See* TTAB Decision at *11.  To reach its conclusion regarding priority, the board explained that PLM "filed its application for registration on June 28, 2005, claiming first use anywhere and in commerce as of February 21, 2005."  *See id.* at *9.  This finding was supported by the deposition testimony of

PLM's Ignacio Gutierrez and Patricia Gutierrez. Through similar evidence in the record, the TTAB determined that PROLACTO, "through its licensees, began using [the] Indian girl in connection with the sale of ice cream and ice cream bars in the United States in April 2001." *See id.* Based on additional testimony, the TTAB further found that PROLACTO "used the marks LA MICHOACANA NATURAL and design, LA FLOR DE MICHOACAN, and LA MICHOACANA in connection with ice cream and retail ice cream store services since 2001." *See id.* at *10. The TTAB concluded that, based on these facts, PROLACTO had priority over PLM for all marks because PROLACTO used each in commerce within the United States before PLM.

The TTAB next considered the likelihood of confusion between PROLACTO's marks and PLM's registered mark. Based on competent evidence in the record, the TTAB made the following findings: all the marks at issue are used in connection with ice cream products; PLM's fruit bars are sold in all normal channels of trade to all normal purchasers of such goods, including retail ice cream stores; ice cream bars and fruit bars are inexpensive products and by their nature are impulse purchase items consumers buy without a high degree of care; considering the overall commercial impressions of the marks, the companies' Indian Girl designs are virtually identical; and PROLACTO's mark LA MICHOACANA, and PLM's registered mark LA INDITA MICHOACANA and design, are similar in appearance and sound, and have similar meanings. *See id.* at *12-15. Based on these findings, the board concluded that PLM's registered mark No. 3,210,304 was sufficiently similar to PROLACTO's design of an Indian Girl doll holding an ice cream, LA MICHOACANA (words only), LA MICHOACANA NATURAL (words only), and LA MICHOACANA NATURAL and design, to create a likelihood of

confusion among customers. *See id.* at *15. The TTAB therefore concluded that PLM's

registered mark No. 3,210,304 must be cancelled. *See id.* at *16.

### 3. New Evidence And Arguments: Tacking

On review of the TTAB decision, a district court must take into consideration new

evidence and new issues not raised before the TTAB. Here, PLM presents for the first time at

the summary judgment stage testimonial and documentary evidence suggesting that it used a

version of the Indian Girl design since at least the mid-1990s, which potentially would predate

PROLACTO's use of similar marks in the United States. *See* Pls.' Stmt Disputed Issues, ECF

No. 120, at 59, No. 6. PLM argues that it should be permitted to "tack" these earlier uses to

establish priority for its registered LA INDITA MICHOACANA mark and design over

PROLACTO's use of similar marks. *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,

174 F.3d 1036, 1048 (9th Cir. 1999) (explaining that "tacking" occurs when the "trademark

holder essentially seeks to 'tack' his first use date in the earlier mark onto the subsequent mark");

*see also* 3 McCarthy on Trademarks §§ 17:25-28 (4th ed.) (discussing tacking). Due to pleading

issues, however, the TTAB did not consider evidence to determine whether PLM's marks are

sufficiently similar to permit tacking as a valid defense.

When a district court hearing a TTAB appeal acts as a finder of fact with regard to new

evidence submitted by the parties, it "must examine the evidence *de novo* and make its own

findings of fact[.]" *Shammas v. Rea*, 978 F. Supp. 2d 599, 606 (E.D. Va. 2013). If a court finds

that new evidence contradicts or is inconsistent with the board's factual findings, it must

consider whether the record, taken as a whole, warrants reversal. *See id.* When this standard of

review is applied in the context of a motion for summary judgment, the primary inquiry is

whether a party has presented sufficient evidence that, when considered with the board's

findings, creates a genuine issue of material fact precluding summary judgment. *See Bd. of Regents of Univ. of Wis. Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 452 (7th Cir. 2011).

The use of an earlier mark may be tacked onto the later use of a different mark only if the first mark is "the legal equivalent of the mark in question or indistinguishable therefrom" such that consumers "consider both as the same mark." *See Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir. 1991). Tacking is permitted "only in rare instances." *Id.* at 1160 (citation and quotation marks omitted). "Legal equivalence" for tacking purposes does not occur simply if the two marks are "confusingly similar"; instead, the marks sought to be tacked must create the same continuing "commercial impression." *Id.*; *see also George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 402 (4th Cir. 2009) (discussing tacking); *Navistar Int'l Transp. Corp. v. Freightliner Corp.*, No. 96 C 6922, 1998 WL 911776, at *2 (N.D. Ill. Dec. 28, 1998) (same).

There is a dispute among the federal circuit courts regarding whether tacking is a question of law for a court or a question of fact for a jury. For example, the Federal Circuit has stated that because "[n]o evidence need be entertained other than the visual or aural appearance of the marks themselves," tacking is a question of law. *See In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 1347 (Fed. Cir. 2001) (citations omitted). The Sixth Circuit agrees that tacking is a question of law. *See Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 623 (6th Cir. 1998). The Ninth Circuit, however, has held that tacking is a question of fact typically left for a jury to decide. *See One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1160 (9th Cir. 2009); *see also Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158, 1168 (9th Cir. 2013) ("[T]acking presents a question of fact that must ultimately be decided by the jury unless the evidence is so strong that it permits only one conclusion.").

The critical inquiry under a tacking analysis is whether a consumer would consider the prior and subsequent designs to be the "same mark." *See Brookfield Commc'ns*, 174 F.3d at 1048 (stating that "tacking should be allowed if two marks are so similar that consumers generally would regard them as essentially the same"); *Van Dyne-Crotty*, 926 F.2d at 1159 (stating that a "consumer should consider both as the same mark"). Consumer opinion is dispositive because a fundamental purpose of trademark law is to create a marketplace in which consumers are not deceived or confused by competing merchants using similar marks. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985) (noting that the Lanham Act's aim is not only to encourage investments in strong trademarks, but also "to protect the ability of consumers to distinguish among competing producers" (citations omitted)); *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 539 (2d Cir. 2005) ("[The Lanham] Act seeks to eliminate the confusion that is created in the marketplace by the sale of products bearing highly similar marks." (citations omitted)).

As such, it is less than ideal for a court, sitting in relative isolation, to speculate about what consumers may think regarding the similarity of two marks as a question of law. In fact, such a conclusion would be inconsistent with the rule in this Circuit that the "likelihood of confusion" inquiry, which requires a similar fact-intensive comparison between marks, is a question of fact for a jury to decide. *See Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1, 48 (D.D.C. 2006); *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 117 (D.D.C. 2003); *see also Louangel, Inc. v. Darden Rests., Inc.*, No. 2:12-CV-00147, 2013 WL 1223653, at *2 (S.D. Tex. Mar. 22, 2013) ("The courts' treatment of the tacking question is commensurate with their treatment of the related issue of 'likelihood of confusion' in the trademark context."). Thus, consistent with this Circuit's approach to the "likelihood of confusion" inquiry, the Court

concludes that tacking presents a question of fact that ultimately must be decided by a jury unless evidence is so strong that it permits only one conclusion such that summary judgment is appropriate.

Here, the Court finds that the evidence presented by PLM regarding its past use of the Indian Girl marks creates a genuine dispute of material fact as to whether the tacking doctrine is applicable because there is at least some evidence that a version of the Indian Girl design was used by PLM in the 1990s, and a jury therefore could find that the earlier marks are sufficiently similar to the later marks to create the continuity of commercial impression. *See, e.g.*, Pls.' Resp. Def.'s Stmt Facts, ECF No. 120-1, at 97, Nos. 120-22. But because the evidence does not compel only one result, the Court concludes that summary judgment is inappropriate as to both parties on PLM's Count I for reversal of the TTAB decision cancelling its registered mark.[4]

## B. Counterclaim Count I: Trademark Infringement Under Lanham Act Section 32(1)

The Lanham Act provides "national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly*, 469 U.S. at 198. Under Section 32(1)(a) of the Act,

> [a]ny person who shall, without the consent of the registrant [] use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive … shall be liable in a civil action by the registrant for the remedies hereinafter provided.

---

[4] Separately, PROLACTO appears to admit that PLM started using LA MICHOACANA as early as 1991. *See* Def.'s Stmt Facts, ECF No. 116-2, at 53, No. 111; *see also* Pls.' Resp. Def.'s Stmt Facts, ECF No. 120-1, at 98-99, No. 128. PROLACTO also argues that the "analogous use" doctrine somehow permits foreign use to be grounds for opposing a trademark registration. *See* Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 116-1, at 38. None of the case law PROLACTO cites, however, supports that proposition.

15 U.S.C. § 1114(1). Section 32 requires that the asserted marks be registered. *Globalaw*, 452

F. Supp. 2d at 25 ("[B]y its very text, a Section 32(1) claim — unlike a Section 43 claim —

contemplates that a 'registration' has occurred and that a 'registrant' is seeking certain

remedies."). Thus, to state an infringement claim under Section 32, a party must prove (1) that it

has a protectable ownership interest in a mark; and (2) that the alleged infringer's use of the

mark is likely to cause consumer confusion.[5] *See Breaking the Chain Found., Inc. v. Capitol*

*Educ. Support, Inc.*, 589 F. Supp. 2d 25, 29 (D.D.C. 2008); *see also Network Automation, Inc. v.*

*Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011); *Louis Vuitton Malletier v.*

*Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006).

PROLACTO moves for summary judgment as to its registered mark No. 3,249,113 for

the LA FLOR DE MICHOACAN and design. *See* Def.'s Mem. Supp. Mot. Part. Summ. J., ECF

No. 116-1, at 42. The TTAB ruled that this mark was not sufficiently similar to PLM's

registered mark No. 3,210,304 to cause consumer confusion and require cancellation.

PROLACTO seeks reversal of that decision through its counterclaim Count I, while PLM moves

for summary judgment in its favor on the same count. Both parties focus their arguments for

summary judgment on whether the board correctly ruled that the marks were not likely to cause

consumer confusion.

---

[5] A trademark infringement claim under Section 32 has nearly identical elements to a claim under Section 43, except that the registration of a mark serves as prima facie evidence of the mark's validity and the registrant's exclusive right to use the mark in commerce. *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013).

| PLM's and PROLACTO's Registered Marks At Issue | |
|---|---|
| **PLM's Registration No. 3,210,304** | **PROLACTO's Registration No. 3,249,113** |
|  | |

Again, the Court must apply a hybrid standard of review to the appeal of a TTAB

decision, affording deferential treatment to the TTAB's factual findings but confronting legal

questions *de novo*. *See Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans, Inc.*, 511 F. Supp. 2d 1,

6 (D.D.C. 2007). The Court therefore reviews the TTAB's findings of fact under the "substantial

evidence" standard, which requires the Court to defer to the factual findings made by the TTAB

unless new evidence "carries thorough conviction." *Material Supply Int'l, Inc. v. Sunmatch*

*Indus. Co.*, 146 F.3d 983, 990 (D.C. Cir. 1998) (citations omitted).

### 1. TTAB Factual Findings And Legal Conclusions

In reaching its conclusion that there was no likelihood of confusion between

PROLACTO's registered LA FLOR DE MICHOACAN mark and PLM's registered mark, the

TTAB made the following findings, each of which was supported by evidence in the record: all

marks and designs are used on packaging for ice cream bars; all marks move in the normal

channels of trade; ice cream bars and fruit bars are impulse purchase items, and consumers do

not exercise a high degree of care before buying; and LA FLOR DE MICHOACAN translates to

English as "the blossom of Michoacán," while LA INDITA MICHOACANA translates to "the

Indian girl or woman from Michoacán." *See* TTAB Decision, at *14. After balancing these

facts, the board concluded that PROLACTO's mark created a different "commercial impression"

than PLM's mark which "outweigh[ed] any similarities caused by the inclusion of the word

'Michoacán.'" *Id.* at *15. For the reasons discussed below, the Court affirms the TTAB's conclusion.

## 2. Application Of Factors

The TTAB did not, and need not as a matter of law, utilize the same multifactor analysis to determine consumer confusion that a district court must apply under the laws of its circuit. *See Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1561 (11th Cir. 1991) ("Although the TTAB need not utilize th[e] multi-factor analysis to be upheld by a district court … we do require the district court to analyze the confusion issue via the multifactor analysis to determine if the result comports with that of the TTAB."); *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, No. CIV. 08-2764, 2011 WL 3240456, at *3 (D. Md. July 27, 2011) (explaining that "[a]lthough the TTAB analyzes the likelihood of confusion under a different set of factors than the jury will use for [defendant's] counterclaims, on review this Court will use the same factors as the jury, and determine if the result under those factors comports with the TTAB's conclusion").

Thus, in accordance with prior cases in this Circuit, the Court should consider approximately seven factors to evaluate consumer confusion, none of which is individually determinative and not all of which must be given equal weight or be present in every case to find that confusion is likely. *See Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1, 48 (D.D.C. 2006). These factors include: (1) the strength of the party's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) evidence of actual confusion; (5) the defendant's purpose or reciprocal good faith in adopting its own mark; (6) the quality of defendant's product; and (7) the sophistication of the buyers. *See id.*; *see also Partido*

*Revolucionario Dominicano (PRD) v. Partido Revolucionario Dominicano, Seccional de Maryland y Virginia*, 312 F. Supp. 2d 1, 14 (D.D.C. 2004).

Notably, the comparison between marks is made in light of what happens with consumers in the marketplace, not by viewing the marks side-by-side in a vacuum. *See Globalaw*, 452 F. Supp. 2d at 49; *see also Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 581 (2d Cir. 1991) ("In [determining whether marks are confusingly similar], a court should look at the general impression created by the marks, taking into account all factors that potential purchasers will likely perceive and remember."); *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 636 F. Supp. 2d 891, 900 (E.D. Mo. 2009) ("This analysis should not be completed in a vacuum because the Court must attempt to recreate the conditions in which buying decisions are made, and … what a reasonable purchaser in market conditions would do." (citation and internal quotation omitted; alteration in original)).  Because the likelihood of confusion inquiry is inherently fact-based and open-ended, summary judgment is disfavored unless the evidence is clear such that "no reasonable factfinder could find that there is a likelihood of confusion based on the evidence presently before the Court." *Jurin v. Google, Inc.*, No. 2:09-CV-03065, 2012 WL 5011007, at *4 (E.D. Cal. Oct. 17, 2012); *see also Packman v. Chi. Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001) (explaining that likelihood of confusion may be resolved at summary judgment only when evidence is so one-sided that there is no doubt about how the question must be answered).

Upon consideration of the *Globalaw* factors, the Court concludes that no reasonable jury could find a likelihood of confusion between the marks at issue.  The Court recognizes, however, that several of the relevant factors weigh in favor of PROLACTO, or are neutral at best.  For example, the parties agree that the products compete within a few regions of the country, and

sometimes even in the same store, albeit rarely. *See* Def.'s Stmt Facts, ECF No. 116-2, at 85-86,

Nos. 193-94. The parties also agree, and the TTAB found, that paletas are relatively inexpensive

products purchased on an impulse, which increases the likelihood of confusion. *See* TTAB

Decision, at *12. On the other hand, PROLACTO has offered expert testimony suggesting a

discernible difference in quality between its product and that of PLM. *See, e.g.*, Def.'s Stmt

Facts, ECF No. 116-2, at 91-106, Nos. 204, 213-14, 221. Though PLM disputes the value and

admissibility of that evidence, a noticeable difference in quality suggests against consumer

confusion. Even more importantly, however, PROLACTO has not provided a survey or other

evidence demonstrating actual consumer confusion between the two specific marks now at issue.

Although "[e]vidence of actual confusion is not necessary to prove likelihood of confusion[,]

actual confusion is substantial proof of the existence of the likelihood of confusion." *Malarkey-

Taylor Assocs., Inc. v. Cellular Telecomms. Indus. Ass'n*, 929 F. Supp. 473, 477 (D.D.C. 1996).

The Court, moreover, is most influenced by the simple fact that the marks in dispute

share little visual resemblance with each other. "Similarity is a holistic consideration that turns

on the marks' sight, sound, and overall commercial impression under the totality of the

circumstances." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 334 (S.D.N.Y.

2013). Although the marks contain similar words — a version of "Michoacán" — this fact alone

does not compel a finding that consumers are likely to be confused. *Cf. Nabisco, Inc. v. Warner-

Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (explaining that the marks "DENTYNE ICE and

ICE BREAKERS are at best marginally similar because of the common use of 'Ice.'");

*GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*, 769 F. Supp. 2d 630, 640 (S.D.N.Y. 2011)

("[E]ven if the marks had contained identical words while competing head to head, that may,

standing alone, still is insufficient to establish similarity."). Instead, "[e]ven if the marks are

composed of the same words and are pronounced the same, they may be distinguished by the use of a company name in close proximity, the use of different font sizes, and dissimilar modes of presentation." *Globalaw*, 452 F. Supp. 2d at 49; *see also King of the Mountain Sports v. Chrysler*, 185 F.3d 1084, 1090-91 (10th Cir. 1999) (finding that marks with the same dominant text are dissimilar due to differences in style, presentation, and visual impact); *Rush Indus., Inc. v. Garnier LLC*, 496 F. Supp. 2d 220, 226 (E.D.N.Y. 2007) ("The use of the same words … is far from dispositive.  Instead, the court must focus on the overall impression conveyed by the use of the words." (citations omitted)); *Door Sys., Inc. v. Overhead Door Sys., Inc.*, 905 F. Supp. 492, 496 (N.D. Ill. 1995) (explaining that "no protection is available against confusion generated by mere similarity of names").

Further, the design elements and colors of the marks in dispute are quite different.  For example, PROLACTO's registered mark features a swirl surrounding an orange popsicle, while PLM's mark features pink and black coloring with a drawing of a little girl holding an ice cream cone with words above and below her image.  *Cf. Nabisco*, 220 F.3d at 47 ("[A]lthough both packages use blue and white colors, the shades and patterns of these colors are different.  The front panel of the DENTYNE ICE package has a light-blue background broken by a thick, dark-blue band and two smaller white bands.  Nabisco's package, on the other hand, has a homogenous, metallic-blue background broken only by the ICE BREAKERS mark itself."); *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999) (finding that MICHELINA'S LEAN 'N TASTY is not confusingly similar to STOUFFER'S LEAN CUISINE as a matter of law because "[t]he use of different colors and typefaces, as well as the prominent display of the house marks convey perceptible distinctions between the products"); *Medici Classics Prods., LLC v. Medici Grp., LLC*, 683 F. Supp. 2d 304, 311 (S.D.N.Y. 2010) (finding no likelihood of

confusion when "the overall impression created by the marks is dissimilar despite the use of the same word. The marks use different typefaces and presentation to create different impressions: in the plaintiff's case, one of royalty and the renaissance, and in the defendant's case, one of modernity"). Indeed, even the phrases within the marks have different meanings and use different letters, as was noted above.

For these reasons, the Court finds that the difference in meaning and commercial impression engendered by the marks outweighs any similarities caused by the inclusion of a version of the word "Michoacán" or the fact that both marks are used on a similar category of products. *See, e.g., Kellogg Co. v. Pack'em Enters.*, 951 F.2d 330, 332-33 (Fed. Cir. 1991) (concluding that "substantial and undisputed differences" between the parties' use of FROOTEE ICE and FROOT LOOPS warranted summary judgment because "the dissimilarity of the marks in their entireties itself made it unlikely that confusion would result from the simultaneous use of the marks" (internal quotation marks omitted)); *Rush Indus.*, 496 F. Supp. 2d at 226 (finding at summary judgment that marks "Long 'n Strong" and "Long & Strong" are dissimilar because "[d]espite the fact that the words use[d] are, essentially, the same, the impression created by the parties' use of the words is vastly different"). As such, the Court affirms the TTAB's decision regarding PLM's lack of infringement and grants summary judgment in PLM's favor on counterclaim Count I.

## C. Counterclaim Count II: Trademark Infringement Under Lanham Act Section 43(a)

In Count II of the counterclaim, PROLACTO asserts that PLM violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), through its use of registered trademarks Nos. 3,210,304; 2,905,172; and 2,968,652 because those marks allegedly infringe on PROLACTO's use of the

LA MICHOACANA marks and the Indian Girl design.[6]  To prevail on a trademark infringement

claim, a party must show that (1) it owns a valid trademark, (2) its trademark is distinctive or has

acquired a secondary meaning, and (3) there is a substantial likelihood of confusion between the

party's mark and the alleged infringer's mark.  *See Globalaw Ltd. v. Carmon & Carmon Law

Office*, 452 F. Supp. 2d 1, 26 (D.D.C. 2006).  Whereas federal registration of a mark is prima

facie evidence that the registrant owns the mark and has the exclusive right to use the mark on

the goods and services specified in the registration, *see* 15 U.S.C. § 1057(b), an unregistered

mark is protectable under Section 43 of the Lanham Act only if a separate showing is made that

it would qualify for registration as a trademark.  *See Globalaw*, 452 F. Supp. 2d at 26; *see also*

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

"'Summary judgment may be granted in trademark matters where there is no protectable

trademark interest and no likelihood of confusion.'"  *Globalaw*, 452 F. Supp. 2d at 22-23

(quoting *Info. Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 50 (S.D.N.Y. 2005)).

　　　　PROLACTO moves for summary judgment on this count largely by relying on the so-

called famous mark doctrine to establish nationwide priority of its marks.  *See, e.g.*, Def.'s Mem.

Supp. Mot. Part. Summ. J., ECF No. 116-1, at 33-34.  Separately, PLM moves for summary

judgment limiting PROLACTO's trademark infringement claim to the Houston, Texas, market

on the bases that, first, the famous mark doctrine is not good law in this Circuit, and second,

PLM has priority use in Sonoma, California, which it claims is the only market besides Houston

---

[6]　　　　PLM asserts that PROLACTO incorrectly attempts to expand the PLM marks at
issue in the infringement count by raising two new marks in its motion for summary judgment.
*See* Pls.' Mem. Opp'n Def.'s Mot. Summ. J., ECF No. 120, at 27.  The Court agrees with PLM
that PROLACTO only pleaded in Count II an infringement claim as to PLM's three registered
marks.  The Court therefore limits its analysis to those marks properly pleaded.  *See DSMC, Inc.
v. Convera Corp.*, 479 F. Supp. 2d 68, 84 (D.D.C. 2007).

in which the companies actually compete. *See* Pls.' Mem. Supp. Mot. Part. Summ. J., ECF No. 114, at 30. The Court addresses each argument below.

          1. Validity Of A Trademark: Priority, Territoriality, And Foreign Use

      It is axiomatic that under United States trademark law, a party establishes valid ownership of a mark by being the first to use that mark in commerce. *See United States v. Steffens*, 100 U.S. 82, 85 (1879); *Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1347 (D.C. Cir. 2008); *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996); *see also Jaffe v. Simon & Schuster Inc.*, 3 U.S.P.Q.2d 1047, 1987 WL 124312, at *4 (S.D.N.Y. 1987) ("Ownership of a mark is not determined by the race to the Patent Office, but by the race to the market."). It also is a basic tenet of American trademark law that foreign use of a mark creates no cognizable right to use that mark within the United States. *See Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985). This is known as the "territoriality principle," through which "trademark rights exist in each country solely according to that country's statutory scheme." *Person's Co., Ltd. v. Christman*, 900 F.2d 1565, 1568-69 (Fed. Cir. 1990); *see also Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans, Inc.*, 511 F. Supp. 2d 1, 12 n.5 (D.D.C. 2007). As such, the "'[p]riority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world.'" *See Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1093 (9th Cir. 2004) (quoting 3 McCarthy on Trademarks § 29:2 (4th ed.) (internal footnote omitted)).

      There is, however, a narrow yet divisive disturbance to the force of the territoriality principle. This is the so-called "famous mark" or "well-known mark" doctrine, under which a mark may be deemed so well-known in a particular American market — despite no actual

commercial use in the market — that the territoriality principle is disregarded and priority is established through reputation rather than actual use in the United States. *See id.* at 1094. The gist of the famous mark doctrine is that "even those who use marks in other countries can sometimes — when their marks are famous enough — gain exclusive rights to the marks in this country." *Id.* at 1095.

But to date, this exception has been adopted only within one federal circuit following a decision by the U.S. Court of Appeals for the Ninth Circuit.[7] *See generally id.*; *see also Kerzner Int'l Ltd. v. Monarch Casino & Resort, Inc.*, 675 F. Supp. 2d 1029, 1039-40 (D. Nev. 2009) (applying *Grupo Gigante*). The Ninth Circuit panel justified embracing the doctrine in *Grupo Gigante* largely on policy grounds: "An absolute territoriality rule without a famous-mark exception would promote consumer confusion and fraud. Commerce crosses borders. In this nation of immigrants, so do people. Trademark is, at its core, about protecting against consumer confusion and 'palming off.'" *Grupo Gigante*, 391 F.3d at 1094. Before and since *Grupo Gigante*, however, no other federal circuit court has adopted such a doctrine, though the exception has been recognized in the past by the TTAB. *See generally, e.g.*, *The All England Lawn Tennis Club (Wimbledon) Ltd. v. Creations Aromatiques, Inc.*, 220 U.S.P.Q. 1069, 1983 WL 51903 (TTAB Sept. 27, 1983); *Mother's Rests. Inc. v. Mother's Other Kitchen, Inc.*, 218 U.S.P.Q. 1046, 1983 WL 51992 (TTAB June 2, 1983).

---

[7]    In *Grupo Gigante*, the Ninth Circuit adopted but did not apply the famous mark doctrine. Instead, the matter was remanded to the district court with instructions to reevaluate the facts in light of the test described in the circuit court's opinion, *see Grupo Gigante*, 391 F.3d at 1098-99, but the district court never reached the issue because the case settled. In addition, as is explained below, some district courts within the Second Circuit had adopted the doctrine, but those cases were overruled by the Second Circuit Court of Appeals' decision in *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135 (2d Cir. 2007).

The U.S. Court of Appeals for the Second Circuit, on the other hand, has explicitly rejected the doctrine. *See generally ITC Ltd. v. Punchgini, Inc*., 482 F.3d 135 (2d Cir. 2007). Prior to 2007, district courts within the Second Circuit differed as to whether the famous mark rule was included in federal trademark law. *Compare Empresa Cubana del Tabaco v. Culbro Corp.*, 70 U.S.P.Q.2d 1650, 2004 WL 602295 (S.D.N.Y. 2004) (finding that the mark COHIBA for premium Cuban cigars was sufficiently well-known in the United States to create rights under Lanham Act § 44(b) senior to a United States user of the same mark for cigars), *with Almacenes Exito S.A. v. El Gallo Meat Market, Inc.*, 381 F. Supp. 2d 324, 327 (S.D.N.Y. 2005) (explaining that the famous-known mark doctrine, while applicable under New York state law, is not a part of federal trademark law under the Lanham Act). In *ITC v. Punchgini*, the Second Circuit concluded that the Lanham Act lacked an express recognition of the famous mark doctrine as embodied in the Paris Convention and the Agreement on Trade-Related Aspects of Intellectual Property Rights. Because the operative American trademark statute did not recognize the rule in so many words, the court concluded that it was not part of federal law. In reaching this conclusion, the court rejected an argument that the famous mark rule is implicit in the structure of the Lanham Act, as advocated by Professor McCarthy. Finally, although the court acknowledged the strong policy rationales for incorporating the doctrine into federal law, it concluded that those arguments must be directed to Congress, not the courts.

Though there are robust arguments on both sides regarding the famous mark doctrine — including legitimate concerns over the need to protect famous international marks as commerce becomes increasingly globalized and interconnected — the Court need not decide whether to recognize the rule at this time because PROLACTO does not come close to establishing the necessary fame of its marks within the United States for the doctrine to apply. Without doubt,

absent the famous mark doctrine, foreign trademark owners are at risk of having their marks adopted in the United States by a seller who wants American consumers to believe they are buying the products of a well-known foreign company. But there must be a limit to the reach of such a doctrine, as not every foreign mark is famous enough within the United States to warrant legal protection.

PROLACTO spends significant portions of its already-extensive summary judgment briefing and statement of facts discussing the company's long history in Mexico and how PLM allegedly knew of this history when it adopted the relevant marks. But such facts are, of course, irrelevant even under the famous mark doctrine: although the rule alters the historical requirement that only use within the United States establishes priority, it still demands that a mark achieve some level of awareness within this country. Thus, even assuming this Court was to recognize the doctrine, prior use and fame within a foreign country are immaterial under the famous mark doctrine except insofar as that familiarity actually permeates into the United States at such a critical level that it qualifies for legal protection.

As the preeminent — and only — circuit court case approving of the doctrine, *Grupo Gigante* is a logical starting point on the threshold question of how much fame is required for the rule to apply. In that decision, the Ninth Circuit panel explained that

> where the mark has not before been used in the American market, the court must be satisfied, by a preponderance of the evidence, that a substantial percentage of consumers in the relevant American market is familiar with the foreign mark. The relevant American market is the geographic area where the defendant uses the alleged infringing mark.

*Grupo Gigante*, 391 F.3d at 1098. The majority opinion, however, provides little guidance as to what exactly constitutes a "substantial percentage" of consumers. The concurring opinion suggests that 50% consumer awareness is the proper baseline, following the analysis of Professor McCarthy. *See Grupo Gigante*, 391 F.3d at 1108 (Graber, J., concurring); *see also* 5 McCarthy

on Trademarks § 29:4 (4th ed.) (arguing that "'substantial percentage' is a reasonable rule and that this means that at least 50% of the relevant group is an appropriate measure of 'substantial' in this context").  But the majority did not adopt the concurrence's suggestion, expressing no opinion about what the test should be on remand.  *See Grupo Gigante*, 391 F.3d at 1098-99.

Nonetheless, it seems plausible that if the majority intended the standard to be 50%, it would have phrased the test not as a "substantial percentage of consumers," but as a "majority of consumers."  To be sure, the famous mark doctrine is a narrow deviation from the long-standing territoriality rule, which gestures at placing a relatively high burden on the party seeking to invoke it.  Thus, it appears to the Court that consistent with *Grupo Gigante*, the appropriate threshold percentage should be somewhere below, but still very close to, 50% of consumers in the relevant market if the doctrine were adopted here.  Of course, as with federal dilution, no specific percentage is required as a matter of law, but such a benchmark is helpful nonetheless for sorting out the haves from the have-nots.

Returning to the evidence in the present case, the Court agrees with PLM's characterization that PROLACTO appears to seek nationwide priority of its marks through the famous mark doctrine.  But PROLACTO fails to provide evidence demonstrating sufficient familiarity with the marks in any relevant United States market, let alone across the entire country.  Relevant factors in determining whether a substantial percentage of consumers are familiar with a foreign mark may be borrowed from the secondary meaning context and might include: survey evidence; direct consumer testimony; exclusivity, manner, and length of use of the mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant.  *See, e.g.*, *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999);

*see also Grupo Gigante*, 391 F.3d at 1098 (explaining that "such factors as the intentional copying of the mark by the defendant, and whether customers of the American firm are likely to think they are patronizing the same firm that uses the mark in another country" are of particular importance because "they bear heavily on the risks of consumer confusion and fraud, which are the reasons for having a famous-mark exception").

Although PROLACTO's marks may be recognized by some in the United States as associated with high-quality paletas and other frozen ice cream treats, there simply is insufficient evidence in the record demonstrating the extent of that fame nationwide — particularly given that PROLACTO only sells goods in three states. Without such evidence, no reasonable jury could conclude that consumers are familiar enough with PROLACTO's marks for the famous mark doctrine to apply on a national scale. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court reaches the same conclusion regarding individual markets within the United States, as *Grupo Gigante* permits. PROLACTO has not provided satisfactory market-by-market evidence from which the Court might conclude if, where, or when its marks achieved "substantial" familiarity such that the famous mark doctrine should apply. PROLACTO argues that it has provided "declarations, photographic, documentary and survey evidence, uncontradicted expert testimony, (and even the testimony of PLM's founders), that establish that [its] Marks are famous within the relevant consuming public here in the United States." Def.'s Mem. Opp'n Pls.' Mot. Summ. J., ECF No. 121, at 14. PROLACTO then cites extensively to its statement of facts. *See id.* (citing to "SOF 13-28, 37-41, 58, 68, 69, 85, 90, 101, 110, 113-116, 131-134, 151, 153, 160, 165-166, 169-176, 192, 195, 220"). The Court is not persuaded by PROLATO's argument.

First, the Court notes that "[j]udges 'are not like pigs, hunting for truffles buried in briefs' or the record." *Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Although PROLACTO makes an effort in its brief to cite parts of its voluminous summary judgment record, much of the evidence referenced therein is completely irrelevant to resolving the present question under the famous mark doctrine and thus does not reduce the Court's burden to uncover the important facts on its own, a considerable task given the amount of evidence submitted for this motion.[8]

Second, the few facts PROLACTO does cite that actually relate to the company's presence within the United States do not establish that its marks have achieved awareness among a "substantial percentage" of relevant consumers in any given market. For example, evidence that PROLACTO has licensed its marks in West Palm Beach, Florida, since April 2001 may go to priority use in that market, but without more information, it says nothing persuasive about consumers' overall familiarity with the marks before or after that date. *See* Def.'s Stmt Facts, ECF No. 116-2, at 32, No. 58; *see also, e.g.*, *id*. at 38, No. 68 (stating that PROLACTO's licensed store in Homestead, Florida, was featured on Telemundo); *id*. at 44-45, No. 85 (stating that in July 2003 an article appeared in the Houston Herald-Coaster about PROLACTO); *id*. at 49-50, No. 101 (stating that in 2011 the Napa Sun named a PROLACTO licensee's store as the

---

[8]     For example, many of PROLACTO's citations here and elsewhere in its briefs relate to the company's history in Mexico or its Mexican trademarks, yet, absent carryover of goodwill into the United States, that background is irrelevant as a matter of law to a trademark infringement claim. Throwing all available facts at the wall through a string cite and hoping something sticks is not a preferred strategy for preparing a motion for summary judgment. *Cf. Hennighan v. Insphere Ins. Solutions, Inc.*, No. 13-CV-00638, 2014 WL 1600034, at *6 n.2 (N.D. Cal. Apr. 21, 2014) (criticizing counsel for providing string cites with as many as fifty to one hundred factual citations without parenthetical explanations, some of which had "no apparent relation to the proposition," and explaining that "[w]hile counsel may suppose that he has made a record for himself simply by throwing a spaghetti of facts against the judicial wall and seeing what disputed material fact sticks, he is wrong").

best for ice cream, and the licensee's products have received extremely favorable reviews on third party food websites).  The famous mark doctrine is narrow and places a high burden on the party seeking its protection.  PROLACTO does not come close to meeting that burden in any market, and the Court therefore need not determine whether the doctrine should be recognized because the facts of this case are insufficient to warrant further judicial inquiry.

2.  Validity Of A Trademark: Priority And Actual Use In The United States

Because PROLACTO fails to demonstrate substantial familiarity with its marks within any relevant American market such that the famous mark doctrine might apply, its trademark infringement claim, like that of the thousands of plaintiffs before it, is constrained by the territoriality doctrine, and as such, the actual commercial use of the marks within the United States.  *See John C. Flood of Va., Inc. v. John C. Flood, Inc.*, 642 F.3d 1105, 1109 (D.C. Cir. 2011) ("[A] party establishes ownership of a mark by being the first to use the mark in commerce." (citation and quotation omitted)); *see also Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 109 (E.D.N.Y. 2012) ("[The territoriality] rule applies with equal force to protect a company that outright copies a mark that has been previously used abroad but that is not famous in the United States, uses the copied mark on goods sold in the United States, and then claims to have priority in the mark in the United States over the foreign originator."); 5 McCarthy on Trademarks § 26:52 (4th ed.) (explaining that when a claim is brought under Section 43(a), "territorial rights should be determined by reference to federal common law").

With exception of the famous mark doctrine, it is firmly established that the adoption and use of an unregistered trademark in a limited market within the United States does not create exclusive ownership of that mark in all geographic markets.  *See Proriver, Inc. v. Red River*

*Grill, LLC*, 27 F. Supp. 2d 1, 4 (D.D.C. 1998). Instead, the first party to use a mark on a product or service in a particular market, known as the senior user, acquires rights only for those territories in which it actually uses its mark, called the "zone of actual market penetration," or into which it might naturally expand, sensibly called the "zone of natural expansion." *See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1023 (11th Cir. 1989); *see also Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1127 (C.D. Cal. 2003) ("A senior user of a trademark is entitled to assert its trademark rights in all areas in which it has legally sufficient market penetration and a zone of natural expansion."). Good faith junior users who later use the same or similar mark on alike products or services also may establish rights to the mark provided there is no competitive overlap with the senior user. *See Tally-Ho*, 889 F.2d. at 1023. This is labeled the *Tea Rose-Rectanus* doctrine after two landmark Supreme Court cases. *See generally United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918); *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916) (the "Tea Rose" case).

PLM seeks summary judgment narrowing PROLACTO's trademark infringement theory for the LA INDITA MICHOACANA and Indian Girl designs to a single American market: Houston, Texas. *See* Pls.' Mem. Supp. Mot. Part. Summ. J., ECF No. 114, at 30. PROLACTO does not directly respond to PLM's argument and instead appears to rely primarily on the famous mark doctrine to establish nationwide priority for its marks. But because PROLACTO fails to provide sufficient evidence to trigger a famous mark defense — were this Court even to recognize such a rule in the first place — PROLACTO's response to PLM's motion largely misses the mark, as it remains only commercial use in the United States, not mere fame, that establishes priority within a market.

Because commercial use of a mark in one market does not automatically create priority to use that mark in all other markets, a market-by-market analysis is required to determine priority in the potential markets on which PLM could have infringed. *Cf. Echo Drain*, 307 F. Supp. 2d at 1128 (explaining that "even if [plaintiff] was able to prove that it had a protectable trademark, its rights in that mark would not extend beyond the Dallas-Fort Worth, Texas area"). PLM argues that there only are three potential markets at issue for possible trademark infringement claim: Sonoma, California; Houston, Texas; and Florida. The Court agrees that these are the only markets potentially at issue given PROLACTO's limited commercial use of its marks in the United States through various licensing agreements.[9]

### a. Florida

Regarding the Florida market, PLM asserts that it has never sold or distributed its products within the state, so PROLACTO cannot sustain a claim of infringement against PLM in the market. *See* Pls.' Stmt Facts, ECF No. 114, at 63, No. 4. PROLACTO disputes this fact because PLM hosted a booth at a trade convention in Florida in 2012, where PROLACTO asserts, without citation to any evidence, that PLM gave away samples of its products. *See* Pls.' Response Def.'s Obj. Evid., ECF No. 126, at 9. The Court is aware of PLM's attendance at the

---

[9]    Separately, PLM argues in its opposition brief that PROLACTO may have abandoned all potential United States trademark rights through naked licensing. *See* Pls.' Mem. Opp'n Def.'s Mot. Summ. J., ECF No. 120, at 37-39. "If a trademark owner allows licensees to depart from its quality standards, the public will be misled, and the trademark will cease to have utility as an informational device." *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997) (citing *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977)). "When this happens, a trademark-holder may involuntarily abandon the mark through so-called 'naked' licensing." *Geneva Int'l Corp. v. Petrof, Spol, S.R.O.*, 608 F. Supp. 2d 993, 1004 (N.D. Ill. 2009). The Court agrees that a genuine dispute of fact exists as to whether PROLACTO engaged in naked licensing, as there is insufficient undisputed evidence in the record regarding critical issues such as royalty payments and quality control to make such a determination at this time, particularly given that PROLACTO appears to have relied only on oral licenses for many years.

convention in Florida, having denied PROLACTO's motion for a temporary restraining order preventing PLM from attending the event. *See* Order, ECF No. 63. As the Court noted in the Memorandum Opinion accompanying its Order, PLM "will not be selling their wares during the convention." Mem. Op., ECF No. 64, at 5. Further, as the Court also explained in its Opinion, the convention was closed to the public and most participants were not based in Florida. *See id.* at 6-7. Because PROLACTO does not provide evidence demonstrating PLM's commercial use of the marks in Florida, the Court must agree with PLM that there are no grounds for a trademark infringement claim based in that market.

### b. Northern California

Turning to California, PROLACTO provides evidence that through a licensing agreement, "[i]n July 2009, Teresita Fernandez opened a Michoacana Natural Ice Cream store in Sonoma, California which makes and sells paletas, ice cream and drinks on site." Def.'s Stmt Facts, ECF No. 116-2, at 48, No. 95. PROLACTO also admits that in 1991, PLM "started an ice cream business called 'Paleteria Michoacana' as an informal partnership, in the city of Turlock, in Northern California." *Id*. at 53, No. 111; *see also* Pls.' Resp. Def.'s Stmt Facts, ECF No. 120-1, at 98-99, No. 128. In addition, PLM registered its two Indian Girl marks — Nos. 2,905,172 and 2,968,652 — in November 2004 and July 2005, respectively, and LA INDITA MICHOACANA was registered in February 2007, with undisputed first use at least as early as February 2005. *See, e.g.*, TTAB Decision at *9. Federal registration provides the registrant with "a nationwide right of exclusive use in the mark, subject only to those entities that used a similar mark prior to the registrant in a remote geographic area." *Solutech, Inc. v. Solutech Consulting Servs., Inc.*, 153 F. Supp. 2d 1082, 1087 (E.D. Mo. 2000) (citing 15 U.S.C. §§ 1115(a) & 1065); *see also Dudley v. Healthsource Chiropractic, Inc.*, 883 F. Supp. 2d 377, 394 (W.D.N.Y. 2012)

("Federal registration is required to secure nationwide priority in a mark." (citing 15 U.S.C. § 1057(c)). Because there is no evidence that PROLACTO used these marks anywhere in northern California prior to 2009, the undisputed facts show that PLM has priority in the market.

### c. Houston, Texas

Finally, PLM argues that there exists a genuine dispute of material fact regarding priority in the Houston, Texas, market, particularly as to when PROLACTO actually first used the marks on products in that area. *See* Pls.' Mem. Supp. Mot. Part. Summ. J., ECF No. 114, at 18. Evidence shows that PLM began selling its products in the Houston market sometime in 2005. *See* Pls.' Stmt Facts, ECF No. 114, at 62-63, No. 3. The parties do not dispute that PROLACTO, through a licensee, opened a store in Rosenberg, Texas, a suburb of Houston, in October 2002. *See* Pls.' Resp. Def.'s Stmt Facts, ECF No. 120-1, at 74, No. 83. It is contested, however, when that licensee actually started using the marks in the store and on products, as well as when exactly between 2004 and 2006 other PROLACTO licensee stores were opened in the Houston area and when those stores first used the marks. *See, e.g.*, *id*. at 75-77, Nos. 84, 86. The Court therefore finds that a genuine dispute exists about priority within the Houston area. As such, the Court cannot grant summary judgment as to infringement in the Houston market, and the issue remains suitable for trial.[10]

---

[10] PROLACTO repeatedly argues that the Court should deny PLM any rights to these marks because it allegedly was aware of their use in Mexico but adopted them anyway. *See, e.g.*, Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 116-1, at 35. The case law, however, simply does not support PROLACTO's argument that awareness of foreign use creates bad faith adoption within the United States as a matter of law. *See, e.g.*, *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 386 n.5 (4th Cir. 2003) ("Even if the plaintiff companies knew of SBM's use of its foreign mark in connection with services rendered in Monaco, this does not render the plaintiff companies bad-faith users of the mark in the United States or preclude them from using the mark in the United States."); *Person's Co., Ltd. v. Christman*, 900 F.2d 1565, 1570 (Fed. Cir. 1990) ("[A]n inference of bad faith requires something more than mere knowledge of prior use of a similar mark in a foreign

### 3. Validity Of A Trademark: Distinctiveness And Secondary Meaning

Even if a party establishes priority in a specific market through commercial use, that alone does not entitle the mark to protection under the Lanham Act. *See Fernandez v. Jones*, 653 F. Supp. 2d 22, 29 (D.D.C. 2009); *Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1, 26-28 (D.D.C. 2006). Instead, a party also must demonstrate that the mark is either inherently distinctive, in which its intrinsic nature serves to identify its particular source, or has acquired a secondary meaning in the minds of consumers. *See Globalaw*, 452 F. Supp. 2d at 26; *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) ("To be entitled to protection, a mark must be sufficiently 'distinctive' to distinguish the registrant's goods from others.").

---

country."); *Buti v. Impressa Perosa, S.R.L.*, 935 F. Supp. 458, 473 (S.D.N.Y. 1996) ("Impressa Perosa has not established Buti's bad faith merely by asserting Buti's knowledge of Impressa Perosa's prior use of the Fashion Cafe name in Italy."). Of course, it remains an open question, which the Court cannot decide today on the available evidence, whether PLM's adoption of the marks in a particular market was based on PROLACTO's prior use elsewhere in the United States such that PLM cannot be said to have acted in "good faith," as the *Tea Rose-Rectanus* doctrine requires. *See Emergency One, Inc. v. Am. Fire Eagle Engine Co., Inc.*, 332 F.3d 264, 271 (4th Cir. 2003).

Further, it remains an unresolved factual issue whether PLM actually intended to copy *PROLACTO's* marks, or whether PLM merely sought to associate its products with marks that it believed — rightly or wrongly — were used indiscriminately by a variety of companies without any one, recognized source. Indeed, though a buyer need not know the corporate identity of the source, *see Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 1203 (Fed. Cir. 1994), a mark must designate a single source of the product at issue in order to acquire trademark protection. *See Erchonia Corp. v. Bissoon*, 410 Fed. Appx. 416, 418 (2d Cir. 2011) ("[S]econdary meaning is established only in cases where an ordinary buyer associates the mark in question with a single source, though that source may be anonymous."); 2 McCarthy on Trademarks § 15:5 (4th ed.) (explaining that a trademark acquires "secondary meaning" when it establishes "a mental association in buyers' minds between the alleged mark and a single source of the product"). Here, PLM argues that the marks in question do not identify any one source of paletas in Mexico or the United States, but rather are used by countless companies. If PLM's position turns out to be true, PROLACTO may indeed have no protectable trademark rights in many of the marks at issue in this case. And if PROLACTO has no rights in the marks, many, if not all, of its claims against PLM would fail. Finally, the Court notes that the exact contours of the Houston market also must be determined at trial.

Courts have identified four general categories for classifying marks: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *See Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1039 (D.C. Cir. 1989). The classifications can be described in the following manner:

> A mark is generic if it is a common description of products [or services] and refers to the genus of which the particular product [or service] is a species. A mark is descriptive if it describes the product's [or service's] features, qualities, or ingredients in ordinary language or describes the use to which the product [or service] is put. A mark is suggestive if it merely suggests the features of the product [or service], requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods [or services]. An arbitrary mark applies a common word in an unfamiliar way. A fanciful mark is not a real word at all, but is invented for its use as a mark.

*Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004) (citation and quotation omitted; alteration in original). These categories "reflect both the eligibility for protection and the degree of protection accorded" to a particular mark. *Id.* But as this Circuit has recognized, "[t]hese categories, like tones in a spectrum, tend to blur at the edges and merge together. The labels are more advisory than definitional, more like guidelines than pigeonholes. Not surprisingly, they are somewhat difficult to articulate and to apply." *Blinded Veterans Ass'n*, 872 F.2d at 1039 (citation and quotation omitted).

Categorization of a mark is a factual question. *See Donchez*, 392 F.3d at 1216 (citing *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 215 (2d Cir. 2003)). "The fact-finder is not the designated representative of the purchasing public, and the fact-finder's own perception of the mark is not the object of the inquiry. Rather, the fact-finder's function is to determine, based on the evidence before it, what the perception of the purchasing public is." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999); *see also Bayer Co. v. United Drug Co.*, 272 F. 505, 509 (S.D.N.Y. 1921) (L. Hand, J.) ("The single question, as I view it, in

all these cases, is merely one of fact: What do the buyers understand by the word for whose use the parties are contending?").

The correct categorization, however, is extremely significant as a matter of law: "[i]f a term is generic (the common name for a product or service), it is ineligible for protection" because "[t]he public has an inherent right to call a product or service by its generic name." *U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517, 523 (4th Cir. 2002) (citation omitted); *see also Blinded Veterans Ass'n*, 872 F.2d at 1040 ("The threshold issue for this court is whether 'blinded veterans' is generic, and therefore unprotectable as a trademark[.]").  By contrast, fanciful, arbitrary, and suggestive marks are deemed inherently distinctive and therefore receive the greatest protection against infringement.  *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996); *Libya v. Miski*, 889 F. Supp. 2d 144, 151 (D.D.C. 2012); *see also* 2 McCarthy on Trademarks § 11:1 (4th ed.).  Finally, "[a] descriptive mark may be eligible for protection, but only if it has acquired a 'secondary meaning' in the minds of the public." *U.S. Search*, 300 F.3d at 523; *see also Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079, 1087-88 (C.D. Cal. 2006) ("Descriptive marks, because of their particular placement — one step above 'generic' — on the spectrum of distinctiveness, require proof of secondary meaning in order to be protectable." (internal quotation omitted)).

It is somewhat unclear what category the parties believe the marks fall into, but given their focus on the secondary meaning inquiry, it appears that they both agree that the marks are not inherently distinctive and instead are better defined as geographically descriptive.  A question therefore remains regarding whether PROLACTO has achieved secondary meaning for its marks such that they are descriptive and protectable, or whether the marks are generic such that no secondary meaning — and thus no trademark protection — exists.

Establishing secondary meaning requires "proof that the public recognizes only one source of the product or service." *Blinded Veterans*, 872 F.2d at 1040. "[A] term has acquired secondary meaning when 'the primary significance of the term in the minds of the consuming public is not the product but the producer.'" *Id.* (quoting *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938)); *see also Fernandez v. Jones*, 653 F. Supp. 2d 22, 29-30 (D.D.C. 2009) ("'The prime element of secondary meaning is a mental association in buyers' minds between the alleged mark and a single source of the product.'" (quoting 2 McCarthy on Trademarks § 15:5 (4th ed. 2009)). "To acquire a secondary meaning in the minds of the buying public, a labelled product, when shown to a prospective customer, must prompt the reaction, 'That is the product I want because I know that all products with that label come from a single source and have the same level of quality.'" *Id.* (quoting 2 McCarthy on Trademarks § 15:11 (4th ed. 2009)).

In this Circuit, commonly considered evidence for ascertaining whether secondary meaning has attached to a mark includes survey evidence, the length and manner of use of the name, the nature and extent of advertising and promotion of the name, and instances of actual confusion. *See Miski*, 889 F. Supp. 2d at 155. PROLACTO does not directly sell or advertise products within the United States and instead relies on licensees in a limited number of markets who use the marks. *See* Pls.'s Stmt Facts, ECF No. 114, at 66, No. 18. The scale of advertising by the licensees is not entirely clear based on the facts PROLACTO provides, although it appears to be limited and sporadic at best. The parties also dispute the length of time that PROLACTO, through its licensees, has sold products bearing the relevant marks in the United States, and in Texas in particular. *See, e.g.*, Pls.' Resp. Def.'s Stmt Facts, ECF No. 120-1, at 50-60, Nos. 51-61.

Regardless, as is often the case, the most helpful factors for determining secondary meaning become survey evidence and instances of actual consumer confusion. *See Globalaw*, 452 F. Supp. 2d at 41 ("Courts have consistently found that an expert survey of purchasers can provide the most persuasive evidence of secondary meaning." (internal citation and quotation omitted)); *see also Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 39 (1st Cir. 2001) (explaining that surveys are the "preferred" method of demonstrating secondary meaning); *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir. 1983) (explaining that "survey evidence is the most direct and persuasive way of establishing secondary meaning").

PROLACTO has provided some evidence, including consumer declarations, showing awareness that its marks emanated from a single source, but PLM disputes the probative value of this evidence for the secondary meaning inquiry. *See, e.g.*, Pls.' Resp. Def.'s Stmt Facts, ECF No. 120-1, at 154, No. 195(d). PROLACTO also cites expert testimony from Chef Fany Gerson comparing the quality of its goods to PLM's, but it is unclear how this information is suggestive of secondary meaning. *See* Def.'s Stmt Facts, ECF No. 116-2, at 96-98, Nos. 215-17. Finally, PROLACTO argues that its expert report from Dr. Jacob Jacoby demonstrates secondary meaning, but the Court finds that this evidence is not probative of whether consumers identify PROLACTO as the single source of the goods, which secondary meaning requires.[11]

---

[11]    PLM has filed a motion *in limine* to exclude Dr. Jacoby's expert report, survey, and testimony under Federal Rules of Evidence 403 and 702 and *Daubert*. *See generally* Pls.' Mot. Exclude Expert Report, ECF No. 119. PROLACTO retained Dr. Jacoby to design and conduct a trademark survey to test for customer confusion and deception between the companies' respective products. As an initial matter, the Court appreciates PLM's concerns about the methodology Dr. Jacoby employed in conducting the survey. The Court, however, does not find that the report necessitates exclusion under Rule 702 and *Daubert*. The Court also finds that the survey need not be excluded under Rule 403 because the prejudicial effect of the survey at this stage of proceedings is minimal at best. *Cf. Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 428 (7th Cir. 2000) (explaining that "while it is not unheard of to exclude evidence under Rule 403 at the summary judgment stage, normally the balancing process contemplated by

Because the evidence points both ways, the Court concludes that substantial questions of material fact exist regarding the secondary meaning issue which a jury must decide. *See Luv N' Care, Ltd. v. Walgreen Co.*, 695 F. Supp. 2d 125, 132 (S.D.N.Y. 2010) (denying motion for summary judgment when evidence regarding secondary meaning factors revealed triable issues of fact for the jury); *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 312 F. Supp. 2d 195, 209 (D. Conn. 2004) (same). Finally, because the Court is denying both parties' motions for summary judgment at this stage, it will not address the third element of an infringement claim, likelihood of confusion, because a determination of that issue will not alter the Court's conclusion.

**D. Counterclaim Count II: False Designation, Passing Off, False Association, And Unfair Competition Under Lanham Act Section 43(a)**

PROLACTO moves for summary judgment on its false designation, passing off, false association, and unfair competition theories in Count II of the counterclaim. As this Court

---

that rule is best undertaken at the trial itself" (internal citation omitted)); *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 274 (3d Cir. 1991) (noting that "excluding evidence under Fed. R. Evid. 403 at the pretrial stage is an extreme measure"). The Court therefore denies PLM's motion to exclude at this time.

The Court, however, will take into consideration the fact that it finds the survey to have limited probative value in deciding most of the questions at issue today. Many of the survey's questions were leading and others demonstrated little more than respondents' ability to read and comprehend the stimuli. Indeed, this is not the first time that the probative value of one of Dr. Jacoby's surveys has been called into question by a court. *See, e.g., Steak n Shake Co. v. Burger King Corp.*, 323 F. Supp. 2d 983, 994 (E.D. Mo. 2004) (explaining that although "the Jacoby study is slightly probative of the issue of secondary meaning," "it is not worth the great weight that Steak n Shake argues it carries"); *Gillette Co. v. Norelco Consumer Products Co.*, 69 F. Supp. 2d 246, 263 (D. Mass. 1999) (explaining that "the probative value of the Jacoby Study is diminished" because it relied on the target audience as the universe, rather than a universe of actual or potential purchasers); *Hershey Foods Corp. v. Mars, Inc.*, 998 F. Supp. 500, 519 (M.D. Pa. 1998) (discounting Dr. Jacoby's results because of confusing stimuli used in the survey); *Jim Beam Brands Co., Inc. v. Beamish & Crawford, Ltd.*, 852 F. Supp. 196, 199 (S.D.N.Y. 1994) ("Dr. Jacoby's study however, I find to have questionable value because his questions were leading.").

explained in *Globalaw Ltd. v. Carmon & Carmon Law Office*, although these claims "may appear to internally allege many different grievances — *i.e.*, trademark infringement, false designation of origin, passing off, and unfair competition — courts have announced that the elements for each of the aforementioned causes-of-action mirror those for a claim of trademark infringement." 452 F. Supp. 2d 1, 26 (D.D.C. 2006) (citations omitted). Thus, because the Court has denied summary judgment as to the trademark infringement claim, it must deny summary judgment on these related theories as well. *See, e.g.*, *E.W., LLC v. Rahman*, 896 F. Supp. 2d 488, 505 (E.D. Va. 2012) (denying summary judgment on passing off and false designation of origin claims after having denied judgment on trademark infringement and unfair competition claims).

### E.  Counterclaim Count II: False Advertising Under Lanham Act Section 43(a)

PROLACTO charges PLM with false advertising in Count II of the counterclaim. Under Section 43(a) of the Lanham Act,

> any person who … uses in commerce any … false or misleading description of fact, or false or misleading representation of fact, which … in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities … shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.[12]

15 U.S.C. § 1125(a)(1)(B). By way of background, in its motion for summary judgment PROLACTO sets forth numerous statements that appear either on PLM's product packaging or PLM's website. A few examples of these allegedly false or misleading advertisements include:

---

[12]  Although false advertising is proscribed within the same section of the Lanham Act as trademark infringement, it involves separate elements that require independent analysis, unlike false designation of origin, passing off, and unfair competition. *Cf. Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072 (9th Cir. 2014), as amended (Mar. 11, 2014) ("These tests [for false advertising and trademark infringement] are distinct, and the district court abused its discretion when it did not separately consider the false advertisement claim.").

- Using on packaging the name "LA INDITA MICHOACANA" with its ice cream products.

- Using on packaging the Indian Girl design with its ice cream products.

- Including on PLM's website indicia of Mexico, including pictures of places in Mexico, a PROLACTO-affiliated store in Mexico, a statute in the town of Tocumbo, Mexico, and maps of Mexico in its websites and catalogs.

- Claiming on PLM's website that PLM shares its name with, and otherwise implying that it is affiliated with, 15,000-20,000 stores in Mexico.

- Including on packaging pictures of PLM's products that do not accurately represent the products inside.

*See* Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 116-1, at 14-15.[13]

Once again, both PROLACTO and PLM move for summary judgment on this cause of action. Specifically, PLM argues that summary judgment is appropriate for two reasons: first, PROLACTO has failed to demonstrate that the statements are material to consumer decision making; and second, PROLACTO has not demonstrated any injury from the advertisements. *See* Pls.' Mem. Supp. Mot. Part. Summ. J., ECF No. 114, at 53. In turn, PROLACTO argues that no genuine dispute of material fact exists regarding each element, and the Court therefore should grant summary judgment in its favor. *See* Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 116-1, at 13-21.

---

[13]    PLM asserts that many of the advertisements PROLACTO cites in its motion for summary judgment were not properly alleged in the counterclaim count for false advertising. The Court finds, however, that the statements addressed by PROLACTO in its motion were sufficiently pleaded such that PLM had proper notice regarding the substance of PROLACTO's claim. Nonetheless, it is undisputed that PLM no longer uses the following advertisement, which was one basis for PROLACTO's false advertising claim: "La Indita Michoacana is a family company founded in Tocumbo Michoacán in the 1940's. Since then we've continued to make premium ice cream, fruit bars and drinks that give the flavor and tradition of Mexico. Distinguish us by our logo." Pls.' Resp. Def.'s Stmt Facts, ECF No. 120-1, at 111-12, Nos. 155, 157. Because, for the reasons explained below, PROLACTO is entitled only to injunctive relief, and because injunctive relief would have no effect as a remedy against PLM's discontinued advertisement, this aspect of PROLACTO's claim is dismissed as moot.

1. Laches And Statute Of Limitations

In its opposition to PROLACTO's motion for summary judgment, PLM asserts that the false advertising claim is barred by the doctrine of laches. *See* Pls.' Mem. Opp'n Def.'s Mot. Summ. J., ECF No. 120, at 52. In determining whether a Lanham Act claim was filed in a timely manner, "courts apply the equitable doctrine of laches because the Lanham Act does not contain a statute of limitations." *Gaudreau v. Am. Promotional Events, Inc.*, 511 F. Supp. 2d 152, 158 (D.D.C. 2007) (citation and quotation omitted). "Federal courts have traditionally 'referred to analogous state statutes of limitations to determine whether a presumption of laches should apply.'" *Id.* (quoting *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821 (7th Cir. 1999)); *see also Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) ("[P]rior to the running of the most closely analogous state statute of limitations[,] there is no presumption of laches and the burden remains on the defendant to prove the defense.").

Relying on *Gaudreau*, PLM asserts that the District of Columbia's three-year default statute of limitations applies to PROLACTO's claim. *See* D.C. Code Ann. § 12-301(8). *Gaudreau*, however, involved a false designation of origin claim, not false advertising. *See Gaudreau*, 511 F. Supp. 2d at 158. Nonetheless, numerous federal courts have found, and this Court agrees, that the analogues provision for a false advertising claim is the state's statute of limitations for fraud. *See, e.g.*, *Conopco*, 95 F.3d at 192 (finding that "New York's six year fraud statute" applies to Lanham Act false advertising claims); *ThermoLife Int'l, LLC v. Gaspari Nutrition, Inc.*, 871 F. Supp. 2d 905, 911 (D. Ariz. 2012) (finding that the proper statute of limitations for a Lanham Act false advertising claim is "Arizona's three year fraud limitations period"); *PBM Products, LLC v. Mead Johnson Nutrition Co.*, 678 F. Supp. 2d 390, 404 (E.D. Va. 2009) (finding that "[t]he analogous state limitation period for [a Lanham Act false

advertising claim] is the limitations period under Virginia's action for fraud, which has a two year limitations period"). Because D.C. Code § 12-301(8) applies to fraud claims, the appropriate analogous statute of limitations claim for PROLACTO's false advertising count is three years. *See Kettey v. Saudi Ministry of Educ.*, No. CV 13-745, 2014 WL 2919152, at *7 (D.D.C. June 27, 2014) ("The District of Columbia statute of limitations on fraud claims is three years." (citing D.C. Code § 12-301(8)).

Of course, "'whether a Lanham Act claim has been brought within the analogous state statute of limitations is not the sole indicator of whether laches may be applied in a particular case.'" *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 139 (D.D.C. 2003) (quoting *Hot Wax*, 191 F.3d at 821-22). Instead, the assertion of a laches defense also "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 47 (D.C. Cir. 2005) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002)). PLM, however, makes no argument as to which advertisements were made when, or about when PROLACTO first became aware that a cause of action may exist based on the advertisings. The Court therefore cannot evaluate whether the presumption of laches applies under the three-year statute of limitations. Further, PLM does not address the required elements for a laches defense as to PROLACTO's Section 43(a) false advertising claim. Accordingly, the Court cannot grant summary judgment on this issue. *Cf. Nat'l Postal Prof'l Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 29-30 (D.D.C. 2006) (denying motion to dismiss when party failed to engage in analysis or provide support for its argument regarding standing); *M.K. v. Tenet*, 99 F. Supp. 2d 12, 25 (D.D.C. 2000) (denying motion to dismiss when "defendants have stated a legal proposition that may be applicable" but "fail to apply the law which they cite in support of their argument").

2. The New *Lexmark* Test For Standing

PLM next argues that PROLACTO lacks standing to assert a false advertising claim under the Supreme Court's recent decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).[14] Recognizing a circuit split over how to address standing for Lanham Act claims, the Supreme Court rejected what it referred to as "antitrust standing or the [*Associated General Contractors*] factors," the "categorical test," and the "reasonable interest approach." *Id.* at 1385 (internal quotation marks omitted). Instead, the Court held that "a direct application of the zone-of-interests test and the proximate-cause requirement supplies the relevant limits on who may sue" under Section 43(a). *Id*. at 1391. Thus, under *Lexmark*, standing is determined by a two-step process: a zone of interests inquiry and a proximate cause analysis. *Id.*

First, analysis of the zone of interests under Section 43(a) requires a court to employ the "traditional tools of statutory interpretation." *Id.* at 1387. As the Supreme Court explained in *Lexmark*, the zone of interests is created by the statute and informed by the Lanham Act's statement of purpose, which is codified at 15 U.S.C. § 1127. *See id*. at 1388-89. The Lanham Act's statement of purpose leaves little doubt as to the protected interests under the statute:

> The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce

---

[14] The Court recognizes that *Lexmark* was decided after the parties filed their motions for summary judgment, and the issue was not raised until PLM's reply brief. The Court is satisfied, however, that it should address the *Lexmark* question at this stage for two reasons. First, this Circuit treats prudential standing as "a jurisdictional issue which cannot be waived or conceded." *Animal Legal Defense Fund, Inc. v. Espy*, 29 F.3d 720, 723 n.2 (D.C. Cir. 1994); *see also Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 674 (D.C. Cir. 2013). Second, the parties already have extensively briefed the merits of PROLACTO's false advertising claim, which overlaps significantly with resolving the standing question. As such, supplemental briefing on the question was not required.

> against unfair competition; to prevent fraud and deception in such commerce by
> the use of reproductions, copies, counterfeits, or colorable imitations of registered
> marks; and to provide rights and remedies stipulated by treaties and conventions
> respecting trademarks, trade names, and unfair competition entered into between
> the United States and foreign nations.

*Id.* at 1389 (quoting 15 U.S.C. § 1127).  Thus, the Supreme Court concluded that the Lanham

Act creates a zone of interests encompassing those who "allege an injury to a commercial

interest in reputation or sales."  *Id*. at 1390.

Second, a party only has standing under the Lanham Act if its "injuries are proximately

caused by violations of the statute."  *Id*.  Proximate cause requires that the "alleged harm … is

[not] 'too remote' from the defendant's unlawful conduct," and that the "harm alleged has a

sufficiently close connection to the conduct the statute prohibits."  *Id*.  Thus, regarding a false

advertising claim, a party "must show economic or reputational injury flowing directly from the

deception wrought by the defendant's advertising; and that that occurs when deception of

consumers causes them to withhold trade from the plaintiff.  That showing is generally not made

when the deception produces injuries to a fellow commercial actor that in turn affect the

plaintiff."  *Id.* at 1391.

Finally, to establish standing at the summary judgment stage a party cannot "rest on …

mere allegations, but must set forth by affidavit or other evidence specific facts, which for

purposes of the summary judgment motion will be taken to be true."  *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 561 (1992) (internal quotations and citation omitted).  In other words,

"[a]t summary judgment, [the party's] burden is to show that a reasonable juror could find he has

standing."  *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012) (citations omitted).

Applying the *Lexmark* analysis and for the reasons discussed in more detail below, the

Court finds that PROLACTO has provided sufficient evidence to demonstrate commercial injury

at the summary judgment stage, at least insofar as it has offered evidence that is possesses a

business reputation and goodwill within the United States that PLM allegedly attempts to usurp

for its own benefit, as well as the possibility of lost sales and customers.[15] *Cf. First Mariner*

*Bank v. Resolution Law Grp., P.C.*, No. CIV-12-1133, 2014 WL 1652550, at *21 (D. Md. Apr.

22, 2014) (finding standing under *Lexmark* when "Plaintiff has alleged that as a result of

Defendants' false advertising, Plaintiff 'has incurred, and likely will continue to incur,

substantial commercial injury in the form of lost sales, loss of market share, and damage to

reputation and good will.'").  Further, the Court finds that PROLACTO has provided sufficient

evidence from which a reasonable juror could conclude that those injuries, if proven at trial to

exist, were proximately caused by PLM's advertisements.  The Court therefore concludes that

PROLACTO has provided sufficient facts to survive summary judgment on the standing

question.

### 3.  Falsity, Actually Or Likely Deceptive, And Interstate Commerce

Moving to the merits of PROLACTO's claim, to prevail on a Lanham Act false

advertising theory a party must show that the advertising was (1) false or misleading, (2) actually

or likely deceptive, (3) material in its effect on buying decisions, (4) connected with interstate

commerce, and (5) actually or likely injurious.  *See Aristotle Int'l, Inc. v. NGP Software, Inc.*,

714 F. Supp. 2d 1, 6 (D.D.C. 2010) (citations omitted).  In its motion for summary judgment,

PROLACTO explains how those advertisements described above and others discussed in the

---

[15]     PROLACTO's situation, as a commercial competitor to PLM, is distinguishable from that of a consumer or retailer who purchased PLM's product and subsequently attempted to bring a Lanham Act false advertising claim, as the consumer or retailer would lack the necessary commercial injury for standing.  *See Lexmark*, 134 S. Ct. at 1390 ("A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act — a conclusion reached by every Circuit to consider the question….  Even a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis." (internal citations omitted)).

briefing are literally false, or at the very least misleading to consumers; how they are deceptive; and how they are connected with interstate commerce. *See* Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 116-1, at 15-19. PLM does not make an argument or provide any evidence contradicting PROLACTO's assertions regarding these elements, and it therefore has conceded the issues. *See Magliore v. Brooks*, 844 F. Supp. 2d 38, 43 (D.D.C. 2012) (explaining that a party concedes an issue at summary judgment "by completely failing to address or rebut" the moving party's arguments).

### 4. Materiality

The materiality prong requires PROLACTO to demonstrate that PLM's falsities or misrepresentations were "likely to influence the purchasing decision" of consumers.[16] *Aristotle Int'l*, 714 F. Supp. 2d at 9 (citation and quotation omitted); *3M Innovative Props. Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 971 (D. Minn. 2005) ("Materiality … considers whether the false or misleading statement is likely to make a difference to purchasers." (internal citation and quotation omitted)). There are two general categories within which the advertisements at issue fall: statements on PLM's packaging and statements on PLM's website. Regarding the first category, PLM argues that these statements are located on the back of the packaging for its boxes and individual units, and consumers therefore do not read them before

---

[16] There is a presumption in some circuits that courts can assume materiality when statements are literally false. *See, e.g.*, *Pizza Hut v. Papa John's Int'l*, 227 F.3d 489, 497 (5th Cir. 2000); *American Council of Certified Podiatric Physicians & Surgeons v. American Bd. Of Podiatric Surgery, Inc*., 185 F.3d 606, 614 (6th Cir. 1999); *Avila v. Rubin*, 84 F.3d 222, 227 (7th Cir. 1996). Other courts, however, have rejected this presumption. *See, e.g.*, *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250-51 (11th Cir. 2002); *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 312 n.10 (1st Cir. 2002); *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 813 (D. Minn. 2011). To date, no such presumption has been applied in this Circuit, and the Court finds no reason to do so for the first time here.

making a purchase. *See* Pls.' Mem. Opp'n Def.'s Mot. Summ. J., ECF No. 120, at 11.

PROLACTO disagrees about whether these statements influence the purchasing decision. But

even if a consumer reads these advertisements, PLM argues that there is insufficient evidence

that the statements affect buyer decision making, particularly given the fact that these are

relatively inexpensive treats purchased on an impulse. *See id.* at 14. PLM, however, overstates

the standard for showing materiality: PROLACTO is not required to prove actual influence on

the purchasing decision, but rather just that the advertisements are likely to affect that choice.

*See, e.g.*, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997);

*Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 155 F. Supp. 2d 1, 20 (S.D.N.Y.

2001); *Minuteman Int'l, Inc. v. Critical-Vac Filtration Corp.*, No. 95 C 7255, 1997 WL 370204,

at *11 (N.D. Ill. June 27, 1997).

With this standard in mind, the Court is not convinced that, after reviewing the available

evidence in the record, either party has demonstrated there is no genuine dispute of material fact

regarding whether the advertisements on PLM's packaging are material. Indeed, materiality is a

question of fact, and as such, it often must be left for the jury to decide. *See, e.g.*, *Reynolds

Consumer Products, Inc. v. Handi-Foil Corp.*, No. 13-CV-214, 2014 WL 794277, at *5 (E.D.

Va. Feb. 27, 2014) ("[A]s a general matter, questions of materiality and falsity are typically

questions of fact."). The Court reaches the same conclusion regarding the second category of

advertisements: statements on PLM's website. Though it is less likely that statements posted on

PLM's website are material to a consumer's decision given their attenuated position compared to

being placed directly on the product itself, a factual dispute about materiality remains.

Accordingly, the Court denies both parties summary judgment on the materiality question.

## 5. Injury

A party's burden for the injury element depends on what form of relief it seeks. The Lanham Act allows the court to grant injunctions, *see* 15 U.S.C. § 1116(a), and also permits the recovery of a party's profits, any actual damages sustained, and the costs of the action. *See id.* § 1117(a). A party pursuing monetary damages for false advertising in violation of Section 43(a) must establish actual damage to its business caused by the false advertising, whereas injunctive relief requires only a showing of "a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Max Daetwyler Corp. v. Input Graphics, Inc.*, 545 F. Supp. 165, 171 (E.D. Pa. 1982); *see also Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311 (1st Cir. 2002) ("[W]hereas a showing that the defendant's activities are likely to cause confusion or to deceive customers is sufficient to warrant injunctive relief, a plaintiff seeking damages must show actual harm to its business."); *Healthport Corp. v. Tanita Corp. of Am.*, 563 F. Supp. 2d 1169, 1181 (D. Or. 2008) ("To the extent that [the defendant] seeks injunctive relief, it need not demonstrate actual injury to establish a Lanham Act violation occurred here.").

In its motion for summary judgment, PROLACTO addresses only the standard for obtaining injunctive relief; it does not argue for, nor provide evidence in support of, monetary damages it allegedly suffered as a result of PLM's advertisements. The Court therefore finds that the only remaining question is if PROLACTO, PLM, or neither has satisfied the burden for summary judgment on the issue of whether PROLACTO has demonstrated the likelihood of a cognizable injury caused by the false advertising.

PROLACTO asserts that if a consumer is confused into buying a PLM product believing it to be a PROLACTO product due to false or misleading advertising, its reputation and goodwill are likely to be injured. *See* Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 116-1, at 21; *see*

*also Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 244 (9th Cir. 1990) (explaining that false advertising injury requires a showing that the "plaintiff has been or is likely to be injured as the result of the [advertisements] either by direct diversion of sales from itself to defendant, or by lessening of the good will which its products enjoy with the buying public"); *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 575 (E.D. Pa. 1999) (explaining that for false advertising, a party must show that "there is a likelihood of injury … in terms of declining sales and loss of good will"). PROLACTO's claim is based largely on evidence that the products of the companies are of different quality, with PROLACTO selling a more traditional, handmade form of paletas and PLM selling a water-based product more similar to a Popsicle. *See, e.g.*, Def.'s Stmt Facts, ECF No. 116-2, at 91-94, 96, Nos. 204-06, 213-14. The Court agrees with PROLACTO that given the apparent differences between the products, there is some basis to anticipate that PROLACTO's goodwill and reputation, in addition to potential sales, may be harmed if consumers are misled by PLM's advertisements into believing they are buying PROLACTO's fruit-based, handmade product.

The Court, however, is not convinced that no genuine dispute of material fact exists such that summary judgment is appropriate. PROLACTO largely relies on affidavits describing customers who were confused by and disappointed with PLM's products. Much of these affidavits, however, are hearsay from customers that cannot support summary judgment. *See Riggsbee v. Diversity Servs., Inc.*, 637 F. Supp. 2d 39, 46 (D.D.C. 2009) ("[O]n summary judgment, statements that are impermissible hearsay or that are not based on personal knowledge are precluded from consideration by the Court."). Nonetheless, the affidavits do contain nonhearsay portions that are at least probative of injury by suggesting that consumers are conflating the brands based on PLM's advertising, which may in turn hurt PROLACTO.

Depending on how a jury credits the evidence regarding the quality of the goods and consumer decision making, as well as the weight given to Dr. Jacoby's survey on this issue, injury to PROLACTO may or may not be likely. The Court therefore refuses to grant either party summary judgment on this issue.

### F. Counterclaim Count III: Trademark Infringement Under District of Columbia Common Law

PROLACTO and PLM move for summary judgment on Count III of the counterclaim for trademark infringement under District of Columbia common law, which is evaluated under the same standard as federal infringement claims. *See AARP v. Sycle*, 991 F. Supp. 2d 224, 229 (D.D.C. 2013); *Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.*, 589 F. Supp. 2d 25, 29 (D.D.C. 2008). As explained above, the creation of a trademark right is geographically limited to the territories in which a party actually uses its mark in commerce or into which it might naturally expand. *See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1023 (11th Cir. 1989). Thus, a party seeking recognition of a protectable trademark right in a specific area must provide evidence of penetration in the market or a zone of natural expansion extending into the market. *See Laurel Capital Grp., Inc. v. BT Fin. Corp.*, 45 F. Supp. 2d 469, 482 (W.D. Pa. 1999). PROLACTO, however, has provided no evidence regarding actual penetration into the District of Columbia or expectations to do so in the near future. As such, PROLACTO has no evidence demonstrating a protectable trademark right under District of Columbia common law, and the Court grants summary judgment to PLM on this count.

The District of Columbia common law claim also fails on procedural grounds. After PLM moved for summary judgment on this count, PROLACTO failed to substantively address the issue in its opposition brief. *See* Def.'s Mem. Opp'n Pls.' Mot. Summ. J., ECF No. 121, at

48.  Instead, PROLACTO merely restated the legal standard and suggested, without further

explanation, that PLM's motion should be denied.  By failing to properly address the merits of

PLM's argument, PROLACTO conceded the issue.  *See Hopkins v. Women's Div., Gen. Bd. of

Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit

that when a plaintiff files an opposition to a dispositive motion and addresses only certain

arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to

address as conceded." (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997); Local Civil

Rule 7.1(b)).  Thus, the Court can grant summary judgment for PLM on this alterative ground as

well.

**G.  Counterclaim Count IV: Federal Trademark Dilution Under Lanham Act Section 43(c)**

Both parties move for summary judgment on PROLACTO's counterclaim Count IV for

federal trademark dilution in violation of Section 43(c) of the Lanham Act.  *See* 15 U.S.C. §

1125(c).  To prove a violation of the Federal Trademark Dilution Act ("FTDA"), as substantially

amended by the Trademark Dilution Revision Act of 2006 ("TRDA"), a party must show that (1)

the mark is famous; (2) the defendant is making a commercial use of the mark in commerce; (3)

the defendant's use began after the mark became famous; and (4) the defendant's use of the mark

dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish

goods and services.  *See id.* § 1125(c)(1); *see also Sociedad Anonima Vina Santa Rita v. U.S.

Dep't of Treasury*, 193 F. Supp. 2d 6, 20 (D.D.C. 2001).

Unlike trademark infringement law, which protects marks from unauthorized use that is

likely to cause confusion, the federal trademark dilution statute "grants extra protection to strong,

well-recognized marks even in the absence of a likelihood of consumer confusion … if the

defendant's use diminishes or dilutes the strong identification value associated with the

plaintiff's famous mark." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, LLC*, 212

F.3d 157, 163 (3d Cir. 2000) (citation omitted); *see also Appleseed Found. Inc. v. Appleseed*

*Inst., Inc.*, 981 F. Supp. 672, 677 (D.D.C. 1997) (discussing trademark infringement and

dilution).  Trademark dilution can occur in two ways — by tarnishment or by blurring — but

PROLACTO only sets forth the tarnishment theory in its motion for summary judgment.[17]  *See*

Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 116-1, at 51.  But for the reasons explained

below, the Court does not reach the tarnishment question because PROLACTO fails to satisfy

the threshold issue for a dilution claim: fame.

### 1.  Famous Among The General Consuming Public Of The United States

"[A] mark is famous if it is widely recognized by the general consuming public of the

United States as a designation of source of the goods or services of the mark's owner."  15

U.S.C. § 1125(c)(2)(A); *see also Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911

(9th Cir. 2002) ("[F]or purposes of § 1125(c), a mark usually will achieve broad-based fame only

if a large portion of the general consuming public recognizes that mark.").  In other words, the

FTDA extends dilution protection only to those trademarks that are firmly established as a

"household name."  *See Thane Intern.*, 305 F.3d at 911; *see also Apple, Inc. v. Samsung Elecs.*

*Co., Ltd.*, No. 11-CV-01846, 2012 WL 2571719, at *7 (N.D. Cal. 2012) (explaining that "fame

requires a high standard of consumer awareness beyond the trademark owner's specific market

— the mark should be a 'household name' or 'part of the collective national consciousness.'"

---

[17]     Dilution by blurring is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B).  Dilution by tarnishment is an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." *Id.* § 1125(c)(2)(C); *see also Appleseed Found.*, 981 F. Supp. at 677 (describing dilution by tarnishment as when "a junior mark presents shoddy products or services, thereby damaging the reputation of the senior mark").

(citations omitted)); *Bd. of Regents Univ. of Tex. Sys. v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 679 (W.D. Tex. 2008) (explaining that trademark dilution claims are restricted to "those few truly famous marks like Budweiser beer, Camel cigarettes, Barbie Dolls and the like").

Further, under the amended federal dilution statute, "niche fame" — that is, fame limited to a particular channel of commerce, segment of industry, demographic, or geographic region — is insufficient as a matter of law to maintain a dilution claim. *See Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372 (Fed. Cir. 2012) (clarifying that by using "general consuming public" as the benchmark, the TDRA eliminated the possibility of "niche fame" as sufficient to maintain a dilution claim); *Luv N' Care, Ltd. v. Regent Baby Prods. Corp.*, 841 F. Supp. 2d 753, 758 (S.D.N.Y. 2012) (same). Accordingly, the alleged awareness of PROLACTO's brand among Hispanic immigrants or within certain localized regions of the country, without more, would be insufficient for a dilution claim because that is the very definition of a niche market. *See, e.g.*, *Idylwilde, Inc. v. Umpqua Feather Merchants, LLC*, No. 3:13-CV-02009, 2014 WL 199201, at *11 (D. Or. Jan. 16, 2014) (explaining that "the proper market to consider is the general public, not just purchasers of fishing flies"); *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, No. 12 CIV. 8205, 2013 WL 3943267, at *10 (S.D.N.Y. July 31, 2013) (rejecting plaintiff's argument that its marks are famous because they "have an extremely high degree of recognition among consumers of luxury jewelry," since "[t]his is the very definition of the type of 'niche' fame that is insufficient to support a finding of fame for TDRA purposes" (internal citations and quotation marks omitted)); *Luv N' Care*, 841 F. Supp. 2d at 757-59 (dismissing trademark dilution claim because plaintiffs had "not alleged facts indicating that the cups', bottles', pacifiers', teething keys', and food containers' trademarks are recognized beyond a niche market, *i.e.*, the baby product market").

2.  Level Of Recognition Required To Be Famous

In determining whether a mark is considered famous for a dilution claim, a court should consider "all relevant factors," including: (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark is registered.  *See* 15 U.S.C. § 1125(c)(2)(A)(i)-(iv).  Although there is no universally recognized numeric threshold for how well-known a mark must be under the dilution statute, there are certain guideposts the Court can follow when evaluating whether PROLACTO has achieved the requisite level of fame.[18]

For example, fame may be established by "surveys showing that a large percentage of the general public recognizes the brand, press accounts about the popularity of the brand, or pop-culture references involving the brand would provide evidence of fame."  *Thane Intern.*, 305 F.3d at 912 (citation omitted).  Professor McCarthy explains that "the extraordinary scope of the federal antidilution law requires proof of a relatively high level of recognition."  4 McCarthy on Trademarks § 24:106 (4th ed.).  He describes the statute's requirement that a mark be "widely recognized by the general consuming public of the United States" as "a rigorous and demanding test," and he consequently recommends "that a minimum threshold survey response should be in

_____

[18]    It is instructive to note that the level of fame required for a dilution claim appears to be greater than that required to establish that a mark is sufficiently well-known for the famous mark doctrine to apply.  *See Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1106 (9th Cir. 2004) (Garber, J., concurring) ("Ultimately, the standard for famous or well-known marks is an intermediate one.  To enjoy extraterritorial trademark protection, the owner of a foreign trademark need not show the level of recognition necessary to receive nation-wide protection against trademark dilution.  On the other hand, the foreign trademark owner who does not use a mark in the United States must show more than the level of recognition that is necessary in a domestic trademark infringement case.").  Dilution, of course, requires nationwide fame, whereas the famous mark doctrine looks only to the relevant consumer market, which further increases the burden on a party asserting a dilution theory.

the range of 75% of the general consuming public of the United States." *Id.* (footnotes omitted);

*see also 7-Eleven Inc. v. Lawrence I. Wechsler*, 83 U.S.P.Q.2d 1715, 2007 WL 1431084, at *14

(TTAB May 17, 2007) (finding that 7-Eleven's BIG GULP mark was famous based in part on

survey evidence of unaided awareness by 73% of consumers). But survey evidence, though

highly instructive, is not dispositive of whether a mark has achieved the requisite level of fame

because additional factors must be considered, including the amount of money spent on

advertising, the years the mark has been in use, and whether the mark is registered. *Cf. Apple,*

*Inc. v. Samsung Electronics Co., Ltd.*, No. 11-CV-01846, 2012 WL 2571719, at *8 (N.D. Cal.

June 30, 2012) (denying Samsung's motion for summary judgment despite Apple's survey

showing that less than 60% of respondents were aware of the trade dress in the iPhone and iPad

product designs because the factors for establishing fame are non-exhaustive and there was

enough other evidence from which a jury could conclude that the trade dresses were "famous"

for establishing a dilution claim).

Turning to the present case, first, PROLACTO has provided no survey of nationwide

consumer awareness that might have demonstrated the fame necessary to sustain its dilution

claim. Second, PROLACTO has conducted very little advertising within the United States, and

any such advertising was limited to local radio or local Spanish-language newspapers, not

nationwide promotional campaigns to raise consumer awareness on a broader scale. *See, e.g.*,

Def.'s Stmt Facts, ECF No. 116-2, at 41, No. 77; *cf. Jada Toys v. Mattel, Inc.*, 518 F.3d 628 (9th

Cir. 2007) (concluding that a reasonable jury could find that HOT WHEELS was a famous mark

after thirty-three years of use, $350 million spent on advertising, and total sales of 3 billion

units); *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1013 (9th Cir. 2004)

(agreeing that a material dispute of fact existed regarding whether NISSAN was a famous mark despite evidence of more than $898 million in promotional expenditures).

Third, PROLACTO has offered limited information about the volume of actual sales of products bearing its marks within the United States, including through its licensees.  It is clear, however, that these goods are sold within only a few states at the most, and PROLACTO therefore is unable to achieve nationwide fame in that manner.  *Cf. Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 219 (S.D.N.Y. 2012) (finding that Gucci's marks, including an unregistered mark, are famous when the company sold "billions of dollars worth of products" bearing the marks and spent more than $13 million on advertising in the United States between 2001 and 2009).  Finally, all but one of PROLACTO's marks are unregistered, and there is insufficient evidence regarding the nationwide fame of the lone registered mark, LA FLOR DE MICHOACAN.  For these reasons, the Court concludes that no reasonable jury could find that any of PROLACTO's marks have achieved the level of nationwide consumer awareness among the general public required to be considered "famous."  Accordingly, the Court grants summary judgment to PLM on the counterclaim for federal trademark dilution and need not consider the remaining elements of the count.

## H.  Counterclaim Counts V, VI, and VII: Cancellation of PLM's Registered Trademarks Under Lanham Act Sections 38 and 45

PROLACTO asserts through counterclaim Counts V, VI, and VII that the Court should cancel PLM's registered trademarks Nos. 2,905,172 and 2,968,652 for fraud under Section 38 of the Lanham Act and abandonment under Section 45 of the Act.  PLM moves for summary judgment on all three counts, and PROLACTO concedes that summary judgment is appropriate as to its Section 45 abandonment claim in Count VII.  *See* Def.'s Mem. Opp'n Pls.' Mot. Summ.

J., ECF No. 121, at 55.  Separately, PROLACTO moves for summary judgment on the remaining

Counts V and VI, which the Court discusses below.

| PLM's Marks that PROLACTO Seeks To Cancel | | |
|---|---|---|
| Registration No.: | 2,905,172 | 2,968,652 |
| Design: |  |  |
| Date of First Use: | 4/1/1994 | 1/1/1995 |
| Date of Registration: | 11/23/2004 | 7/12/2005 |

1. Cancellation Standard

Pursuant to Section 37 of the Lanham Act, "[i]n any action involving a registered mark

the court may determine the right to registration, order the cancellation of registrations, in whole

or in part … and otherwise rectify the register with respect to the registrations of any party to the

action."  15 U.S.C. § 1119.  This provision has been held to grant district courts authority

concurrent with that of the United States Patent and Trademark Office to conduct cancellation

proceedings pursuant to Section 14 of the Lanham Act, 15 U.S.C. § 1064.  *See Durox Co. v.*

*Duron Paint Mfg. Co.*, 320 F.2d 882, 886 (4th Cir. 1963); *Mears v. Montgomery*, No. 02 CIV.

0407, 2004 WL 964093, at *12 (S.D.N.Y. May 5, 2004).  Section 14, in turn, authorizes the

filing at any time of "[a] petition to cancel a registration of a mark … by any person who

believes that he is or will be damaged by the registration of a mark … if its registration was

obtained fraudulently."  15 U.S.C. § 1064.  Section 14 also provides that a registered mark may

be cancelled "at any time if [it] is being used by … the registrant so as to misrepresent the source

of the goods[.]"  *Id.*

For PROLACTO to succeed on its fraud claim, it must prove by clear and convincing evidence that PLM knowingly made false, material misrepresentations of fact and intended to deceive the patent office in its trademark application. *See In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009); *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 420 (4th Cir. 1998); *Audiovox Corp. v. Monster Cable Prods., Inc.*, 544 F. Supp. 2d 155, 158 (E.D.N.Y. 2008). "The party alleging fraud carries a heavy burden of proof, and, in deciding whether fraud has been committed, the Court has no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *Haggar Intern. Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 107-08 (E.D.N.Y. 2012) (citations and internal quotation marks omitted).

A false representation must be material in the sense that "a reasonable examiner would have considered it important in deciding whether to issue the registration." *Fair Isaac Corp. v. Experian Info. Solutions Inc.*, 711 F. Supp. 2d 991, 998 (D. Minn. 2010) (internal citation and quotation omitted); *see also Orient Exp. Trading Co., Ltd. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988) (describing a material fact as "one that would have affected the PTO's action on the applications"); *Colt Indus. Operating Corp.*, 221 U.S.P.Q. 73, 1983 WL 51834, at *3 (TTAB Nov. 25, 1983) (describing a material fact as one "which, if transmitted to the Office, would have resulted in the refusal of the registration sought"). As part of the registration process, a trademark registrant must affirm, under oath, that he "believes" himself to be the owner of the mark sought to be registered and that "to the best of his knowledge and belief" no other person has the right to use the mark in commerce. *See Maurag, Inc. v. Bertuglia*, 494 F. Supp. 2d 395, 399 (E.D. Va. 2007) (citing 15 U.S.C. § 1051(a)(3)(A), (A)(3)(D)). "The oath is phrased in terms of a subjective belief, such that it is difficult to prove

fraud so long as the affiant or declarant has an honestly held, good faith belief." *Resorts of Pinehurst*, 148 F.3d at 420 (citations and internal alterations omitted); *see also MPC Franchise, LLC v. Tarntino*, No. 11-CV-6310, 2014 WL 1920531, at *15 (W.D.N.Y. May 14, 2014) ("Fraud will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true." (citation omitted)). "It is plain that the existence of another authorized user with the identical mark is material to the USPTO in determining whether to grant the application." *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 242 (E.D.N.Y. 2009).

## 2. Alleged Misrepresentations

In its motion for summary judgment, PROLACTO asserts that PLM made multiple misrepresentations in its Indian Girl trademark applications, namely that: PLM knew at the time it filed the applications that PROLACTO was using a similar Indian Girl design; PLM knew its first use of the Indian Girl designs was after 1999, not 1994 and 1995 as it claimed in the applications; and PLM misrepresented the source of its goods. *See* Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 116-1, at 47-48. PLM rejects each of PROLACTO's arguments and moves for summary judgment in its favor on Counts V and VI. The Court addresses each allegation below.

### a. Knowledge Of Prior Use

On November 19, 2003, PLM filed Application Serial No. 78/330,419 for an Indian Girl holding an ice cream cone. *See* Def.'s Stmt Facts, ECF No. 116-2, at 59-60, No. 142. On the same day, PLM filed Application Serial No. 78/330,432 for a similar design depicting an Indian Girl holding an ice cream bar. *See id.* Nos. 142-43. In each application, PLM submitted a declaration attesting that

> to the best of his/her knowledge and belief no other person, firm, corporation, or
> association has the right to use the mark in commerce, either in the identical form

thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/service of such other person, to cause confusion, or to cause mistake, or to deceive[.]

*Id.* at 60, No. 144. PROLACTO argues that PLM knew the Indian Girl design was being used in Mexico before filing the applications but failed to make such a disclosure. In response, PLM raises two defenses: first, it disputes whether it knew a specific company was using the designs in Mexico, let alone that this company was PROLACTO; and second, even if PLM knew PROLACTO was using the designs in Mexico, commercial use in a foreign country is insufficient to establish fraud on the trademark office as a matter of law. *See* Pls.' Mem. Opp'n Def.'s Mot. Summ. J., ECF No. 120, at 48-49. The Court finds that the latter argument is dispositive.

PROLACTO does not cite, and this Court cannot find, any fraudulent registration case holding a party liable for failing to disclose that another company used a similar mark in a foreign country. To the contrary, there appears to be no legal basis for holding that knowledge of foreign use is grounds for a cancellation cause of action. Understandably, this conclusion is premised on the territoriality principle, through which foreign use of a mark does not create priority in the United States. *See Person's Co. v. Christman*, 900 F.2d 1565, 1568-69 (Fed. Cir. 1990). Because foreign use cannot create priority — perhaps with exception of the narrow and largely unfollowed famous mark doctrine, which itself still requires meaningful reputational impact in the United States — the fact that a similar mark was used in another country is immaterial to the decision about whether to grant an application.

For example, in *Buti v. Impressa Perosa, S.R.L.*, 935 F. Supp. 458, 474 (S.D.N.Y. 1996), the U.S. District Court for the Southern District of New York explained that even if the registrant had revealed his knowledge that another company was using a similar mark in Milan, Italy, this fact was immaterial because the trademark office would have awarded the trademark anyway, as

foreign use is irrelevant to priority in the United States.  Likewise, the TTAB confronted a similar question in *Lafont v. S.A.C.S.E.*, 228 U.S.P.Q. 589, 1985 WL 71974, at *4 (TTAB Dec. 10, 1985), and concluded:

> Because the question of who had the superior right to U.S. registration was not affected by respondent's knowledge of petitioner's European use and registration, we cannot conclude from this record that respondent's statement in its applications was an attempt to deceive the Office by withholding material facts which would lead to a refusal to register respondent's marks.  Even if the Examining Attorney had been aware of respondent's European use and registration, this would not have led to a refusal of registration, because these facts are immaterial to the issue of respondent's right to register in the U.S.

The same decision was reached in *Person's Co. v. Christman*, 9 U.S.P.Q.2d 1477, 1988 WL 252326, at *3 (TTAB Nov. 10, 1988), when the TTAB denied a fraudulent registration claim and noted the following: "Respondent was of course aware of petitioner's use [in] Japan, but he was aware of no use by petitioner of the mark in the United States and was unaware of any intention or plans of petitioner to use its mark outside of Japan."

Finally, the TTAB held in *Bonaventure Assoc. v. Westin Hotel Co.*, 218 U.S.P.Q. 537, 1983 WL 51970, at *4 (TTAB June 2, 1983), that "[m]ere knowledge of the existence of a Canadian hotel named 'BONAVENTURE,' especially in view of the established commonality of the name Bonaventure in the Montreal area, can hardly equate to fraudulent registration of the same mark in the United States for restaurant, golf and construction services."  Because PROLACTO does not set forth evidence creating a material dispute as to whether PLM was aware of prior use of the Indian Girl designs within the United States before filing its applications, the Court grants summary judgment to PLM on this theory of fraud in Counts V and VI.

*b.  Date Of First Use*

PLM claimed in Application Serial No. 78/330,432 that it used the mark in connection

with ice cream and fruit ices at least as early as April 1, 1994.  *See* Def.'s Stmt Facts, ECF No.

116-2, at 59-60, Nos. 142-43.  PLM also filed a statement of use in Application Serial No.

78/330,419 alleging first use of the design on January 1, 1995.  *See id.* No. 145.  PROLACTO

argues that PLM's applications were fraudulent because PLM did not use any Indian Girl design

until after at least 1999.  *See* Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 116-1, at 47.

PLM contends that it has testimonial evidence proving that it used the designs beginning around

1994 and 1995, and documentary evidence showing use as early as 1997.  *See* Pls.' Resp. Def.'s

Stmt Facts, ECF No. 120-1, at 97-99, Nos. 120-28.

A clear dispute of fact exists regarding when PLM first used the Indian Girl designs in

commerce.  But to deny summary judgment, a dispute of fact must be material.  *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Federal courts and the TTAB consistently have

held that the date of first use is immaterial to a registration application so long as the actual date

of initial use predated the application.  *See, e.g.*, *Pony Exp. Courier Corp. of Am. v. Pony Exp.*

*Delivery Serv.*, 872 F.2d 317, 319 (9th Cir. 1989) (explaining that the claim of a date of first use

is not a material allegation supporting a fraudulent registration claim as long as the first use in

fact preceded the application date); *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F.

Supp. 2d 868, 879-80 (N.D. Ill. 2008) (same); *Lewis v. Microsoft Corp.*, 410 F. Supp. 2d 432,

437-38 (E.D.N.C. 2006) (same); *W. Worldwide Enters. Grp. Inc. v. Qinqdao Brewery*, 17

U.S.P.Q.2d 1137, 1990 WL 354566, at *5 (TTAB July 30, 1990) (same); *CarX Serv. Sys., Inc. v.*

*Exxon Corp.*, 215 U.S.P.Q. 345, 1982 WL 52058, at *7 (TTAB Aug. 30, 1982) (same).

Although there is disagreement about the actual date of first use, PROLACTO accepts in its

summary judgment motion that "PLM's first use of any Indian Girl design was after 1999," which still is well before PLM filed the applications. *See* Def.'s Mem. Supp. Mot. Part. Summ. J., ECF No. 116-1, at 47. Thus, even if PROLACTO is correct that PLM claimed the wrong date of first use in its applications — a question on which the Court need not take a position — it fails to demonstrate how such an error was material. The Court therefore grants summary judgment to PLM on this theory in Counts V and VI.

### c. Source Of Goods

PROLACTO argues in its motion for summary judgment that PLM uses the Indian Girl designs to make customers believe that its ice cream treats came from, or were authorized by, PROLACTO. *See id.* at 48. PLM responds that the Court should not consider this theory because it was not asserted in the counterclaim. *See* Pls.' Mem. Opp'n Def.'s Mot. Summ. J., ECF No. 120, at 50. PROLACTO does not address PLM's argument in its reply brief, perhaps conceding that PLM is correct. *Cf. Remmie v. Mabus*, 846 F. Supp. 2d 91, 95 (D.D.C. 2012) (noting that a party appeared to concede an argument by not addressing it in the reply brief); *Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233, 268 (D.D.C. 2012) ("[T]he Court may treat the plaintiff's failure to oppose the defendant's … arguments as a decision to concede those arguments."). Nonetheless, the Court agrees with PLM that this argument was not contained in counterclaim Counts V or VI, and PROLACTO therefore cannot assert the theory anew through a motion for summary judgment. *See Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 41 (D.D.C. 2010) ("A plaintiff may not assert new allegations at the summary judgment stage if such allegations amount to a 'fundamental change' in the nature of plaintiff's claims." (citation omitted)); *Sharp v. Rosa Mexicano, DC, LLC*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007) (stating

that plaintiff may not, "through summary judgment briefs, raise [] new claims … because plaintiff did not raise them in his complaint, and did not file an amended complaint").

## I.  Monetary Relief: Actual Damages, Profits, Costs, And Attorney's Fees

In addition to injunctive relief, the Lanham Act permits, "subject to the principles of equity," the recovery of the defendant's profits, any actual damages sustained by the plaintiff, and the costs of the action.  *See* 15 U.S.C. § 1117(a).  These categories of damages are intended to constitute compensation, not a penalty.  *See id*.  Attorney's fees also may be awarded to the prevailing party in exceptional situations.  *See id.*

PLM moves the Court to enter summary judgment that PROLACTO is not entitled to any type of monetary relief for its counterclaims.  Indeed, PLM dedicates roughly one-third of its motion for summary judgment arguing why PROLACTO cannot recover each category of monetary award otherwise permitted by the Lanham Act.  *See* Pls.' Mem. Supp. Mot. Part. Summ. J., ECF No. 114, at 29-39.  Yet in its opposition memorandum, PROLACTO simply ignores PLM's arguments for summary judgment as to the monetary recovery issues, including whether there is sufficient evidence of actual damages and whether equitable principles prohibit the Court from awarding monetary relief.[19]  When a party fails to address an issue in its opposition brief, the Court may regard that issue as conceded and grant summary judgment to the moving party.  *See COMPTEL v. FCC*, 945 F. Supp. 2d 48, 55 (D.D.C. 2013) ("Where a party fails to address arguments raised by the opposing party's motion for summary judgment, the Court may treat those arguments as conceded."); *Iweala v. Operational Techs. Servs., Inc.*, 634

---

[19]     Such an approach appears to be consistent with PROLACTO's arguments regarding the false advertising claim, in which it made no effort to demonstrate actual monetary damages caused by PLM's alleged violations and instead focused on the standard for injunctive relief.

F. Supp. 2d 73, 80-81 (D.D.C. 2009) (treating as conceded defendants' summary judgment arguments when plaintiff failed to respond in her opposition).

Specifically, PROLACTO fails to address PLM's argument that it has not provided sufficient evidence of actual damages for its trademark claims. The Court therefore grants summary judgment in PLM's favor on this issue.[20] *See, e.g.*, *Members 1st Fed. Credit Union v. Metro Bank*, No. 1:09-CV-1171, 2010 WL 4318839, at *4 (M.D. Pa. Oct. 22, 2010) ("Plaintiff does not address the issue of actual damages in its brief in opposition to Defendants' motion. Therefore, the Court must grant Defendants' motion for summary judgment on the issue of actual damages.").

PROLACTO also ignores PLM's argument that the equitable principles of laches, acquiescence, and estoppel prohibit it from recovering any form of monetary relief, including PLM's profits, were PROLACTO to succeed on a counterclaim theory. *See Johnson & Johnson v. Actavis Grp. hf*, No. 06 CIV. 8209, 2008 WL 228061, at *9 (S.D.N.Y. Jan. 25, 2008) ("Because monetary awards provided by the Lanham Act are 'subject to the principles of equity,' the equitable defenses of laches, acquiescence, and estoppel may be relied upon … to bar monetary as well as injunctive relief." (quoting 15 U.S.C. § 1117(a)); 6 McCarthy on Trademarks § 31:1 (4th ed.) (stating that "the defenses of acquiescence and laches are included

---

[20]     PROLACTO also would lose on the merits. "[A]ny award based on plaintiff's damages requires some showing of actual loss." *Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 642 (D.C. Cir. 1982). When assessing actual damages, the district court "must ensure that the record adequately supports all items of damages claimed and establishes a causal link between the damages and the defendant's conduct, lest the award become speculative or violate section 35(a)'s prohibition against punishment." *See ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990). Here, PROLACTO provides no evidence from which the Court can determine whether it suffered actual damages and, if so, in what amount. As such, summary judgment in favor of PLM would be appropriate. *See, e.g.*, *Strike It Rich, Inc. v. Jos. Schlitz Brewing Co.*, 505 F. Supp. 89, 92 (D.D.C. 1980) (granting motion for summary judgment on the issue of damages because plaintiff failed to "demonstrate some actual harm").

under the[] 'principles of equity'" described in § 1117(a)); *see also Tillamook Country Smoker, Inc. v. Tillamook Cnty Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006) (noting that laches is a valid defense to Lanham Act claims for monetary damages).  By failing to address this argument, PROLACTO concedes the issue and summary judgment is granted in PLM's favor as to all monetary forms of relief.  *See, e.g.*, *Mack v. WP Co., LLC*, 923 F. Supp. 2d 294, 302 (D.D.C. 2013) (granting summary judgment on damages question when plaintiff's opposition brief failed to address the issue, thus conceding it).

## V.  CONCLUSION

For the foregoing reasons, PLM's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**, and PROLACTO's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.  In addition, PROLACTO's motion to strike is **DENIED**, and PLM's motion *in limine* is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 25, 2014                                                     RUDOLPH CONTRERAS
                                                                                              United States District Judge