# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PALETERIA LA MICHOACANA, INC. *et al.*, :
                                     :

        Plaintiffs & Counter-Defendants,     :      Civil Action No.:     11-01623 (RC)

                                        :

        v.                                      :

                                        :

PRODUCTOS LACTEOS TOCUMBO S.A.    :
DE C.V.,                                    :

                                        :

        Defendant & Counter-Claimant.      :

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This long-running dispute between Plaintiffs/Counter-Defendants Paleteria La

Michoacana, Inc. and Paleteria La Michoacana (Sub), Inc. (collectively, and together with their

predecessors in interest, "PLM")[1] and Defendant/Counter-Claimant Productos Lacteos Tocumbo

S.A. De C.V. ("PROLACTO") involves the right to use various registered and unregistered

trademarks when selling ice cream and various other frozen treats in the United States.  PLM

brought this action against PROLACTO under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*,

challenging a decision by the Trademark Trial and Appeal Board (the "TTAB") to cancel the

federal registration of one of PLM's asserted trademarks and seeking other relief on various

infringement-related theories.  *See* Second Am. Compl., ECF No. 40.  PROLACTO, in turn, filed

a variety of counterclaims against PLM alleging, among other things, trademark infringement

---

[1]      PLM originally filed this action naming Paleteria La Michoacana, Inc. and Paleteria La
Michoacana, LLC as plaintiffs.  *See, e.g.*, Second Am. Compl., ECF No. 40.  In July 2013,
Paleteria La Michoacana, LLC converted to Paleteria La Michoacana (Sub), Inc. pursuant to
California law, and, in March 2016, the Court granted PLM's pre-trial motion to correct the
caption of this case by referring to "Paleteria La Michoacana (Sub), Inc." as a plaintiff and
counter-defendant in place of "Paleteria La Michoacana, LLC."  *See* Mem. & Order, ECF No.
333.  The Court refers to specific entities that are included in the Court's use of the term "PLM"
in this Memorandum Opinion where appropriate.

and false advertising.  *See* Ans. 2d Am. Compl. & Countercls., ECF No. 41.  At the summary

judgment stage, the Court resolved a number of the parties' claims and narrowed some of the

issues for trial.

The Court conducted a bench trial over the course of thirteen days between September

14, 2015 and October 1, 2015.  Following the trial, the parties submitted proposed findings of

fact and conclusions of law, as well as subsequent briefs in opposition.  The Court now makes its

Findings of Fact and Conclusions of Law, as required by Rule 52(a)(1) of the Federal Rules of

Civil Procedure.  For the reasons discussed below, the Court will enter judgment in favor of

PROLACTO as to Count I of PLM's Second Amended Complaint, enter judgment in favor of

PLM as to Counts II and III of the Second Amended Complaint and as to PROLACTO's

Counterclaim Count II.  The Court will also dismiss Count IV of the Second Amended

Complaint as moot.

## I.  BACKGROUND

For clarity in following the Court's specific findings of fact and conclusions of law, the

Court first provides a brief overview of the facts underlying this case and a summary of the

case's procedural history and current posture.

### A.  Factual Overview

PLM and PROLACTO are in the business of manufacturing and selling "paletas," a style

of ice cream bars and popsicles that originated in Mexico and are traditionally made from fruit,

spices and nuts and sold to the public in trucks and retail stores, as well as other frozen treats.

PROLACTO is a Mexican company founded in 1992.  The Andrade Malfavon family,

which founded and owns the company, traces its history in the paleta business to the purported

origin of the paleta and the ice cream stores that make and sell them, called "paleterias," in

Tocumbo, a city in the Mexican state of Michoacán, in the 1940s.  PROLACTO primarily does business in the United States through licensing agreements with various members of the Andrade Malfavon family who own and operate individual paleterias in certain markets, namely, Florida, Texas, Northern California, and North Carolina.  Until relatively recently, PROLACTO did not directly own any paleterias in the United States or otherwise directly sell its products to any consumers in the United States.

PLM traces its history to at least as early as 1991, when two brothers, Mexican immigrants Ignacio Gutierrez and Ruben Gutierrez, began selling paletas out of pushcarts in Northern California using the name "La Michoacana," which literally means, in Spanish, "the woman from the state of Michoacán."  The partnership dissolved in 1999, and Ignacio Gutierrez operated the business as a sole proprietorship for several years before incorporating in California. PLM's business has grown significantly since its beginnings as a pushcart operation in Northern California.  PLM currently manufactures its products in a factory in Modesto, California and distributes its products throughout various parts of the United States where they are sold at large-scale retailers such as Costco, Wal-Mart, and Walgreens, as well as Hispanic grocery stores such as El Super and Vallarta and a variety of other retail outlets.

Both PLM and PROLACTO use a variety of trademarks when selling their products in the United States.  A graphic displaying some of the marks the parties have used appears below:



The battle between the PLM and PROLACTO over the right to use these marks has been fierce and protracted. The parties sharply dispute, among many other things, which of them first used these marks in the United States, and each party accuses the other of engaging in bad faith in a variety of different ways.

### B. Procedural History

The procedural history of this case stretches back nearly a decade. An understanding of this history is necessary to resolve the issues before the Court.

### 1. TTAB Proceedings

After unsuccessfully attempting to register certain marks with the United States Patent and Trademark Office (the "USPTO"), on April 27, 2007, pursuant to the Lanham Act,

PROLACTO filed a petition with the TTAB, a body of the USPTO, to cancel PLM's

Registration No. 3,210,304 for the mark titled "LA INDITA MICHOACANA," shown above,

for use on ice cream and fruit products. *See* Pet. Cancellation, TTAB Dkt. 1.[2]  The cancellation

proceeding remained pending for several years, and, as part of the discovery process, the parties

took oral and written deposition testimony from a number of witnesses between 2009 and 2010.

On May 20, 2011 the TTAB granted PROLACTO's petition for cancellation of PLM's

LA INDITA MICHOACANA mark. *See generally Productos Lacteos Tocumbo S.A. De C.V. v.*

*Paleteria La Michoacana, Inc.*, 98 U.S.P.Q.2d 1921, 2011 WL 2161071 (T.T.A.B. May 20,

2011) ("TTAB Decision").  The TTAB concluded that the mark should be cancelled because

PROLACTO had established priority of use and likelihood of confusion with respect to several

of its asserted, unregistered marks, including its own Indian Girl design, as well as its LA

MICHOACANA (words only), LA MICHOACANA NATURAL (words only), and LA

MICHOACANA NATURAL marks. *See id.* at **9–16.

Following the TTAB's decision, PLM moved for reconsideration, arguing that

PROLACTO failed to establish priority of use and that the TTAB erred in concluding that

PROLACTO established common law rights in its "Michoacana" marks. *See* Mot. Recons.,

TTAB Dkt. 109.  The TTAB issued a decision denying reconsideration on July 13, 2011.  *See*

TTAB Dkt. 115.

---

[2]      Pursuant to 15 U.S.C. § 1071(b)(3), the Court admitted the record of the underlying proceeding before the TTAB in this case at the joint request of the parties. *See* Minute Order (Nov. 18, 2013); Joint Status Report at 3–5, ECF No. 98.  The standard under which the Court reviews the TTAB record is discussed, *infra*.

### 2. The Present Action

PLM commenced this action pursuant to 15 U.S.C. § 1071(b) on September 8, 2011. *See* Compl., ECF No. 1.

#### a. *PLM's Second Amended Complaint and PROLACTO's Counterclaims*

PLM's Second Amended Complaint alleges four causes of action: Count I seeks reversal of the TTAB's decision to cancel the registration of PLM's LA INDITA MICHOACANA mark and denial of PROLACTO's cancellation petition; Count II seeks a declaration that there is no likelihood of confusion between PLM's LA INDITA MICHOACANA mark and various marks asserted by PROLACTO on the basis of their common usage of the word "MICHOACANA"; Count III alleges that PROLACTO's use of its Indian Girl mark infringes three of PLM's registered marks under 15 U.S.C. § 1114, including its LA INDITA MICHOACANA mark; and Count IV seeks to cancel PROLACTO's registration of certain marks containing the name LA FLOR DE MICHOACAN if a likelihood of confusion is found between those marks and PLM's marks. *See* Second Am. Compl. at 13–16.

PROLACTO, in turn, filed seven counterclaims: Counterclaim Count I alleges that PLM infringed its registered LA FLOR DE MICHOACAN and design mark under 15 U.S.C. § 1114(1); Counterclaim Count II alleges trademark infringement, unfair competition, passing off, false advertising, false association, and false designation in violation of 15 U.S.C. § 1125(a); Counterclaim Count III alleges trademark infringement of the District of Columbia's common law; Counterclaim Count IV alleges trademark dilution under 15 U.S.C. § 1125(c); and Counterclaim Counts V, VI, and VII seek cancellation of two of PLM's registered marks due to fraud and abandonment. *See* Ans. 2d Am. Compl. & Countercls. at 29–43.

*b.  Summary Judgment*

After the close of discovery in this case, the parties filed cross-motions for partial

summary judgment, each of which the Court granted in part and denied in part.  *See generally*

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 69 F. Supp. 3d 175

(D.D.C. 2014) ("*PLM I*").  The Court subsequently granted in part and denied in part a motion

by PLM to revise the Court's Memorandum Opinion and Order at summary judgment and denied

a motion for consideration by PROLACTO, issuing a First Revised Order on February 3, 2015.

*See* First Revised Order, ECF No. 175; *Paleteria La Michoacana, Inc. v. Productos Lacteos*

*Tocumbo S.A. De C.V.*, 79 F. Supp. 3d 60 (D.D.C. 2015) ("*PLM II*") (denying PROLACTO's

motion for reconsideration); Mem. & Order, ECF No. 174 ("*PLM III*") (granting in part and

denying in part PLM's motion to revise the Court's summary judgment Memorandum Opinion

and Order).

A brief summary of the disposition of each count of PLM's Second Amended Complaint

and PROLACTO's Counterclaims is necessary to understanding the issues presented at trial for

the Court's determination:

- *Complaint Count I*:  The Court denied summary judgment to both parties after concluding that new evidence presented by PLM created a genuine dispute of material fact as to whether the "tacking" doctrine is applicable in order to establish priority of use for its LA INDITA MICHOACANA mark.  *See* First Revised Order ¶ 10; *PLM I*, 69 F. Supp. 3d at 192–96.

- *Complaint Count II*:  The parties did not seek summary judgment.

- *Complaint Count III*:  The parties did not seek summary judgment.

- *Complaint Count IV*:  The parties did not seek summary judgment.[3]

---

[3]      PLM takes the position that, in light of the Court's disposition of Counterclaim Count I, Complaint Count IV is now moot and should be dismissed.  *See* Pls.' Status Conference Stmt. at

- *Counterclaim Count I*:  The Court entered judgment in favor of PLM, affirming the TTAB's conclusion that PLM did not infringe LA FLOR DE MICHOACAN and design mark.  *See* First Revised Order ¶ 1; *PLM I*, 69 F. Supp. 3d at 196–200.

- *Counterclaim Count II*:  Trademark Infringement, False Designation of Origin, Passing Off, and Unfair Competition:  The Court entered partial judgment in favor of PLM limiting this claim to the Houston, Texas market and denied summary judgment to both parties as to whether PROLACTO has established secondary meaning for its marks after finding the existence of a genuine dispute of material fact.  *See* First Revised Order ¶¶ 2, 11; *PLM I*, 69 F. Supp. 3d at 209–12; *PLM III* at 5–12.

- *Counterclaim Count II*:  False Advertising:  The Court entered judgment in favor of PROLACTO as to the elements of falsity, deceptiveness, and interstate commerce after finding that PLM conceded the issues.  *See* First Revised Order ¶ 3; *PLM I*, 69 F. Supp. 3d at 216.  The Court denied summary judgment to both parties as to the elements of materiality and injury after finding that a genuine dispute of material fact existed.  *See* First Revised Order ¶ 13; *PLM I*, 69 F. Supp. 3d at 216–19.  The Court entered judgment in favor of PLM as to all markets with regard to its use of "LA MICHOACANA ES NATURAL" and "PALETERIA MICHOACANA" on the basis that PROLACTO did not plead those marks.  *See* First Revised Order ¶ 3; *PLM III* at 8–11.  The Court entered judgment in favor of PLM as to the Sonoma, California market with regard to its use of "LA INDITA MICHOACANA" and Indian Girl designs on the basis that PLM established priority in that market.  *See* First Revised Order ¶ 3; *PLM III* at 11–12.   The Court denied summary judgment to PLM as to its arguments that laches prevents PROLACTO from bringing its claim and that PROLACTO lacks prudential standing.  *See* First Revised Order ¶ 12; *PLM I*, 69 F. Supp. 3d at 213–16.  The Court also dismissed one particular alleged false advertisement as moot after finding that PLM no longer used the advertisement.  *See PLM I*, 69 F. Supp. 3d at 213 n.13.

- *Counterclaim Count III*:  The Court entered judgment in favor of PLM on the basis that PROLACTO provided no evidence that it used or planned to use the marks at issue in the District of Columbia.  *See* First Revised Order ¶ 4; *PLM I*, 69 F. Supp. 3d at 219.

- *Counterclaim Count IV*:  The Court entered judgment in favor of PLM after concluding that PROLACTO's marks had not achieved the level of fame necessary for a trademark dilution claim.  *See* First Revised Order ¶ 5; *PLM I*, 69 F. Supp. 3d at 219–22.

---

9 & n.4, ECF No. 176.  The Court discusses the disposition of Complaint Count IV in its conclusions of law.

8

- *Counterclaim Count V*:  The Court entered judgment in favor of PLM after finding that PROLACTO failed to establish fraud.  *See* First Revised Order ¶ 6; *PLM I*, 69 F. Supp. 3d at 222–26.

- *Counterclaim Count VI*:  The Court entered judgment in favor of PLM after finding that PROLACTO failed to establish fraud.  *See* First Revised Order ¶ 6; *PLM I*, 69 F. Supp. 3d at 222–26.

- *Counterclaim Count VII*:  The Court entered judgment in favor of PLM after PROLACTO conceded that summary judgment was appropriate.  *See* First Revised Order ¶ 8; *PLM I*, 69 F. Supp. 3d at 223.

In addition, the Court entered judgment in favor of PLM as to the issue of whether

PROLACTO is entitled to any form of monetary relief on any of its counterclaims after finding

that PROLACTO conceded the issue.  *See* First Revised Order ¶ 9; *PLM I*, 69 F. Supp. 3d at

227–28; *PLM II*, 79 F. Supp. 3d at 71–82.

### c.  Bench Trial

The Court conducted a bench trial over the course of thirteen days between September

14, 2015 and October 1, 2015.  *See* Trial Tr. Day 1 A.M. Session (Sept. 14, 2015) ("Day 1

A.M."), ECF No. 256; Trial Tr. Day 1 P.M. Session (Sept. 14, 2015) ("Day 1 P.M."), ECF No.

321; Trial Tr. Day 2 A.M. Session (Sept. 15, 2015) ("Day 2 A.M."), ECF No. 257; Trial Tr. Day

2 P.M. Session (Sept. 15, 2015) ("Day 2 P.M."), ECF No. 322; Trial Tr. Day 3 A.M. Session

(Sept. 16, 2015) ("Day 3 A.M."), ECF No. 262;[4] Trial Tr. Day 3 P.M. Session (Sept. 16, 2015)

("Day 3 P.M."), ECF No. 323; Trial Tr. Day 4 A.M. Session (Sept. 17, 2015) ("Day 4 A.M."),

ECF No. 266; Trial Tr. Day 4 P.M. Session (Sept. 17, 2015) ("Day 4 P.M."), ECF No. 324; Trial

Tr. Day 5 A.M. Session (Sept. 18, 2015) ("Day 5 A.M."), ECF No. 325; Trial Tr. Day 5 P.M.

---

[4]     This session of the trial contained witness testimony designated as confidential and held outside the presence of other witnesses and the public.  For ease of reference, unless referring specifically to the confidential portion of the testimony, the Court cites the publicly filed version of this transcript in which the confidential portion of the testimony has been redacted.  The complete transcript of this session was filed under seal as ECF No. 273.

Session (Sept. 18, 2015) ("Day 5 P.M."), ECF No. 270; Trial Tr. Day 6 A.M. Session (Sept. 21, 2015) ("Day 6 A.M."), ECF No. 275;[5] Trial Tr. Day 6 P.M. Session (Sept. 21, 2015) ("Day 6 P.M."), ECF No. 278; Trial Tr. Day 7 A.M. Session (Sept. 22, 2015) ("Day 7 A.M."), ECF No. 280; Trial Tr. Day 7 P.M. Session (Sept. 22, 2015) ("Day 7 P.M."), ECF No. 285; Trial Tr. Day 8 A.M. Session (Sept. 23, 2015) ("Day 8 A.M."), ECF No. 284; Trial Tr. Day 8 P.M. Session (Sept. 23, 2015) ("Day 8 P.M."), ECF No. 319; Trial Tr. Day 9 A.M. Session (Sept. 25, 2015) ("Day 9 A.M."), ECF No. 289; Trial Tr. Day 9 P.M. Session (Sept. 25, 2015) ("Day 9 P.M."), ECF No. 230; Trial Tr. Day 10 A.M. Session (Sept. 28, 2015) ("Day 10 A.M."), ECF No. 291; Trial Tr. Day 10 P.M. Session (Sept. 28, 2015) ("Day 10 P.M."), ECF No. 326; Trial Tr. Day 11 A.M. Session (Sept. 29, 2015) ("Day 11 A.M."), ECF No. 292; Trial Tr. Day 11 P.M. Session (Sept. 29, 2015) ("Day 11 P.M."), ECF No. 327; Trial Tr. Day 12 A.M. Session (Sept. 30, 2015) ("Day 12 A.M."), ECF No. 293; Trial Tr. Day 12 P.M. Session (Sept. 30, 2015) ("Day 12 P.M."), ECF No. 328; Trial Tr. Day 13 (Oct. 1, 2015) ("Day 13"), ECF No. 329.

PLM presented six witnesses over the course of seven days:  Ignacio Gutierrez, the co-founder of PLM's business; Patricia Gutierrez, the Chief Operating Officer of Paleteria La Michoacana (Sub), Inc.; two private investigators, Zachary Fechheimer and Patti James; George Reis, an expert in the field of image forensics; and Samuel Quinones, a journalist who has written on the subject of paleterias.  PLM introduced a substantial volume of exhibits and designated significant deposition testimony for consideration.

---

[5]    This session of the trial contained witness testimony designated as confidential and held outside the presence of other witnesses and the public.  For ease of reference, unless referring specifically to the confidential portion of the testimony, the Court cites the publicly filed version of this transcript in which the confidential portion of the testimony has been redacted.  The complete transcript of this session was filed under seal as ECF No. 275-1.

PROLACTO presented eleven witnesses over the course of five days:  Ruben Gutierrez, who co-founded PLM's business with his brother, Ignacio Gutierrez, and left PLM in 1999; Marco Antonio Andrade Malfavon, a partner of PROLACTO; four U.S. licensees or employees of U.S. licensees, Mary Fernandez, Teresita Fernandez, Miguel Chavez Bermudez, and Cesar Gonzales Perez; Jorge Leon Baz, PROLACTO's outside Mexican counsel; Dr. Jacob Jacoby, an expert who conducted a market research study; and three individuals who claimed to have either purchased or consumed PLM's products, Felipe de Jesus Martinez, Lorena Salazar, and Ramon Salazar.  PROLACTO introduced a substantial volume of exhibits and designated significant deposition testimony for consideration.  During trial, the Court also took under advisement issues relating to the admissibility of numerous exhibits proffered by both parties.

Following the close of trial, each party submitted their proposed findings of fact and conclusions of law to the Court.[6]  *See* Pls.' [Proposed] Findings of Fact & Conclusions of Law ("Pls.' Br."), ECF No. 309;[7] Def.'s Proposed Findings of Fact & Conclusions of Law ("Def.'s Br."), ECF No. 311.[8]  Each party also submitted an opposition brief.  *See* Pls.' Opp'n & Obj.

---

[6]    Throughout this opinion, the Court cites to particular pages of the parties' briefing using the electronic page numbers generated by ECF.

[7]    PLM filed two version of its proposed findings of fact and conclusions of law:  one submitted as part of a motion for leave to file under seal containing confidential information and one publicly filed version in which the confidential information is redacted.  *See* Pls.' Sealed Mot. Leave File Doc. Seal, ECF No. 307.  PLM's motion to file the document under seal is unopposed, and the Court will grant the motion.  For ease of reference, unless referring specifically to the portions of the document that PLM has designated as confidential, the Court cites the publicly filed, redacted version of the document.

[8]    PLM argues that the Court should disregard PROLACTO's proposed findings of fact in their entirety, because they contain insufficient citations to the record.  *See* Pls.' Opp'n & Obj. Def.'s Proposed Findings of Fact & Conclusions of Law at 9–11, ECF No. 314.  Indeed, PROLACTO's proposed findings of fact leave much to be desired.  As PLM observes, the vast majority of PROLACTO's proposed facts, including proposed facts that are highly specific and material to the issues in this case, do not contain *any* citations to the record.  *See, e.g.*, Def.'s Br. at 4 ¶ 12 (discussing PROLACTO's earliest licensing agreements in the United States); *id.* at 5 ¶¶ 16–17 (discussing PROLACTO's earliest usage of the marks at issue in the United States); *id.*

Def.'s Proposed Findings of Fact & Conclusions of Law ("Pls.' Opp'n"), ECF No. 314;

PROLACTO's Reply & Opp'n Pls.' [Proposed] Findings of Fact & Conclusions of Law ("Def.'s

Opp'n"), ECF No. 315.

### d. Other Pending Motions

In addition to the factual and legal issues presented to the Court during trial, several other

motions filed during the course of trial or post-trial remain pending.

PROLACTO filed a motion for involuntary dismissal of PLM's claims under Rule 52(c)

of the Federal Rules of Civil Procedure at the close of PLM's case-in-chief. *See* Def.'s Mot. &

Mem. Involuntary Dismissal & Recons. Interlocutory Order, ECF No. 283. Pursuant to Rule

52(c), the Court declined to render any judgment until the close of all the evidence. *See* Day 9

A.M. at 4:13–5:3. Because the Court now finds for PLM on some of its claims after the close of

all the evidence, PROLACTO's motion for involuntary dismissal will be denied as moot.[9]

PROLACTO also filed a separate motion to exclude evidence and to seek spoliation sanctions.

*See* Def.'s Mot. & Mem. Exclusion & Spoliation Sanctions, ECF No. 290. For numerous

reasons explained below, the Court will deny that motion. Finally, in response to certain post-

---

at 8 ¶ 25 (discussing PLM's co-founders' understanding of the marks at issue at the time they founded PLM's business); *id.* at 11 ¶ 39 (discussing PLM's "first-ever interstate sale of product"); *id.* at 23–24 ¶ 72 (discussing distinctiveness and secondary meaning of PROLACTO's marks). The lack of citations has certainly created more work for the Court. The Court has not, however, disregarded PROLACTO's proposed findings of fact in their entirety. Rather, the Court has carefully considered both parties' arguments and the record in making its findings of fact, expending considerable effort to determine what portions of the record PROLACTO relies upon in its post-trial briefing. In some instances, in the absence of citations, the Court has been unable to locate substantial, if any, support in the record for PROLACTO's propositions. The Court makes its findings of fact accordingly.

[9]     PROLACTO's motion also included a request for the Court to reconsider portions of its summary judgment ruling based on PLM's purported bad faith adoption of its marks. The Court addresses the issue of bad faith in its findings of fact and conclusions of law, and, based on those findings and conclusions, will deny this portion of the motion as well.

trial arguments made by PLM in its proposed findings of fact and conclusions of law, PROLACTO filed a motion seeking leave to file additional deposition designations.  *See* Def.'s Mot. Seeking Leave File Add'l Deposition Designations, ECF No. 316.  The Court discusses the significance of the parties' designated deposition testimony in its findings of fact, and, for the reasons stated below, will deny PROLACTO's motion as moot.

PLM, for its part, filed four motions asking the Court to take judicial notice of certain facts.  *See* Pls.' Request Judicial Notice, ECF No. 248; Pls.' Request Judicial Notice No. 2, ECF No. 263; Pls.' Request Judicial Notice No. 3, ECF No. 277; Pls.' Request Judicial Notice No. 4, ECF No. 282.  The Court addresses these pending motions, as well as admissibility issues relating to certain evidence taken under advisement during the trial, throughout its findings of fact to the extent that the Court has found the issues relevant.  To the extent those issues are not relevant to the Court's analysis, they will be denied as moot.

## II.  LEGAL STANDARDS

The Court first sets forth the requirements of the Federal Rules of Civil Procedure governing the Court's findings of fact and conclusions of law and then addresses the standard that the Court uses in reviewing the TTAB's decision in this case.

### A.  Rule 52(a) of the Federal Rules of Civil Procedure

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, in an action tried without a jury, the Court "must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  The Court's "[f]indings and conclusions may be incorporated in any opinion or memorandum of decision the court may file."  *Defs. of Wildlife, Inc. v. Endangered Species Sci. Auth.*, 659 F.2d 168, 176 (D.C. Cir. 1981); *see also* Fed. R. Civ. P. 52(a)(1) ("The findings and conclusions  . . . may appear in an opinion or memorandum of decision filed by the court.").

The Court's findings must be "sufficient to indicate the factual basis for the ultimate conclusion." *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422 (1943); *see also Lyles v. United States*, 759 F.2d 941, 943–44 (D.C. Cir. 1985) ("One of [the rule's] chief purposes is to aid the appellate court by affording it a clear understanding of the ground or basis of the decision of the trial court." (internal quotation omitted)).   "But the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts."   Fed. R. Civ. P. 52(a) advisory committee note to 1946 amendment; *accord Caffey v. Togo*, No. 97-5092, 1998 WL 230269, at *2 (D.C. Cir. Feb. 9, 1998); *Wise v. United States*, --- F. Supp. 3d ----, 2015 WL 7274026, at *2 (D.D.C. Nov. 17, 2015); *Moore v. Hartman*, 102 F. Supp. 3d 35, 65 (D.D.C. 2015).

The Court is neither "require[d]" nor "encourage[d]" "to assert the negative of each rejected contention as well as the affirmative of those which they find to be correct."   *Schilling v. Schwitzer-Cummins Co.*, 142 F.2d 82, 84 (D.C. Cir. 1944); *see also Huff v. City of Burbank*, 632 F.3d 539, 543 (9th Cir. 2011) ("It is . . . not 'necessary that the trial court make findings asserting the negative of each issue of fact raised.'" (quoting *Carr v. Yokohama Specie Bank, Ltd., of S.F.*, 200 F.2d 251, 255 (9th Cir. 1952), *rev'd on other grounds*, 132 S. Ct. 987 (2012))).   Similarly, "the court need not 'address every factual contention and argumentative detail raised by the parties,' or 'discuss all evidence presented at trial.'"   *Moore*, 102 F. Supp. 3d at 65 (quoting *Mayaguez v. Corporacion Para El Desarrollo Del Oeste*, 824 F. Supp. 2d 289, 295 (D.P.R. 2011); *Wachovia Bank N.A., Nat. Ass'n v. Tien*, 598 Fed. App'x 613, 617–18 (11th Cir. 2014)); *see also Wise*, 2015 WL 7274026, at *2 ("[T]he Court need not address all the evidence presented at trial, and must simply make findings sufficient to allow the appellate court to conduct a meaningful review."); *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d

14

1052, 1058 (2d Cir. 1992) ("All that is required by Rule 52(a) is that the trial court provide findings that are adequate to allow a clear understanding of its ruling."); 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2579 (3d ed. 2008).

In accordance with these standards, the Court has cited portions of the record, including trial testimony, trial exhibits, designated deposition testimony, and the TTAB record, to support its findings of fact.  The Court has not, however, exhaustively identified every portion of the record upon which it has relied to make its findings of fact, and the omission of a citation to a particular portion of the record does not necessarily mean that the Court did not rely on that portion to make its findings of fact.  Rather, the Court has considered the record in its entirety, including the Court's own determination of witnesses' credibility, and its citations to portions of the record are simply intended to provide a helpful reference for the basis of its findings.

Finally, the Court notes that Rule 52 provides that the Court's "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6); *see also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–76 (discussing the "clearly erroneous" standard).

### B.  Standard for Reviewing the TTAB's Decision

PLM seeks reversal of the TTAB's decision to cancel the registration of its trademark in Complaint Count I.  The other pending claims and counterclaims in this action were not presented to the TTAB.  Nevertheless, because there is some overlap in the factual issues underlying Complaint Count I and the other claims and counterclaims in this action, and given recent developments in the legal landscape, it is helpful for the Court to clarify upfront that the

standard by which it reviews the TTAB's factual findings and makes its own findings of fact in this case is *de novo*.

First, an understanding of the statutory framework for this action is necessary. The Lanham Act offers a party to a cancellation proceeding before the TTAB who is "dissatisfied" with the TTAB's decision two options. *See* 15 U.S.C. § 1071. The party may either: (1) appeal the TTAB's decision directly to the United States Court of Appeals for the Federal Circuit pursuant to § 1071(a); or (2) commence a civil action in a United States District Court pursuant to § 1071(b). *See id.* Here, PLM chose the latter option, filing this action against PROLACTO pursuant to § 1071(b). In a § 1071(b) action, the district court is empowered to "adjudge that an applicant is entitled to a registration upon the application involved, that a registration involved should be cancelled, or such other matter as the issues in the proceeding require, as the facts in the case may appear." 15 U.S.C. § 1071(b)(1).

Proceedings under § 1071(a) and § 1071(b) "differ in important ways." *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 13 (D.C. Cir. 2008). For example, unlike a § 1071(a) proceeding, in a § 1071(b) proceeding, the court is not always required to review the TTAB's record. Rather, the statute only requires that the record "be admitted on motion of any party, upon such terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court imposes, without prejudice to the right of any party to take further testimony." 15 U.S.C. § 1071(b)(3); *see also Aktieselskabet*, 525 F.3d at 13. Once admitted, the record "shall have the same effect as if originally taken and produced in the suit." 15 U.S.C. § 1071(b)(3); *see also Aktieselskabet*, 525 F.3d at 13. And, importantly, the parties in § 1071(b) action may raise new claims, present new evidence, and seek additional relief beyond that which was before the TTAB. *See Aktieselskabet*, 525 F.3d at 13 (holding that the district court "may

consider both new issues and new evidence that were not before the TTAB"). Here, both parties

have asserted a variety of new claims and introduced substantial evidence, in the form of both

witness testimony and documentary evidence, that was not before the TTAB.

In determining the proper standard of review in this case, the Court looks to recent

Supreme Court precedent. In 2012, the Supreme Court held in *Kappos v. Hyatt*, 132 S. Ct. 1690

(2012), that when an applicant for a patent seeks review of a decision of the USPTO in a district

court pursuant to 35 U.S.C. § 145 and "new evidence is presented on a disputed question of fact,

the district court must make *de novo* factual findings that take account of both the new evidence

and the administrative record before the PTO." *Kappos*, 132 S. Ct. at 1701. The Court

explained:

> The district court must assess the credibility of new witnesses and
> other evidence, determine how the new evidence comports with the
> existing administrative record, and decide what weight the new
> evidence deserves. As a logical matter, the district court can only
> make these determinations *de novo* because it is the first tribunal to
> hear the evidence in question.

*Id.* at 1700. The Court agreed with the Federal Circuit's decision below that "the district court

may, in its discretion, 'consider the proceedings before and findings of the Patent Office in

deciding what weight to afford an applicant's newly-admitted evidence'" but also cautioned that

"[t]hough the PTO has special expertise in evaluating patent applications, the district court

cannot meaningfully defer to the PTO's factual findings if the PTO considered a different set of

facts." *Id.* (quoting *Hyatt v. Kappos*, 625 F.3d 1320, 1335 (Fed. Cir. 2010)). Thus, the Court

concluded: "the proper means for the district court to accord respect to decisions of the PTO is

through the court's broad discretion over the weight to be given to evidence newly adduced in

the § 145 proceedings." *Id.*

Although *Kappos* specifically concerned a federal district court's review of a USPTO patent decision under 35 U.S.C. § 145, its holding applies with equal force to actions challenging a TTAB trademark decision under 15 U.S.C. § 1071(b) that involve the introduction of new evidence. The Supreme Court subsequently clarified in *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293 (2015), that *Kappos* concerned an "analogous scheme in patent law" and that when a party challenges a trademark registration in district court under § 1071(b), "the judge resolves registration *de novo.*" *B & B Hardware*, 135 S. Ct. at 1301; *see also id.* at 1305 (referring to a party's ability to "seek judicial review of a TTAB registration decision in a *de novo* district court action"); *id.* at 1306 (stating that Congress "authorized *de novo* challenges for those 'dissatisfied' with TTAB decisions" in § 1071(b)). The Court's clarification in *B & B Hardware* followed the Fourth Circuit's decision in a separate case describing *Kappos* as "the primary case interpreting the patent and trademark civil action statutes" and as "explicitly defin[ing] the only situation where consideration of the TTAB decision is permitted." *Swatch AG (Swatch SA) v. Beehive Wholesale, LLC*, 739 F.3d 150, 155–56 (4th Cir. 2014); *see also Shammas v. Focarino*, 784 F.3d 219, 225 (4th Cir. 2015) (citing *Kappos*, 739 F.3d at 155); *Adams Mfg. Corp. v. Rea*, Civ. No. 12-1430, 2014 WL 978116, at *7 (W.D. Pa. Mar. 12, 2014). The leading authority on trademark law has also recognized that, in light of *Kappos*, a district court reviews the TTAB record in a § 1071(b) proceeding *de novo.* 3 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* ("*McCarthy on Trademarks*") § 21:20 (4th ed. 2016) ("[I]f review is sought in a federal district court, new evidence is permitted and both new evidence and the T.T.A.B. record are reviewed with '*de novo*' scrutiny."); *id.* § 21:22 ("[A]fter the 2012 *Kappos* case, the district court reviews with '*de novo*' scrutiny.").

Therefore, in line with the Supreme Court's decisions in *Kappos* and *B & B Hardware*, the Court makes its findings of fact and conclusions of law *de novo*. As permitted by *Kappos*, the Court has reviewed the entirety of the TTAB record in this case and, in its discretion, takes into account both the new evidence submitted over the course of the lengthy bench trial and the TTAB record. *See Kappos*, 132 S. Ct. at 1701. But because the TTAB, in many respects, considered a "different set of facts" than has been presented here, the Court finds itself largely unable to "meaningfully defer" to the TTAB's factual findings, despite the TTAB's expertise on trademark issues. *Id.* The Court recognizes that this standard of review may represent a departure from the pre-*Kappos* approach in this Circuit, as well as the Court's own approach at the summary judgment stage of this litigation,[10] but the Court is confident, particularly after the Supreme Court's clarification in *B & B Hardware*, that the proper standard of review is *de novo*. The parties appear to be in agreement with the Court on this issue as well.[11]

---

[10]    In its summary judgment opinion, issued after *Kappos* but before *B & B Hardware*, the Court stated, citing pre-*Kappos* authorities, that, in a § 1071(b) proceeding, a district court "reviews the TTAB's findings of fact under the 'substantial evidence' standard, which requires a court to defer to the factual findings made by the TTAB unless new evidence 'carries thorough conviction'" but that the court reviews any new evidence *de novo*. *PLM I*, 69 F. Supp. 3d at 193 (quoting *Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 146 F.3d 983, 990 (D.C. Cir. 1998) (citing 3 *McCarthy on Trademarks* § 21:20 (4th ed. 1997))). McCarthy has recognized that the "thorough conviction" rule is "no longer the law" and that, after *Kappos*, "the district court reviews with '*de novo*' scrutiny." 3 *McCarthy on Trademarks* § 21:20 (4th ed. 2016). To the extent that the Court's discussion of the standard of review at summary judgment could be considered to have been incorrect at the time, it had no impact on the Court's ultimate holding and does not require reconsideration. The Court's discussion of the standard of review specifically concerned Complaint Count I, *see PLM I*, 69 F. Supp. 3d at 193, and the Court denied summary judgment to both parties on that count after finding that new evidence submitted by PLM, which the Court properly reviewed *de novo*, created a genuine dispute as to whether the "tacking" doctrine provided PLM with priority of use as to the Indian Girl mark, *see id.* at 194–96. The Court also notes that the parties have never challenged the Court's summary judgment ruling on this basis. On the contrary, PROLACTO argued during trial that the Court should have afforded *greater* deference to the TTAB's findings of fact. *See* Day 8 A.M. at 20:18–23:10.

[11]    In its post-trial briefing, PLM argues that the standard of review is *de novo*, citing, among other authorities, the Supreme Court's decision in *Kappos* and the Fourth Circuit's decision in

## III.  FINDINGS OF FACT

### A.  Plaintiffs

#### 1.  In General

1.      The plaintiffs and counter-defendants in this action, Paleteria La Michoacana, Inc. ("PLM, Inc.") and Paleteria La Michoacana (Sub) Inc. ("PLM (Sub) Inc."), are California corporations.

2.      PLM produces and sells Mexican-style ice cream, paletas, and bolis out of its current headquarters in Modesto, California.  *See* Day 3 A.M. at 90:4–92:2.  A paleta is a Mexican-style popsicle that can be either water-based or cream-based.  *See id.* at 92:7–13.  A bolis is an ice milk or water-based product similar to an American push pop that is sealed on both sides and cylindrical in shape.  *See id.* at 90:15–18.

3.      PLM's target consumers are of Mexican origin, typically first-, second-, or third-generation immigrants to the United States from Mexico.  The flavor profile of PLM's products

---

*Swatch AG.  See* Pls.' Br. at 54–56 ¶¶ 9–13.  In response, PROLACTO does not dispute PLM's citation of *Kappos*.  Def.'s Opp'n at 39 ¶ 12.  PROLACTO argues, however, that PLM's "remaining analysis is flawed and incomplete," citing the Supreme Court's "superced[ing]" decision in *B & B Hardware*.  Def.'s Opp'n at 39–41 ¶ 12.  As discussed, *B & B Hardware* only solidifies the Court's conclusion, and, indeed, relying on the Supreme Court's opinion, PROLACTO repeatedly refers to the standard of review as being *de novo*.  *See, e.g.*, *id.* at 41 & n.1.  Although PROLACTO does not actually present any concrete argument in its discussion of *B & B Hardware*, it extensively summarizes the Court's holding regarding the preclusive effect of TTAB decisions in subsequent litigation, the central issue in that case.  *See id.* at 39–41 ¶ 12.  To the extent that PROLACTO argues that *B & B Hardware* means that the TTAB's findings of fact have preclusive effect here, it plainly misunderstands the opinion.  This case does not present any preclusion issues.  This is an action challenging the TTAB's decision *de novo* pursuant to § 1071(b) in which the parties have brought additional claims.  Unlike the case in *B & B Hardware*, it is not a separate infringement suit that followed an unchallenged TTAB decision.  *See B & B Hardware*, 135 S. Ct. at 1302 (stating that the party "did not seek judicial review in either the Federal Circuit or District Court"); *see also id.* at 1305 (distinguishing between "judicial review of a TTAB registration decision in a *de novo* district court action" and "unreviewed TTAB decisions" as to preclusion).

is designed to appeal to these target consumers, but PLM also sells its products to consumers that fall outside this target demographic. *See* Day 5 A.M. at 91:5–15.

4.      Today, PLM sells its products to Wal-Mart, large supermarkets such as Safeway, HEB, Albertsons, and Super Value, and regional chain stores, such as Save Mart, FoodMaxx, and Lucky Stores in the Northern California area, and Vallarta Supermarkets, Northgates, and El Super in the Southern California area. *See* Day 5 A.M. at 92:16–93:3. PLM also sells some of its product to distributors that distribute to street vendors. *See id.* at 93:7–16. PLM does not generally sell its products directly to consumers, and it does not own or operate any retail location where consumers can purchase its products. PLM currently sells its products in, approximately, 30 states or more. *See* Day 6 A.M. at 102:21–23.

## 2. History and Growth of PLM

5.      The history of PLM can be traced to Ignacio and Ruben Gutierrez, two brothers who immigrated to California from Jalisco, Mexico and began selling shaved ice part-time out of pushcarts in the area of Turlock, California in 1988 or 1989. *See* Day 3 A.M. at 76:6–80:25; Day 8 A.M. at 37:24–40:15. The Gutierrez brothers sold shaved ice under the name "Acapulco" from approximately 1988 to 1991. *See* Day 3 A.M. at 80:12–25; Day 8 A.M. at 37:24–50:19.

6.      In or about October 1990, the Gutierrez brothers decided to sell paletas instead of shaved ice. In preparation, the brothers visited Guadalajara, in the state of Jalisco, Mexico to purchase paleta-making equipment, including molds, flavorings, sticks, a brine tank, and push carts, and to learn how to make, package, and store paletas. As part of their research in Mexico, the brothers also visited numerous paleterias in order to understand the business of making and selling paletas. *See* Day 3 A.M. at 82:10–86:21; Day 8 A.M. at 45:17–52:14.

21

7.      In 1991, using money they had saved from their shaved ice business, the Gutierrez brothers opened a paleta factory at 351 North Walnut Road in Turlock, California and sold the paletas that they made in this factory out of their pushcarts in the Northern California area.  *See* Day 3 A.M. at 81:11–82:5; *id.* at 94:6-16; Day 8 A.M. at 48:17–50:10.

8.      From 1991 to 1999, the Gutierrez brothers conducted their paleta business as a general partnership based on an oral agreement.  The Gutierrez brothers executed a written partnership agreement effective January 1, 1999, a few months before the partnership dissolved.  *See* Day 3 P.M. at 34:17–35:15; Day 8 A.M. at 62:17–63:4; R. Gutierrez Dep. Tr. (Mar. 15, 2010) at 9:22–11:11, 35:15–24, TTAB Dkt. 81.

9.      In 1991, the Gutierrez brothers' paleta business generated between $50,000 and $60,000 in sales revenue.  By 1998, their business generated close to $1 million in sales.  *See* Day 3 A.M. at 94:17–19 (sealed testimony); Day 3 P.M at 76:24–77:14; Day 5 A.M. at 85:8–13.

10.      The Gutierrez brothers' partnership operated under various fictitious names over time, including "Paleteria Michoacana," "Paleteria La Michoacana," and "La Michoacana," but all variations used the word "Michoacana."  *See, e.g.*, R. Gutierrez Dep. Tr. (June 10, 2013) at 13:1–5 (stating that the partnership conducted business under the name "Paleteria Michoacana"); *id.* at 15:10–16 (stating that business "probably" operated under names other than "Paleteria Michoacana" between 1991 and 1996 but that he was not sure); I. Gutierrez Dep. Tr. (Dec. 30, 2009), Reg. Ex. 30, TTAB Dkt. 69; (Affidavit of Publication for fictitious business name of "PALETERIA MICHOACANA" dated May 22, 1991); *id.* Reg. Ex. 37 (telephone bill dated February 17, 1993 addressed to "RUEBEN [sic] GUTIERREZ DBA LA MICHOACANA"); I. Gutierrez Dep. Tr. (Dec. 30, 2009), Reg. Ex. 36, TTAB Dkt. 71 (Purchase and Sale Agreement dated April 8, 1999 terminating the partnership known as "PALETERIA LA MICHOACANA").

11.     On May 5, 1993, the Gutierrez brothers sold their product wholesale to a Las Vegas, Nevada distributor.  Ignacio Gutierrez recorded the sale by hand on an invoice with the name "PALETERIA MICHOACANA" written on the top.  *See* Pls.' Ex. 142 at 1; Day 3 A.M. at 111:11–114:10.

12.     In or about 1997, the Gutierrez brothers began to have disagreements with each other, which sometimes resulted in physical violence.  In early 1997, as a result of these disagreements, Ruben temporarily left the business.  Ignacio persuaded Ruben to return a week or two later, but the Gutierrez brothers agreed to conduct their business separately.  Under this arrangement, each brother ran the business in two-week shifts so that they did not need to work together at the same time.  From that point until the dissolution of the partnership, the Gutierrez brothers had very limited contact with each other.  Despite this arrangement (or perhaps as a result of it), the Gutierrez brothers continued to have serious disagreements with each other. *See* Day 8 A.M. at 65:4–72:25.

13.     In 1998, Ignacio married Patricia Gutierrez, who then immigrated to the United States in approximately February 1999.  In March or April 1999, she began visiting the PLM offices to informally assist Ignacio with his work.  The marriage and Patricia's involvement in the business exacerbated problems between the Gutierrez brothers, and Ruben Gutierrez ultimately determined that it was necessary to dissolve the partnership.  *See* Day 6 A.M. at 50:17–51:2; Day 6 P.M. at 5:10–6:3; Day 7 A.M. at 96:13–24; *id.* at 106:16–107:20; Day 8 A.M. at 77:17–83:12; *see also* Day 4 A.M. at 9:17–10:2.

14.     The Gutierrez brothers terminated their partnership through a Purchase and Sale Agreement dated April 8, 1999 pursuant to which Ignacio Gutierrez agreed to pay Ruben for his 50% share of the business.  *See* Day 3 P.M. at 35:10–23; Day 8 A.M. at 83:13–84:7; I. Gutierrez

Dep. Tr. (Dec. 30, 2009), Reg. Ex. 36, TTAB Dkt. 71 (Purchase and Sale Agreement dated April 8, 1999 terminating the partnership known as "PALETERIA LA MICHOACANA").

15.     After the termination of the Gutierrez brothers' partnership, Ruben Gutierrez formed his own paleta and ice cream business called Tropicale Foods, Inc. ("Tropicale Foods"). Tropicale Foods primarily sells its products using the trademark name "Helados Mexico." *See* Day 8 P.M. at 38:13–40:3.  Tropicale Foods and PLM are competitors. *See* Day 4 A.M. at 13:1– 9.

16.     Following the dissolution of the Gutierrez brothers' partnership, Ignacio Gutierrez continued to operate the business without interruption as a sole proprietorship. *See* Day 3 P.M. at 35:16–36:9.  At the time, the sole proprietorship primarily sold its products to independently- owned Mexican stores in the United States and the "C-store channel," which includes gas stations with mini-marts and neighborhood convenience stores and liquor stores. *See* Day 5 A.M. at 91:16–92:15.

17.     In approximately May or June 1999, Patricia Gutierrez began formally working for the sole proprietorship in an administrative or secretarial role, which included, among other things, filing documents related to sales and distribution and ordering and distributing office supplies.  *See* Day 5 A.M. at 82:11–17; *id.* at 108:6–9; *id.* at 112:3–6; Day 6 A.M. at 50:17–51:2; Day 6 P.M. at 5:21–6:3; Day 7 A.M. at 109:11–21.

18.     At the time that Patricia Gutierrez joined the business in 1999, PLM sold its products to, among others, a distributor that sold PLM's products in the Sacramento and northern Nevada areas.  *See* Day 5 A.M. at 93:17–94:11.

The issue of when PLM began selling its products in interstate commerce was disputed between the parties.  PROLACTO argues, without providing any citation to the record, that PLM

made its "first-ever interstate sale of product . . . when Ignacio Gutierrez personally delivered a relatively small shipment of paletas to a customer in the State of Arizona" on February 21, 2005. Def.'s Br. at 11 ¶ 39.  PROLACTO appears to be referencing PLM's sale of product bearing the registered LA INDITA MICHOACANA mark to a customer in Arizona named Cruz Ramirez. *See* Day 4 P.M. at 88:7–14.  That sale is discussed below.  The Court is not persuaded, based on its observation of the witnesses' testimony and trial and its review of the documentary record in this case that this was PLM's "first-ever" interstate sale.

PROLACTO also offered testimony by Ruben Gutierrez that throughout his time as a partner in the business from 1991 to April 1999, PLM sold its products exclusively within the state of California.  *See* Day 8 A.M. at 75:25–77:18.  To the extent that his testimony conflicts with Patricia Gutierrez's testimony, the Court found Ms. Gutierrez's testimony to be more credible and convincing.  As explained in detail below with respect to the dispute over PLM's first use of the Indian Girl mark, the Court found Ms. Gutierrez to be more credible in her testimony than Ruben Gutierrez for a number of reasons, including the Court's observation of the witnesses' live testimony.  With respect to this issue specifically, the Court found Ms. Gutierrez's testimony to be particularly credible given her specific recollection of personally processing the paperwork to obtain a license to sell PLM's dairy products across state lines and into Nevada.  *See* Day 5 A.M. at 94:3–11.

19.     In 2002, Ignacio Gutierrez incorporated the business in California as Paleteria La Michoacana, Inc.  *See* Day 3 P.M. at 54:19–25.

20.     Also in 2002, the business moved from 351 North Walnut in Turlock, California to its current location at 2068 Lapham Drive in Modesto, California, 95354.  PLM makes all of

its products at the Modesto, California location.  *See* Day 3 A.M. at 90:19–92:2; Day 5 A.M. at 84:23–85:2.

21.     From 1999 and through 2006, PLM expanded its geographic distribution to other states, and, by 2005, PLM was selling its products in, at a minimum, California, Nevada, Texas, Oregon, Utah, and Colorado.  *See* Day 6 A.M. at 101:13–23.

22.     At some point in 2005, PLM began selling its products to supermarket and grocery store chains in Texas, including in the areas of Houston and Dallas, that in turn offered PLM's products for sale to consumers.  *See generally* Day 6 A.M. at 101:24–102:1.  For example, PLM began selling its product to and running advertisements in HEB, a chain operating stores in Houston and Dallas, and a Hispanic-format store operated by HEB called Mi Tienda.  *See* Day 4 A.M. at 25:8–26:18; Day 6 A.M. at 64:4–66:16; Pls.' Ex. 121 at 2.  PLM also began selling to Sellers Bros., a chain operating in the city of Houston and areas to the south of the city, as well as running advertisements in the chain's weekly circular.  *See* Day 6 A.M. at 58:16–63:12; Pls.' Ex. 121 at 1.

23.     In 2011, Ignacio Gutierrez sold 22% of his ownership interest in PLM, Inc. to the Central Valley Fund ("CVF").  As part of this transaction, Paleteria La Michoacana, LLC ("PLM, LLC") was formed.  *See* Day 3 P.M. at 81:6–16.

24.     Between 2006 and 2012, PLM expanded its geographic distribution even further through large-scale retailers such as Wal-Mart, entering states including Washington, New Mexico, and Illinois.  *See* Day 6 A.M. at 102:2–19.

25.     In 2013, PLM, LLC was converted to Paleteria La Michoacana (Sub), Inc. ("PLM (Sub) Inc."), which has continued to operate the business to the present day.  *See* Day 3 P.M. at

80:24–82:4.  CVF subsequently converted its equity in the company to debt.  *See* Day 7 P.M. at 60:16–25.

26.　　PLM's business grew over time, particularly following the dissolution of the Gutierrez brothers' partnership in April 1999, in terms of its payroll, geographic distribution, revenue, and variety of products.  *See, e.g.*, Day 5 A.M. at 82:25–84:1; Pls.' Ex. 147; Pls.' Ex. 269.

### 3.  PLM's Use of "Michoacana"

27.　　Since 1991, PLM has continuously and consistently used "Michoacana" or "La Michoacana" as a trademark in connection with making and selling paletas, bolis, and ice cream. *See* Day 3 A.M. at 94:20–95:3; Day 8 P.M. at 30:21–31:6; R. Gutierrez Dep. Tr. (Mar. 15, 2010) at 35:25–37:2, 38:5–19, 53:6–9, TTAB Dkt. 81.

28.　　The Gutierrez brothers used "Michoacana" as a trademark from the beginning of their paleta business in 1991.  *See* Day 3 A.M. at 94:22–95:2.

29.　　The Gutierrez brothers adopted the marks "La Michoacana" and "Michoacana" for their business in 1991 because they had seen that name used in paleterias in Mexico.  At the time that they adopted the marks, however, they did not believe that, in Mexico, the terms "La Michoacana" or "Michoacana" denoted a single source of product.  The brothers adopted the marks because, at least in part, they believed that their target consumers would recognize the name.

The Court's finding is well grounded in Ignacio and Ruben Gutierrez's live testimony at trial.  The Gutierrez brothers both testified that during their time in Mexico, including during their trip to Guadalajara in preparation for opening their business in California in 1991, they observed innumerous paleterias that used the name "La Michoacana" or a variation on that name

containing the word "Michoacana," including "Paleteria Michoacana." *See* Day 3 A.M. at 85:4–16; Day 8 A.M. at 50:24–51:4; Day 8 P.M. at 63:7–21; *see also* R. Gutierrez Dep. Tr. (Mar. 15, 2010) at 7:21–8:1, TTAB Dkt. 81.  Ruben Gutierrez was confident that there were, in his words, "over a thousand" paleterias named "La Michoacana" in Mexico, Day 8 P.M. at 63:21, and Ignacio Gutierrez similarly stated that in Guadalajara, "they're almost on every corner," Day 3 A.M. at 85:8–9; *see also* Day 4 P.M. at 50:13–14 (stating that there is one "just in every town in Mexico").  These paleterias were distinct from each other in terms of appearance.  *See* Day 3 A.M. at 88:9–10; Day 8 P.M. at 51:7–52:9.  Ignacio testified that his understanding was not that the phrase "La Michoacana" referred to a single source of product, but, rather, "everybody used it."  Day 3 A.M. 85:8–17; *see also* Day 4 P.M. at 50:17.  Similarly, Ruben Gutierrez testified on cross-examination that he did not know whether all of the "La Michoacana" paleterias that he observed in Mexico were owned or operated by the same company.  *See* Day 8 P.M. at 63:22–64:3.  He also testified that he did not know whether PROLACTO licensed the phrase "La Michoacana" to every paleteria that uses the name in Mexico.  *See id.* at 64:4–65:6.  Finally, the Court notes that PROLACTO itself was not even formed in Mexico until 1992, the year *after* the Gutierrez brothers began doing business in California using "La Michoacana," and no evidence has been presented to the Court suggesting that the Gutierrez brothers recognized some other entity as being the exclusive owner or user of the phrase "La Michoacana" in Mexico in 1991.

30.     There is no indication that the Gutierrez brothers adopted the name in an effort to associate themselves with a prior user of the name in the United States.

31.     The Gutierrez brothers used "LA MICHOACANA" on pushcarts, as shown on the design in Plaintiffs' Exhibit 91.[12] Ignacio Gutierrez drew this design in October or November of 1990, and it was used on pushcarts beginning in 1991.  *See* Pls.' Ex. 91; Day 3 A.M. at 98:12–100:15.

32.     For a period of time beginning in 1991, the Gutierrez brothers packaged each paleta in a plastic wrapper printed with "La Michoacana," as shown on the design in Plaintiffs' Exhibit 59, which is a printer's proof of the packaging containing handwritten changes made by Ignacio Gutierrez in February 1991.  This was the first wrapper design that the Gutierrez brothers used.  Pls.' Ex. 59; Day 3 A.M. at 99:25–105:14; R. Gutierrez Dep. Tr. (June 10, 2013), Pls.' Ex. 256, at 16:21–17:7, 18:10–19.

33.     For a short period in the early 1990s, the Gutierrez brothers decided to intentionally copy a local competitor's paleta wrapper design of a clown for use on their paleta wrappers.  After the local competitor took action against the Gutierrez brothers, the Gutierrez brothers ceased using the clown design.  *See* Day 4 P.M. at 92:10–93:23; *id.* at 96:5–96:14; Day 8 A.M. at 55:12–57:20.

34.     At some point either shortly before or after the Gutierrez brothers briefly adopted a competitor's clown design for their paleta wrappers in the early 1990s, the brothers created and adopted a new design for their paleta wrappers as shown in the wrapper film contained in Plaintiffs' Exhibit 79.  This design used "MICHOACANA" with an array of cartoon fruit and paletas wearing sunglasses in black and white.  Pls.' Ex. 79; Day 3 A.M. at 105:16–109:10.

---

[12]     The remainder of the Spanish text translates to "NOW IN THE UNITED STATES" and "THE BEST IN THE WORLD."

35.     In 1993, the Gutierrez brothers began providing freezers to retail establishments in order to hold and sell their products to consumers.  A photograph of the first freezer, which had a decal and the name "PALETERIA MICHOACANA," is located in Plaintiffs' Exhibit 89. *See* Pls.' Ex. 89; Day 3 A.M. at 115:22–118:4; *see also* R. Gutierrez Dep. Tr. (June 10, 2013) at 19:1–24.

36.     In approximately 1994, the Gutierrez brothers modified the design of their paleta wrappers again, adopting the wrapper contained in Plaintiffs' Exhibit 101 and Defendant's Exhibit 73.  This design, unlike the previous design, was in color.  It used the same array of fruit and paletas with sunglasses and contained the name "PALETERIA LA MICHOACANA," with "LA MICHOACANA" being the focus of the design.  The Gutierrez brothers continued to use this wrapper design until the dissolution of their partnership in 1999.  Pls.' Ex. 101; Def.'s Ex. 73; Day 3 A.M. at 118:21–119:20; Day 8 A.M. at 58:18–59:7.

37.     Since the dissolution of the Gutierrez brothers' partnership, PLM has continued to use "Michoacana" in various forms on its products, including in connection with the Indian Girl and LA INDITA MICHOACANA marks that are also at issue in this case.

### 4. PLM's Use of the Indian Girl and LA INDITA MICHOACANA

*a. In General*

38.     PLM has used various marks containing an Indian Girl, appearing in different designs, in commerce over time.

39.     PLM (Sub), Inc. is currently the owner of the three registered trademarks appearing in the chart below.[13]

---

[13]     Throughout trial, PROLACTO repeatedly raised issues concerning the admissibility of documentary evidence submitted by PLM of various USPTO trademark registrations taken from the USPTO's website, arguing that only hard copy records formally certified by the USPTO

| | | |
|:---:|:---:|:---:|
|  |  |  |
| "Indian Girl with Paleta"[14]<br>Reg. No. 2,905,172<br>Pls.' Ex. 35 | "Indian Girl with Cone"[15]<br>Reg. No. 2,968,652<br>Pls.' Ex. 36 | LA INDITA MICHOACANA<br>Reg. No. 3,210,304<br>Pls.' Ex. 37 |

40.     PLM has also used various marks over time that incorporate the Indian Girls that

appear in each of its three registered marks (or an Indian Girl that is similar in appearance) along

---

were admissible.  Without taking a position on this issue, the Court permitted PLM to substitute the relevant exhibits with hard copy records formally certified by the USPTO after trial, which PLM did.  The Court's citations are to those records.  The Court notes, however, that in a suit brought under 15 U.S.C. § 1071(b), "the parties have an unrestricted right to submit . . . evidence so long as it is admissible under the Federal Rules of Evidence and Civil Procedure."  *Swatch AG*, 739 F.3d at 155 (citing *Kappos*, 132 S. Ct. at 1700).  Pursuant to the Federal Rules of Evidence, the Court also takes judicial notice throughout this opinion of information regarding federal trademark registrations that is publicly available through the USPTO's Trademark Status & Document Retrieval Database, available online at http://tsdr.uspto.gov.  *See* Fed. R. Evid. 201(b)(2) (providing that a court may judicially notice a fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 705 n.5 (3d Cir. 2004) (taking judicial notice of records available on the USPTO's website) (citing *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 954 n.27 (Fed. Cir. 1993); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 514 n.3 (Fed. Cir. 1990)).  The Court also notes that the USPTO files for each of these registrations were already included as part of the TTAB record.

[14]     This mark is not registered with a title but is described as "a little girl holding a popsicle." Pls.' Ex. 35.  For ease of reference, the Court refers to this mark using the same name that PLM uses in its proposed findings of fact and conclusions of law.  *See, e.g.*, Pls.' Br. at 109 ¶ 155.

[15]     This mark is not registered with a title but is described as "a little girl holding an ice cream cone."  Pls.' Ex. 36.  For ease of reference, the Court refers to this mark using the same name PLM uses in its proposed findings of fact and conclusions of law.  *See, e.g.*, Pls.' Br. at 109 ¶ 155.

with the words "LA MICHOACANA ES NATURAL" in different variations.  A sample of these marks is provided below.[16]



| Pls.' Ex. 70 | Pls.' Ex. 25 at 9 | Pls.' Ex. 124 | Pls.' Exs. 112 & 125 | Pls.' Ex. 82 |

### b.  "Indian Girl with Paleta" and "Indian Girl with Cone"

41.    PLM, while it operated as a sole proprietorship owned by Ignacio Gutierrez, used the Indian Girl with Paleta and Indian Girl with Cone marks, pictured below, on the outside of its corrugated shipping boxes in which it shipped products from its factory in California to distributors and retail stores in California and Nevada at least as early as June 1999, when, at the latest, Patricia Gutierrez began working for the business.



"Indian Girl with Paleta"
Reg. No. 2,905,172
Pls.' Ex. 35

"Indian Girl with Cone"
Reg. No. 2,968,652
Pls.' Ex. 36

---

[16]    There are some minor, immaterial discrepancies between the photographs presented and the marks as used in the exhibits.  For example, in Plaintiffs' Exhibit 112, the Indian Girl image is positioned in the upper third of the circle, with a greater amount of space between the image and "es natural."  These minor discrepancies are immaterial to the Court's analysis.

The fact issue of when PLM first used the Indian Girl with Paleta and the Indian Girl with Cone marks on its shipping boxes was sharply disputed by the parties at trial through conflicting witness testimony.

Ignacio Gutierrez testified that the Gutierrez brothers' partnership began using the Indian Girl with Paleta on the outside of the corrugated shipping boxes used for shipping and selling their fruit bars to customers in 1994. *See* Day 3 P.M. at 44:17–45:24; *id.* at 50:11–25. He stated that, beginning in 1995, the brothers began also using the Indian Girl with Cone mark on their shipping boxes for ice cream bars. *See id.* at 49:22–50:10. Ignacio explained that he and his brother disagreed over whether to use the Indian Girl, with Ignacio wanting to use it because it represented the name "Michoacana" and Ruben not wanting to use it because he did not want a change. *See id.* at 47:16–49:6. As a compromise, according to Ignacio's testimony, they agreed to use the Indian Girl, which Ignacio said that he drew, on shipping boxes. *See* Day 4 P.M. at 94:3–95:10.[17] He stated that PLM no longer had any original boxes from that time but identified photographs of more recent shipping boxes that displayed the Indian Girl with Paleta and Indian Girl with Cone marks, cropped portions of which appear below. *See* Day 3 A.M. at 49:7–51:9.



**Pls.' Ex. 108 at 3**    **Pls.' Ex. 108 at 1**

---

[17]     On cross-examination, Ignacio Gutierrez explained that he drew "variations" or "versions" of what ultimately became the Indian Girl. *See* Day 5 P.M. at 44:21–45:12.

Ruben Gutierrez, in stark contrast, testified that the partnership never used any Indian Girl marks, including the Indian Girl with Paleta and Indian Girl with Cone marks, on its shipping boxes and that the first time that he saw a shipping box with those marks was when he saw them in the marketplace in approximately late 2004, long after he left PLM's business in April 1999. *See* Day 8 A.M. at 91:7–93:5. He did not believe that the brothers had ever discussed the idea of using an Indian Girl at any time during their partnership. *See* Day 8 P.M. at 5:12–22.

Finally, Patricia Gutierrez testified several times over the course of three separate days that, at the time she joined Ignacio's sole proprietorship in 1999, the business used both the Indian Girl with Paleta and the Indian Girl with Cone on its shipping boxes. She identified the same photographs as Ignacio and testified that those boxes were shipped to customers in California and Nevada. Because she was not a part of the business at the time that it operated as the Gutierrez brothers' partnership, she had no personal knowledge of its prior use. *See* Day 5 A.M. at 95:3–97:19; Day 6 A.M. at 51:3–19; Day 7 A.M. at 110:2–6; Day 7 P.M. at 58:15–59:19.

Ultimately, without any documentary evidence supporting either side's position, the Court must resolve this factual dispute by making credibility determinations. The Court found Patricia Gutierrez to be the most credible witness of the three. Based on the Court's observation of her entire live testimony over the course of more than two-and-a-half days of trial, as well as her testimony on this particular issue, the Court found her to be clear, consistent, and sufficiently and reasonably precise in her recollections. She even returned after one break to clarify, unprompted by counsel, that one particular Indian Girl design along with the words LA MICHOACANA ES NATURAL, discussed below, was not used on PLM's shipping boxes in

34

1999 but that it was added years later.  *See* Day 5 P.M. at 4:15–5:20.  Moreover, PROLACTO

did not present any evidence to counter her testimony as to the 1999 time frame, as Ruben

Gutierrez left the business in April 1999, before Patricia joined.

  The Court did not find Ruben Gutierrez's testimony on this issue, or on any of the other

issues that PLM's witnesses disputed at trial, to be particularly credible or persuasive.  The Court

found, based on its observation of his live testimony in court, including his demeanor, that Ruben

Gutierrez was extremely emotional and, frankly, hateful towards his brother and he exhibited a

high degree of bias that undercut the reliability of his testimony.  It is helpful for the Court to

explain just some of its observations supporting its reasoning here.

  First and foremost, the Gutierrez brothers have had a very long and extremely contentious

history together.  Ruben testified, for example, that their disputes rose to the level of serious

physical altercations.  *See* Day 8 P.M. at 69:25–70:1 ("Well, he knocked me out once when I was

cold.  Two or three hours later I woke up.").  He even testified, while being extremely emotional

in court, that if he had not left PLM, "someone was going to kill someone," and, when asked

whether *he* would have killed someone, responded, "Anything can happen in the heat of

passion."  *Id.* at 68:11–19; *see also id.* at 69:18–21 ("[A]rguments led to altercations, physical

altercations.  And you never know what will happen in one of those things.  It's in the heat of

passion somebody is going to kill somebody else.").  He also became very emotional when

discussing disputes that he and Ignacio had concerning their mother.  *See id.* at 88:3–89:23.  He

also testified emotionally regarding prior litigation that he and Ignacio had concerning the terms

of their partnership and its dissolution and claimed that Ignacio "wanted to put [his] wife and

[him] in jail."  *Id.* at 55:6; *see also id.* at 55:5–56:14 (stating that he "pleaded and begged, got on

[his] knees").  It is not the Court's place to take any position on the legitimacy of Ruben

Gutierrez's opinion of his brother.  The Court does, however, find that, given this long and emotional history, his testimony on key factual disputes in this case was colored by bias and not credible.

It is also important to note that, beyond emotional issues, the Court found that Ruben Gutierrez appeared biased based on his business stake in the outcome of this trial.  His business, Tropicale Foods, is a direct competitor of PLM, and Ruben stated that from 1999 through 2008, PLM was his *biggest* competitor.  *See* Day 8 P.M. at 60:14–61:5.  Ignacio and Ruben engaged in litigation that concerned unfair competition, and Ignacio was successful, almost putting Ruben out of business.  *See* Day 8 A.M. at 102:18–24; Day 8 P.M. at 21:5–23.  It was, in fact, Ruben who first took issue with some of PLM's advertisements and marks that are at issue in this case, retaining a lawyer in March 2006 to send a cease-and-desist letter to PLM and to alert PROLACTO and the USPTO.  *See* Day 8 P.M. at 12:12–19:22; Def.'s Ex. 83 (letter dated March 22, 2006).  That letter referred to Tropicale Foods as being PLM's "biggest competitor."  Def.'s Ex. 83.

Perhaps most significantly, Ruben testified that he had been in discussions with PROLACTO about licensing the very marks at issue in this case and distributing product for PROLACTO in the United States.  He testified that this discussion began around 2007, *see* Day 8 P.M. at 70:5–71:25, the same year that PROLACTO commenced the cancellation proceedings before the TTAB in this case.  Later, in August 2011, a month after the TTAB denied PLM's motion for reconsideration of its decision to cancel its LA INDITA MICHOACANA mark, PROLACTO's lead counsel in this case and Jorge Leon, PROLACTO's Mexican counsel who was also present at trial, arranged a meeting between Ruben and PROLACTO to discuss a potential licensing arrangement in Mexico City.  *See* Pls.' Ex 316 (August 10, 2011 e-mail

exchange); *see also* Day 8 P.M. at 72:1–75:1. According to Ruben, that meeting took place in September 2011, the same month that PLM filed its initial complaint in this action. *See* Day 8 P.M. at 75:2–76:17. For all of these reasons, and many more not described here, the Court found Ruben Gutierrez to be an unreliable witness.

Finally, the Court also notes that its finding of fact does not place great weight on Ignacio Gutierrez's testimony, either. Based on the Court's observation of his live testimony at trial and its consideration of his prior conduct, not to mention his own personal and business stake in the outcome of this litigation, the Court did not find Ignacio Gutierrez to be a particularly credible witness on this issue. The Court need not determine, however, precisely when PLM began using the Indian Girl designs on its shipping boxes, as, for purposes of this case, whether PLM began using the marks in June 1999 or earlier is immaterial.

42.     PLM began using its Indian Girl marks because, at least in part, Ignacio Gutierrez had seen the Indian Girl mark used in paleterias in Mexico and believed that PLM's target consumers would also recognize the mark. He did not, however, believe that, in Mexico, the mark denoted a single source of product, and there is no indication that he was aware of any prior use of the Indian Girl in the United States.

When Ignacio Gutierrez was asked on direct examination why he wanted to use an Indian Girl in connection with PLM's product packaging, he responded by stating that, because "La Michoacana" means "the woman from Michoacán," he "wanted to add a girl that would basically translate to the name itself." Day 3 P.M. at 48:23–49:6. The Court does not find this to be credible as a complete explanation, however. On cross-examination, he acknowledged that he had seen a version of an Indian Girl in Mexico before adopting it in the United States and that he "redid [his] own version of it" from his memory of its use in Mexico. Day 4 P.M. at 46:7–16.

For the same reasons stated above with respect to the term "La Michoacana," the Court does not find, however, that Ignacio Gutierrez believed that the Indian Girl was associated with one particular source in Mexico. No evidence was presented at trial suggesting that he was aware of any usage of the Indian Girl in the United States before PLM adopted the marks at least as early as June 1999. The Court notes its finding below that PROLACTO did not begin using an Indian Girl mark until March 2000 and that there has been no evidence that any third party was using an Indian Girl mark in the United States before June 1999.

43.     PLM, Inc., which owned the marks as the successor to Ignacio Gutierrez's sole proprietorship, filed applications to register both the Indian Girl with Paleta and Indian Girl with Cone marks on November 19, 2003. The USPTO issued Registration No. 2,905,172 for the Indian Girl with Paleta on November 23, 2004 and issued Registration No. 2,968,652 for the Indian Girl with Cone on July 12, 2005. *See* Pls.' Exs. 35 and 36. Both registrations became "incontestable" pursuant to 15 U.S.C. § 1065 on December 12, 2014 upon PLM's filing of Section 15 affidavits with the USPTO.

44.     PLM has continually and consistently used the Indian Girl with Paleta and the Indian Girl with Cone marks on its shipping boxes for paletas and bolis since at least June 1999 and uses them on its shipping boxes today. *See, e.g.*, Day 3 P.M. at 58:3–19.

### c. *PLM's Use of an Indian Girl with "LA MICHOACANA ES NATURAL"*

45.     PLM has used a design, pictured below, containing an image of an Indian Girl similar, if not identical, to its Indian Girl with Paleta inside of a slanted oval with the words "La MICHOACANA es…natural" on its product packaging, business cards, and company checks.



46.     Beginning in or around the summer of 2001, while it was operating as a sole proprietorship owned by Ignacio Gutierrez, and continuing until late 2002 or early 2003, PLM used this "slanted oval" design on the wrappers for some of its products along with cartoon animals, as reflected in Plaintiffs' Exhibit 69, a printer's proof of the design containing Ignacio Gutierrez's handwriting and dated March 17, 2001, and Plaintiffs' Exhibit 70, a copy of the actual film used for the product packaging, both of which are copied below with the mark enlarged.



Pls.' Ex. 69          Pls.' Ex. 70[18]

The Court's finding as to the first use of this design on product packaging is grounded not only in the Court's review of the documentary exhibits but also the live witness testimony of Ignacio and Patricia Gutierrez.  *See* Day 3 P.M. at 67:20–71:10; Day 6 A.M. at 51:22–54:24. PROLACTO disputes this fact, arguing that PLM did not use this design until years later.  *See* Def.'s Opp'n at 15–16 ¶ 44.  The Court finds that, based on its review of the evidence and its observation of the witnesses' testimony at trial, none of the grounds argued by PROLACTO has

---

[18]     The Court notes that, upon its review of the USPTO's online database, Plaintiffs' Exhibit 70 is a copy of the specimen PLM, Inc. submitted with the USPTO on November 19, 2003 in its U.S. application Serial No. 78,330,432 to register the Indian Girl With Paleta design, which ultimately registered on November 23, 2004 as U.S. Reg. No. 2,905,172.

merit.  First, PROLACTO argues that the Court cannot consider these exhibits because they are

illegible.  *See id.*  The Court previously addressed this argument at trial, when PROLACTO

objected to the admission of Plaintiff's Exhibit 69 on this same ground.  *See* Day 3 P.M. at

71:17–19 ("I think they're sufficiently legible.  I see this logo in my sleep.  I think I can identify

it here.").  PROLACTO also argues that a printer's proof is insufficient to show actual use and

that Ignacio Gutierrez's testimony was not credible.  Def.'s Opp'n at 15–16 ¶ 44.  PROLACTO

also argues that the existence of a prior version of this packaging, which is nearly identical,

except for the mark at issue, somehow defeats PLM's factual claim.  *See id.*  The Court

disagrees.  Its finding is based on more than simply a printer's proof; it is based on an exhibit of

the actual film that was used, which itself was accepted by the USPTO as a specimen as part of

the registration application for the Indian Girl with Paleta mark, as well as testimony from two

witnesses.  The Court found, based on its observations of their live testimony, including their

demeanor, that both Ignacio and Patricia Gutierrez were credible on this issue.  The fact that

PLM acknowledges previously using a different version of this package without the Indian Girl

does nothing to belie the proposition that PLM later elected to change the packaging.  *See* Pls.'

Ex. 107 at 1; Day 3 P.M. at 39:10–40:18.

 47. PLM, while it operated as a sole proprietorship owned by Ignacio Gutierrez, also

used the same "slanted oval" design on its business cards at least as early as June 1999 when, at

the latest, Patricia Gutierrez joined the business.

 Like the issue with the shipping boxes, the issue of when PLM began using the "slanted

oval" LA MICHOACANA ES NATURAL with Indian Girl design on its business cards was also

sharply disputed by the parties.

PLM argues that it used the design on its business cards at least as early as 1997, while the Gutierrez brothers operated the business as a partnership.  As support, PLM introduced into evidence a printer's proof dated July 28, 1997 for a set of business cards with the names of Ignacio Gutierrez, Ruben Gutierrez, and their employees at the time, together with an invoice for business cards dated November 27, 1997.  *See* Pls.' Ex. 200; *see also* Pls.' Ex. 106.  Ignacio Gutierrez testified that he and his brother ordered 10,000 of these business cards.  Ruben Gutierrez testified that the partnership never used these cards or any other cards containing an Indian Girl mark and instead produced on the stand, from his wallet, a hard copy of a business card that he claimed was the one that the partnership used.  *See* Day 8 A.M. at 85:12–90:25; *see also* Def.'s Ex. 182.  This card has what appears to be an identical front side but a very different backside, without any Indian Girl present.  *See* Def.'s Ex. 182.  Oddly, unlike the proof with the Indian Girl, his surname is misspelled.  *Compare* Def.'s Ex. 182 ("Gutierez") *with* Pls.' Ex. 200 at 3 ("Gutierrez").  Patricia Gutierrez testified that when she joined Ignacio Gutierrez's sole proprietorship in May or June 1999, the business was using the cards with an Indian Girl and the words "La Michoacana Es Natural" and that they continued to use these cards through approximately the mid-2000s.  *See* Day 5 A.M. at 110:8–111:23; *see also* Day 7 A.M. at 96:3–17.

As with the issue of the shipping boxes, the Court found Patricia Gutierrez's testimony to be the most credible of the three and found Ruben Gutierrez's testimony to be colored by bias. In addition to the reasons provided above with respect to the shipping boxes, on this specific issue, the Court found Patricia Gutierrez's testimony to be particularly reliable.  Among other reasons, she testified that, as part of her duties in the office, she was responsible for handing business cards out to the drivers.  *See* Day 5 A.M. at 112:3–6.  She also recalled seeing cards for

Ignacio and other employees, but not Ruben. *See id.* at 111:24–112:2; *see also* Day 7 A.M. at

95:14–96:13. The existence of a printer's proof from 1997 may suggest that the cards were

made and used before 1999, and Ruben's possession of a business card without the Indian Girl

mark on it does not disprove the notion that the partnership at some point adopted a different

design. The Court is most confident, however, that the business cards with the Indian Girl mark

and the words "LA MICHOACANA ES NATURAL" were in use at least as early as June 1999.

48. Beginning in at least June 2000, PLM, at that time a sole proprietorship owned by

Ignacio Gutierrez, used the "slanted oval" Indian Girl mark on the company's invoices. *See* Pls.'

Ex. 148 at 2 (invoice dated June 14, 2000); *see also id.* at 3 (invoice dated October 25, 2000);

Day 5 A.M. at 114:16–116:6 (testimony by Ignacio Gutierrez authenticating the invoices and

describing the company's practice with regard to invoices).[19]

---

[19]     During trial, PLM's counsel brought a box of hard copy originals of invoices dating from 1995 through 2006 in the courtroom. *See* Day 5 A.M. at 116:7–11. PROLACTO raised issues concerning this box of invoices, because PLM did not produce them during discovery. The Court permitted PROLACTO to review the invoices during a break later in the trial and to ask its witness, Ruben Gutierrez, about them. The Court also ordered PLM to turn custody of the box of invoices to the Court and offered PROLACTO's counsel the opportunity to review the invoices in chambers. PROLACTO also filed a motion seeking exclusion of any invoices that were not produced in discovery and seeking sanctions against PLM for spoliation and reconsideration of the Court's order on summary judgment that PROLACTO was not entitled to monetary relief for any of its counterclaims, to which PLM filed an opposition and PROLACTO elected not to file a reply. *See* Def.'s Mot. & Mem. Exclusion & Spoliation Sanctions, ECF No. 290; Pls.' Opp'n Def.'s Mot. & Mem. Exclusion & Spoliation Sanctions, ECF No. 297.

     For a variety of reasons, the Court will deny PROLACTO's motion. First, it is clear that although PROLACTO's discovery requests for the production of documents encompassed all of the invoices, PLM served timely objections and responded that it would produce documents "sufficient to show" the requested items. PLM then produced, in PROLACTO's own estimation, hundreds of invoices over a wide span of time. PROLACTO never raised any issues concerning PLM's responses until trial and has therefore waived any objections. Second, the Court finds PROLACTO's characterization of "spoliation" as misplaced. Spoliation is "the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *True the Vote, Inc. v. I.R.S.*, No. CV 13-734, 2014 WL 4347197, at *4 (D.D.C. Aug. 7, 2014) (quotation omitted). Courts also require a finding of bad faith. *See, e.g.*, *Valentino v. U.S. Postal Serv.*, 674 F.2d 56, 73 & n.31 (D.C. Cir. 1982)

49.     Beginning in at least January 2001, PLM, at that time a sole proprietorship owned by Ignacio Gutierrez, used the "slanted oval" Indian Girl mark on the company's checks. *See* Pls.' Ex. 143 at 2 (returned check dated January 25, 2001 signed by Ignacio Gutierrez).

50.     In approximately 2002, PLM, at that time operating as PLM, Inc. began using a design containing its Indian Girl with Cone mark surrounded by the words "LA MICHOACANA ES NATURAL" on tab lids for its 4 oz. single-serve ice cream cups, as shown in the printer's

---

(denying request for spoliation where "the circumstances of the destruction . . . provide no basis for attributing bad faith"). On the contrary, here, PLM not only preserved the evidence, it brought it into the courtroom during trial. The Court has also reviewed the invoices and has seen nothing that suggests that any evidence was tampered with or destroyed, and the Court notes that in the six months since the conclusion of trial, PROLACTO elected not to do so itself despite the Court's offer.

Finally, even to the extent that PROLACTO did not waive any challenges to PLM's discovery responses, it has not suffered any prejudice. PLM did not seek to introduce the invoices into evidence. The Court did not consider them in making its findings of fact and conclusions of law, and the produced and admitted invoices played little, if any role at all, in the Court's findings and conclusions. PROLACTO argues that "[h]ad PLM produced these invoices during discovery, PROLACTO would likely had been able to [sic] identify additional damages, used the additional information to check the summaries PLM produced during discovery, and been able to use the information to support a jury trial in this matter." Def.'s Mot. & Mem. Exclusion & Spoliation Sanctions at 7. But PROLACTO fails to offer any explanation as to how a review of the entire set of original invoices, rather than more comprehensive sales or accounting information, could have informed its argument. PROLACTO's argument is completely disconnected from the procedural history of this case. The Court granted summary judgment for PLM on the monetary relief issue because PROLACTO entirely failed to oppose various arguments raised by PLM. *See PLM II*, 79 F. Supp. 3d at 71–82. Specifically, on the issue of actual damages, PROLACTO did not oppose PLM's argument that it had failed to present evidence of actual loss. *See id.* at 75. At the summary judgment stage, PROLACTO had in its possession hundreds of PLM invoices covering a wide span of time, as well as more detailed and comprehensive financial information. PROLACTO did not utilize any of this evidence in opposing summary judgment on the monetary relief issue; it simply failed to respond to PLM's arguments at all. PROLACTO has not offered any explanation as to how exactly having possession of the entire set of original, hard copy, and handwritten invoices would have made any difference.

proof of the lid design dated April 3, 2002 by Patricia Gutierrez found at Plaintiffs' Exhibit 74.
*See* Pls.' Ex. 74; Day 5 P.M. at 6:3–8:13.

51.     In approximately 2002 or 2003, PLM began using a design containing its Indian
Girl with Cone mark surrounded by the words "LA MICHOACANA ES NATURAL" on its
shipping boxes, as pictured below in a cropped image of Plaintiffs' Exhibit 124.  *See* Day 5 P.M.
at 14:9–15:5; Day 6 P.M. at 62:8–10, 64:15–25.



**Pls.' Ex. 124**

52.     Beginning at least as early as January 2004, PLM, Inc. used a colorized design of
its Indian Girl with Cone mark surrounded by the words "LA MICHOACANA ES NATURAL"
on tab lids for its 5 oz. single-serve ice cream cups, as pictured in a printer's proof dated January
8, 2004.  *See* Pls.' Ex. 125; Day 5 P.M. at 10:20–12:15.

53.     Beginning at least as early as 2004, PLM, Inc. also used a design of a
"modernized" Indian Girl surrounded by the words "LA MICHOACANA ES NATURAL" on its
products, including film to package its ice cream sandwiches, bolis, and ice cream cups.  Some
examples of its usage of the mark on product packaging and shipping boxes are shown in the
exhibits below, along with corresponding witness testimony concerning the use over time.



**Pls.' Ex. 138**
**Day 5 P.M. at 16:24–18:16**

**Pls.' Ex. 73**
**Day 5 P.M. at 33:10–38:19**

**Pls.' Ex. 140**
**Day 5 P.M. at 15:19–16:17**

PROLACTO disputes PLM's claims regarding its use of these designs.  *See, e.g.*, Def.'s

Opp'n at 17–18 ¶ 50 (disputing Plaintiffs' Exhibit 138); *id.* at 17 ¶ 49 (disputing Plaintiffs'

Exhibit 140); *id.* at 19–20 ¶ 53 (disputing Plaintiffs' Exhibit 73).  PROLACTO's argument rests

on essentially two grounds:  first, that a printer's proof or photograph of a roll of film does not

prove actual usage; and second, that PLM claimed before the TTAB that the first use of any

mark "analogous," in PROLACTO's words, to its LA INDITA MICHOACANA mark was on

February 21, 2005.  The Court finds that neither is persuasive.  First, in making its finding of

fact, the Court relies not only on documentary evidence, although the Court does find dated

photographs of actual film and dated printer's proofs to be highly persuasive, but also on live

witness testimony, particularly that of Patricia Gutierrez, who the Court found to be highly

credible on this issue.  Second, whether this design is "analogous," in PROLACTO's words, to the LA INDITA MICHAOCANA mark is better considered in the Court's tacking analysis and is not helpful in determining whether this design was actually used.

### d.  PLM's Use of LA INDITA MICHOACANA

54.     PLM, Inc. started using LA INDITA MICHOACANA (Reg. No. 3,210,304) pictured below, on February 21, 2005.  The phrase "La Indita" translates to English as "the Indian girl."  This mark was used on product packaging, and the first sale of product with this packaging was made to Cruz Ramirez, a customer in Arizona.  *See* Day 4 P.M. at 88:7–14.



**LA INDITA MICHOACANA**
**Reg. No. 3,210,304**

55.     PLM applied to register its LA INDITA MICHOACANA mark on June 28, 2005. The USPTO published the mark for opposition on December 5, 2006 and issued the registration on February 20, 2007.  *See* Pls.' Ex. 37.

56.     PLM created and adopted this mark on its product packaging pursuant to an agreement with a third party based in Arizona who had threatened to challenge its use of "La Michoacana" on its products.  To settle this dispute and avoid litigation, PLM agreed to use the LA INDITA MICHOACANA mark on all of the products that it distributes in Arizona and Nevada.  *See* Day 5 P.M. at 60:4–66:18.

57.     In March 2005, PLM obtained, from its attorneys, a trademark search report concerning uses of the mark LA INDITA MICHOACANA.  Based upon its review of the report,

and the advice of its counsel, PLM determined to use the registered LA INDITA MICHOACANA mark in Arizona and Nevada. *See* Day 6 A.M. at 31:3–48:3.

58.     Since 2005, PLM has also used its registered LA INDITA MICHOACANA mark in other markets in which it operates. Outside of Arizona and Nevada, it has used the mark on certain products, such as its single serve products and value packs. On other products, even within the same market at the same time, it has chosen to use LA MICHOACANA marks instead. *See* Day 5 P.M. at 62:22–63:3; *id.* at 67:8–74:1.

59.     PLM tracks sales of products bearing the LA INDITA MICHOACANA mark separately from products bearing the LA MICHOACANA marks using different SKU numbers. *See* Day 6 A.M. at 99:7–17.

60.     From February 2005 to the present, PLM has continually used its registered LA INDITA MICHOACANA mark on a wide variety of its product packaging, as well as on its shipping boxes, in all geographic areas in which it distributes product. Some examples of its usage of the mark on product packaging and shipping boxes are shown in the exhibits below, along with corresponding witness testimony concerning the use over time.



Pls.' Ex. 64
Day 5 P.M. at 60:4–20



Pls.' Ex. 122
Day 5 P.M. at 64:20–25, 73:11–17,
85:1–86:19



Pls.' Ex. 134
Day 5 P.M. at 101:6–18.



**Pls.' Ex. 80 at 1**
**Day 5 P.M. at 92:25–94:2**

**Pls.' Ex. 84**
**Day 5 P.M. at 94:4–23**

61.     Since 2007 or 2008, PLM has also used a design similar to its registered LA

INDITA MICHOACANA mark on product packaging using the same words "La Indita

Michoacana."  In this design, however, "La Indita" appears to the side and in small, upper and

lowercase letters, "MICHOACANA" appears in large, all capital letters at the top, and an Indian

Girl appears to the side.  An example of this design is seen in Plaintiffs' Ex. 133, which shows

product packaging for PLM, Inc.'s half-gallon tubs of ice cream.



**Pls.' Ex. 133**
**Day 5 P.M. at 102:23–103:25**

61.     In yet another variation of the same theme, since at least as early as 2012, PLM

has essentially combined its LA INDITA mark with a LA MICHOACANA ES NATURAL

mark, creating a hybrid of sorts that appears on some product packaging and shipping boxes. In this design, "La Indita" is used in small, upper and lowercase letters to the side of the Indian Girl and "MICHOCANA" appears on top, with "ES NATURAL" on bottom. Some examples of this design in use on product packaging and shipping boxes are shown in the exhibits below, along with corresponding witness testimony concerning the use over time.



Pls.' Ex. 68
Day 5 P.M. at 108:9–19

Pls.' Ex. 131
Day 5 P.M. at 116:7–20

*e. Tacking*

62. The "tacking" doctrine does not advance PLM's priority date for its LA INDITA MICHAOCANA mark, because the mark does not create the same continuing commercial impression as its earlier Indian Girl marks.

PLM argues that although it did not begin using its LA INDITA MICHAOCANA mark prior to February 21, 2005, the priority date for that mark should be advanced to the date it first used any Indian Girl mark pursuant to the "tacking" doctrine. *See* Pls.' Br. at 85–91. After considering the evidence presented to the Court at trial and PLM's arguments in its post-trial briefing, the Court disagrees.

The tacking doctrine permits the use of an earlier mark to be "tacked" onto the later use of a different mark, in effect "cloth[ing] a new mark with the priority position of an older mark." *Hana Fin., Inc. v. Hana Bank*, 135 S. Ct. 907, 909 (2015). "The standard for 'tacking,' however, is exceedingly strict: 'The marks must create the *same, continuing commercial impression*, and the later mark should not materially differ from or alter the character of the mark attempted to be tacked.'" *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1048 (9th Cir. 1999) (quoting *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir. 1991)) (emphasis in original). Tacking is permitted "only in rare instances." *Van Dyne-Crotty*, 926 F.2d at 1160 (citation and quotation marks omitted); *see also Brookfield Commc'ns*, 174 F.3d at 1047 (stating that it is permitted only in "exceptionally narrow instance[s]"). In order to meet this high bar, the previously used mark must be "the legal equivalent of the mark in question or indistinguishable therefrom" such that consumers "consider both as the same mark." *Van Dyne-Crotty*, 926 F.2d at 1159; *see also PLM I*, 69 F. Supp. 3d at 195 ("The critical inquiry under a tacking analysis is whether a consumer would consider the prior and subsequent designs to be the 'same mark.'" (citations omitted)); *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1161 (9th Cir. 2009) ("[T]acking will be allowed only if the marks are virtually identical."); *Quicksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 758 (9th Cir. 2006) ("The later mark must be indistinguishable from the original mark at the time that the later mark is introduced.").

The Supreme Court has recognized that "in making rulings in bench trials, judges may look to past cases holding that trademark owners either were or were not entitled to tacking as a matter of law." *Hana Fin.*, 135 S. Ct. at 912. At the same time, however, the tacking analysis is "fact-intensive" and "necessarily requires [a] judgment call[.]" *Id.* PLM concedes that it has the

burden of establishing tacking.  *See* Pls.' Br. at 86 ¶ 94 (citing *Navistar Int'l Transp. Corp. v. Freightliner Corp.*, No. 96 C 6922, 1998 WL 911776, at *3 (N.D. Ill. Dec. 28, 1998)).

Although the Court stated in its summary judgment opinion that it was "less than ideal for a court, sitting in relative isolation, to speculate about what consumers may think regarding the similarity of two marks," *PLM I*, 69 F. Supp. 3d at 196, PLM elected not to present any evidence during trial as to how exactly consumers view its LA INDITA MICHOACANA mark in comparison with its other Indian Girl marks.  Instead, PLM essentially asks the Court to rely on three forms of evidence to find that the marks all create the same continuing commercial impression:  first, the visual similarity of the marks to each other in comparison to precedent; second, the testimony of a PROLACTO witness who once purchased a PLM product; and third, a comment made by PROLACTO's counsel during trial.  This evidence is far from sufficient to meet the tacking doctrine's high bar.  The Court addresses each in turn.

First, PLM points to the visual similarity between its various Indian Girl marks over time, providing a chart showing the changes over time that appears at Plaintiffs' Exhibit 327, which the Court has reproduced, in part, below for reference.  *See* Pls.' Br. at 89; Pls.' Ex. 327.



PLM argues that all of these marks create the same continuing commercial impression, because they all feature a similar-looking Indian Girl.  *See* Pls. Br. at 90–91 ¶¶ 105–10.  PLM further argues that the addition of the words "LA MICHOACANA ES NATURAL" and the subsequent change to the words "LA INDITA MICHOACANA" do not alter the commercial impression of the marks, because, in Spanish, the phrases only refer to or describe the Indian Girl

that is displayed in the mark.  *See id.*  PLM also asks the Court to compare this set of marks with other sets of marks that courts have deemed to be legal equivalents for tacking purposes.[20]  *See* App'x A, Pls.' Opp'n, ECF No. 314-1.

The Court does not find the visual similarity of PLM's various Indian Girl marks over time to be sufficient evidence to establish that the marks create the same continuing commercial impression in the minds of consumers.  As the Ninth Circuit has stated:  "In determining whether the marks have the same continuing commercial impression, the visual or aural appearance may be instructive.  Commercial impression, however, should be resolved by considering a range of evidence, ideally including consumer survey evidence."  *Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158, 1164 (9th Cir. 2013), *aff'd Hana Fin.*, 135 S. Ct. 907.  Other courts, including those cited by PLM, have recognized that visual similarity is insufficient.  *See, e.g.*, *Louangel, Inc. v. Darden Rests., Inc.*, Civ. No. 12-147, 2013 WL 1223653, at *4 (S.D. Tex. Mar. 22, 2013) (stating that "an 'eyeball' comparison, alone, does not end the inquiry"); *Navistar*, 1998 WL 911776, at *3 n.5 ("[T]he fundamental inquiry is whether the two marks make the same commercial impression, not whether the two marks are similar in appearance.  Of course, two marks that are similar in appearance *may* make the same commercial impression, but that will not necessarily be true."); *id.* at *4 ("Defendants argue that we can apply a tacking test without resort to evidence of consumers' perceptions, but we disagree.  Because the inquiry is how consumers perceive the marks, there must be some evidence demonstrating those perceptions."). The Court's consideration of these marks, side-by-side and without any evidence concerning

---

[20]     One cited case is actually a TTAB opinion that the TTAB designated as non-precedential and did not concern tacking at all, but rather concerned a trademark applicant's attempt to amend its drawing as part of an intent-to-use application for federal trademark registration.  *See In re Hot Stuff Foods, LLC*, Serial No. 77392514, 2013 WL 2951792 (T.T.A.B. Mar. 8, 2013).

how consumers in the marketplace perceive them, does not compel the conclusion that they present the same continuing commercial impression.

The Court's review of the relevant precedent is similarly inconclusive.  As PLM observes, some courts have permitted tacking in cases involving marks that appear substantially different.  *See, e.g.*, *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F. Supp. 2d 868, 889 (N.D. Ill. 2008); *Beech-Nut Packing Co. v. P. Lorillard Co.*, 299 F. 834 (D.N.J. 1924), *aff'd* 7 F.2d 967 (3d Cir. 1925), *aff'd* 273 U.S. 629 (1927).  In most of the cases cited, however, unlike the marks at issue here, the wording on the marks remained consistent, particularly in the modern cases.  *See, e.g.*, *Miyano*, 576 F. Supp. 2d at 889; *Paris Glove of Can., Ltd. v. SBC/Sporto Corp.*, 84 U.S.P.Q.2d 1856, 1862, 2007 WL 2422997 (T.T.A.B. 2007).  The Court also observes that other courts have refused to permit tacking of marks that appear to be only barely distinguishable from each other.  *See, e.g.*, *One Indus.*, 578 F.3d at 1160–65 (affirming summary judgment).  Courts have widely recognized that the key question in a tacking analysis is how consumers perceive the marks.  The Court cannot find that the marks create the same continuing commercial impression based on visual appearance alone; more is needed.[21]

PLM's limited attempt to provide additional evidence to support its tacking argument falls flat.  PLM first cites testimony given by a PROLACTO witness at trial, Lorena Salazar,

---

[21]   Even on the Court's "eyeball" comparison of the marks, the Court notes significant visual differences.  For example, the Indian Girl with Paleta and Indian Girl with Cone marks do not contain any wording.  The words "La Michoacana Es Natural" were added to later marks, and the LA INDITA MICHOACANA mark shares only the word "Michoacana" with those subsequent marks.  In the LA INDITA MICHOACANA mark, the word "Michoacana" appears in a different font and is placed less prominently, in lowercase letters in a smaller front at the bottom of the mark, whereas the new words "LA INDITA" appear larger and more prominently at the top of the mark.  The changes in wording also, of course, mean that the marks are aurally distinct.  Even the Indian Girls themselves differ visually in terms of color and various other features, including her belt, the ruffles of her skirt, her eyes, and her headdress.

who once purchased PLM's products.  *See* Pls.' Br. at 87–89 ¶¶ 97–03.  Specifically, counsel for

PLM showed Ms. Salazar the chart presented above and asked her whether "those designs give

the same continuing commercial impression," without giving any explanation as to the meaning

of that legal phrase.  Day 9 P.M. at 51:16–18.  Ms. Salazar only responded, "Similar."  *Id.* at

51:19.  PLM's counsel asked no follow up questions.  Similarity is not the standard for tacking.

Ms. Salazar's one word answer does not persuade the court that consumers view the marks as

identical.  Nor does the Court find offhanded comments made by Stephen Anderson,

PROLACTO's counsel, that PLM's LA MICHOACANA ES NATURAL mark is "as close as it

can possibly be" to its LA INDITA MICHOACANA mark and "seems to be the same visual

representation" of the LA INDITA MICHAOCANA mark to be persuasive.  Day 5 P.M. at

20:22–24.  The key issue is whether PLM can tack its first use of the Indian Girl with Paleta and

Indian Girl with Cone marks in 1999 onto its LA INDITA MICHOACANA mark, not whether it

can tack its LA MICHOACANA ES NATURAL mark, which PLM did not start using until *after*

PROLACTO began using its Indian Girl mark in Florida, as discussed below.  And, of course,

Mr. Anderson was not a witness at trial, and his comments, though perhaps unwise, are not

evidence.

     The Court also notes that, although the focus of the tacking analysis is on the perception

of the consumer, PLM's intentions in creating the LA INDITA MICHOACANA mark and its

own treatment of the mark are telling.  *See Louangel, Inc.*, 2013 WL 1223653, at **4–6

(considering intentions of the owner of the mark at issue).  As the Court has found, PLM did not

create the mark in order to "modernize" or "update" its prior mark.  *Cf. Brookfield Commc'ns*,

174 F.3d at 1048 (explaining that the purpose of the tacking doctrine is to permit a mark owner

to "alter[] the mark in response to changing consumer preferences, evolving aesthetic

developments, or new advertising and marketing styles"). Rather, PLM specifically created the mark in order to avoid litigation over another entity's use of the term "Michoacana." As a matter of logic, PLM's intention was to create a mark that was distinguishable from its prior mark.[22]

PLM's treatment of its LA INDITA MICHOACANA mark since adopting it appears to confirm the intended differentiation. As the Court has found, PLM has chosen to use the LA INDITA MICHOACANA mark on certain types of products and use the LA MICHOACANA ES NATURAL mark on other types of products, even where these products are sold in the same market. Throughout Patricia Gutierrez's testimony, she repeatedly referred to LA INDITA MICHAOCANA as a separate "brand" or "brand name" of PLM products. *See, e.g.*, Day 5 P.M. at 61:21–25 ("So we compromised that, you know, the company would be able to continue to do business in the state of Arizona under the brand La Indita Michoacana. And so we made a change and this product was – this brand name was introduced in 2005."); *id.* at 88:23–24; *id.* at 92:10-11; *id.* at 94:9–10; *id.* at 101:10–11; *id.* at 103:15–17; *id.* at 109:19–20. Indeed, Ms. Gutierrez explained that PLM separately tracks sales of products that use the LA INDITA MICHOACANA mark using a unique SKU number, and the financial information that PLM presented to the Court treats LA INDITA MICHOACANA products separately. *See* Day 6 A.M. at 99:4–17; Pls.' Ex. 269. Finally, PLM's decisions to separately register its LA INDITA MICHOACANA mark and to not raise the tacking issue before the TTAB are also indicative of its own view of the mark. *See Louangel*, 2013 WL 1223653, at *6 ("[S]eparate registration of the marks is some evidence that the owner does not regard them as a continuum or mere modification or modernization.").

---

[22]    The Court recognizes that, when directly asked whether PLM intended to "continue the same commercial impression," Patricia Gutierrez responded that they did. *See* Day 5 P.M. at 76:10–77:8. This conclusory and biased testimony is of no real value to the Court.

Thus, for these reasons, and particularly without any evidence of consumers' perceptions, the Court cannot find that PLM's LA INDITA MICHOACANA mark meets the "exceedingly strict" standard for tacking. *Brookfield Commc'ns*, 174 F.3d at 1048.

### 5. PLM's Advertisements

#### a. The "Tocumbo Statement"

63.     During various periods of time beginning in approximately 2004 or 2005 and concluding prior to trial,[23] PLM placed the following statements on its product packaging, including on wrappers for individual ice cream bars and on boxes containing multiple products, and in some promotional materials and on PLM's website, in English and occasionally in Spanish, that the parties have collectively referred to as the "Tocumbo Statement":

> a.   "La Indita Michoacana is a family company founded in Tocumbo, Michoacan in the 1940's.  Since then we've continued to make premium ice cream, fruit bars and drinks that give the flavor and tradition of Mexico.  Distinguish us by our logo."  *See, e.g.*, Pls.' Ex. 64; Day 6 P.M. at 76:2–77:21.
>
> b.   "La Michoacana is a family company founded in Tocumbo, Michoacan in the 1940's.  Since then, we've continued to make premium ice cream, fruit bars and drinks that give the flavor and tradition of Mexico.  Distinguish

---

[23]     The parties have not presented the Court with sufficient evidence to determine precisely when and where each variation of the Tocumbo Statement appeared.  Though PROLACTO asserts some loosely defined dates (e.g., "beginning in 2004, and continuing at least until 2009"), with the exception of one statement, it does not provide the Court with citations to the record substantiating those claims.  *See, e.g.*, Def.'s Br. at 11 ¶ 38; *id.* at 13 ¶ 48.  Neither party, however, contends that any of these statements are currently in use.

us by our logo."  *See, e.g.*, Def.'s Ex. 82 at 1; Day 5 A.M. at 14:13–

15:21[24]; *see also* Pls.' Ex. 82 at 6; Day 3 P.M. at 84:4–88:6.

64.     PLM was neither founded in the 1940s nor founded in Tocumbo, Michoacán.  *See*
Day 3 P.M. at 88:7–19.

65.     At least during the time that PLM used the above statements in its packaging and
advertising, PLM did not produce drinks.  *See* Day 3 P.M. at 89:2–3.

66.     Ignacio Gutierrez made the decision to use these statements on PLM's packaging
and advertisements because he had seen similar, if not identical, language printed on containers
in various paleterias in Mexico named "La Michoacana."  He purchased one of these containers
in Mexico in approximately 2002 from a commercial supplier under the belief that various,
separately-owned paleterias in Mexico used the language on their product packaging even
though it was not literally true as applied to each of them.[25]  *See* Day 3 P.M. at 89:10–98:19; *id.*
at 92:2–17.

67.     For a period of time prior to trial, PLM also used the following statements on its
promotional materials and/or on its website in English and/or Spanish:[26]

---

[24]     The cited testimony discusses Plaintiff's Exhibit 93, which was identified but not entered
into evidence.  That exhibit is identical to Defendant's Exhibit 83, however, which was admitted
into evidence.  *See* Day 13 at 39:20–41:5 (discussing the two exhibits); Day 6 P.M. at 46:25–
47:25 (admitting Defendant's Exhibit 82).

[25]     The Court notes that Ignacio Gutierrez's testimony is supported by the deposition
testimony of Guillermo Andrade Malfavon, PROLACTO's general manager and a director of the
company, who conceded that PROLACTO did not create the Tocumbo Statement label that
appears on containers displayed in PROLACTO's U.S. licensees' stores.  *See* G. Andrade
Malfavon Dep. Tr. (July 31, 2013), Pls.' Ex. 259, at 58:8–23; *id.* at 59:17–60:2.

[26]     Witnesses inconsistently translated the Spanish text of PLM's advertising statements over
the course of trial.  The Court's wording here is identical to the wording used in PLM's post-trial
brief, discussed below with respect to PROLACTO's false advertising counterclaim.  To the
extent there are minor differences in the text between the Court's finding of fact and the actual

a. "La Michoacana is a tradition that was born in Tocumbo, Mochoacan in the 1940's.  The Gutierrez family continues with the tradition introducing La Michoacana to the United States."  *See* Def.'s Ex. 106 at 2; Day 4 P.M. at 53:6–21; Day 7 P.M. at 101:13–17.

b. "La Michoacana is a tradition that was born in Tocumbo, Michoacan in the 1940's.  In 1991 Ignacio Gutierrez was continuing with the tradition of La Michoacana by introducing it in the United States.  La Michoacana is distinguished by its quality and elaboration of the ice cream bars with natural fruits and ingredients of the highest quality."  Def.'s Ex. 85; Day 5 A.M. at 20:5–17.

68.     There is no credible evidence that any of the statements above have influenced, or are likely to influence, an average potential consumer of PLM's products to purchase or not to purchase PLM's products.

PROLACTO offered little, if any, evidence that any consumers even saw one of the above statements, let alone that any consumers factored the statement into their decision whether to purchase or not purchase PLM's products.  In its post-trial briefing on this issue, PROLACTO addresses the impact of *all* of PLM's advertisements on consumer decision-making generally, without addressing the specific impact of the Tocumbo Statement—in any of its variations—or any other advertisement.  None of the cited evidence supports PROLACTO's claim as to the materiality of these statements.

---

language contained in PLM's advertising statements, those differences are immaterial to the Court's findings of fact and conclusions of law.

First, PROLACTO points to the testimony of PLM's purported expert on the history of paletas and paleterias in Mexico, Samuel Quinones. Mr. Quinones testified that when he first encountered PLM's products in the marketplace in the United States, he "spent a good 15 minutes looking them all over because I had never seen these mass produced before." Day 2 P.M. at 21:8–10. He believed that he read the "small print" on the side of the package but could not recall whether it made any claim to a connection to paleterias in Mexico. *See id.* at 21:2–10. He believed, however, that it was similar to products he had purchased in Mexico and long assumed that PLM had some connection to Mexico. *See id.* at 21:11–22:23. Thus, it is not even clear whether Mr. Quinones read the Tocumbo Statement, in any of its variations. Even to the extent he did read it and it influenced his purchasing decision, Mr. Quinones is far from the typical consumer of PLM's products. Mr. Quinones demonstrated a particularly keen interest in paletas and paleterias in Mexico. He has, for example, devoted an entire chapter of a book he authored to the topic. It is understandable that he would spend "a good 15 minutes" looking over a box of PLM's products. Even PROLACTO agrees that "[t]he parties' ice cream products are relatively inexpensive treats typically purchased on impulse." Def.'s Br. at 12 ¶ 47. Mr. Quinones's experience is highly atypical and not a good indication of how normal consumers in the marketplace would view and understand PLM's advertisements.

The second cited set of evidence is even less helpful. PROLACTO points to the testimony of one witness who claimed to have purchased PLM's products and two witnesses who tasted the products that the witness purchased. The Court found that none of these witnesses had any real credibility, for the simple and obvious reason that they were all close family members of PROLACTO's lead trial counsel, Stephen Anderson. *See* Day 9 A.M. at 37:10 ("brother-in-law"); Day 9 P.M. at 7:1 ("my uncle Steve Anderson"); *id.* at 53:8–11 (Mr.

Anderson's nephew).  Moreover, none of them testified that they even saw the Tocumbo

Statement at all, and the only witness who actually encountered the product in the marketplace

and purchased it testified that she "didn't really study it all that much because [she] was in a

hurry, so [she] just threw some into the cart."  Day 9 A.M. at 55:23–1.  When counsel pressed

her to identify marks that she saw on the package, she recalled the "ice cream pictured on the

cover."  *Id.* at 56:2–7.  None of the other witnesses recalled reading the Tocumbo Statement or

any other statements indicating a connection to Mexico.

Finally, the Court notes that although PROLACTO's expert witness, Dr. Jacob Jacoby,

performed a consumer survey using a version of the Tocumbo Statement, he did not test the

materiality of the statement on consumers' decision-making process.  He only tested for the

"likelihood of deception."  Def.'s Ex. 130 at 45–48.  His study simply asked potential consumers

to read the statement and answer questions about what they understood it to mean.  *See id.*  His

methodology did not replicate the marketplace experience and determine whether, for example,

any consumers would actually take the time to study PLM's product packaging and read about

its purported history before deciding whether to make a purchase.  This study produced no

credible results concerning materiality.

69.     PROLACTO produced no credible evidence indicating that any of the variations

of the Tocumbo Statement have caused it or are likely to cause it any economic or reputational

injury.

The Court's finding here is largely grounded in the same reasoning underlying its

materiality determination above.  Because there is no credible evidence that consumers actually

read or are or were likely to read the Tocumbo Statement, there is no credible evidence that the

statement itself could cause PROLACTO any harm.  PROLACTO did not offer any evidence

showing that consumers withheld their business from PROLACTO or are likely to withhold their business from PROLACTO as a direct result of these statements or that the statements negatively affected their perception of PROLACTO's reputation or the quality of its products.  Nor did PROLACTO even offer evidence that consumers would associate the Tocumbo Statement with PROLACTO, as opposed to any other paleteria in Mexico, apart from its unsubstantiated historical claims.  Simply put, there was no credible evidence that the Tocumbo Statement has had, or would have, any real impact on PROLACTO in any way.

### b. Other Advertising Statements and Images

70.     Some of PLM's product packaging contains images of paletas and ice cream bars that have been digitally enhanced to indicate that the paletas and bars contain chunks of fruit. *See, e.g.*, Def.'s Ex. 160; Day 4 P.M. at 5:6–20; *id.* at 72:22–75:22.

71.     PLM's ice cream bars contain chunks of fruit.

During trial, counsel for PROLACTO went to unusual lengths, albeit with the permission of the Court, in an attempt to demonstrate that PLM's products, unlike PROLACTO's products, do not contain chunks of fruit.  During trial, counsel placed PLM's product in a strainer, allowed it to melt over the course of part of a day, and asked the Court to observe the results.  *See* Day 4 A.M. at 40:14–41:15 (explaining the procedure).  This theatrical pseudoscience experiment hardly conformed to scientific methods that ensure reliability.  In any event, the Court observed that fruit chunks were present.  *See* Day 4 P.M. at 30:7–12; *id.* at 64:25–65:18.

72.     PLM's product packaging has also included, at some point in time potentially continuing to the present, the following:

        a.     Images of white sand beaches.  *See* Def.'s Ex. 160; Day 4 P.M. at 3:17–
        4:15.

    b.  A statement that read, in part:  "Discover the wonderful rich taste and flavors of La Indita Michoacana.  Our creamy, full-flavored ice cream and delicious fresh fruits are in the old world tradition of Latin American paletas and ice cream that's the perfect blend of the best ingredients available."  Day 4 A.M. at 78:23–79:2.

73.    PROLACTO did not introduce any credible evidence that the images of white sand beaches or text quoted in the preceding finding of fact placed on PLM's product packaging have influenced, or are likely to influence, an average potential consumer of PLM's products to purchase or not to purchase PLM's products.

74.    PROLACTO produced no credible evidence indicating that the images of white sand beaches or text quoted in the previous finding of fact placed on PLM's product packaging have caused it or are likely to cause it any economic or reputational injury.

75.    PLM has also, at some point in time, included the following on its website:

    a.  Generic images of Mexico and Michoacán, including maps, flags, and photos.  *See* Def.'s Ex. 85; Day 4 P.M. at 66:7–67:19; Day 7 P.M. at 107:6–108:13.

    b.  A statement that PLM shares its name with "over 20,000 ice cream parlors" in Mexico.  Def.'s Ex. 85; Day 4 P.M. at 68:2–71:1.  (In other versions of this statement, the number given was 15,000).

    c.  A statement that "La Michoacana ice cream is the essence and flavor of Mexico" and that "[t]hey are determined to make the best paletas in the world."  Day 7 P.M. at 101:13–102:10.

76.     PROLACTO did not introduce any credible evidence showing that any consumers visited PLM's website or were likely to visit PLM's website at any time before deciding whether to purchase PLM's products.

77.     PROLACTO did not introduce any credible evidence showing that the images and statements on PLM's website have caused it or are likely to cause it any economic or reputational injury.

### B.  Defendant

### 1.  In General

78.     The defendant and counter-claimant in this action, Productos Lacteos Tocumbo S.A. De C.V., is a Mexican corporation.

79.     Members of the Andrade Malfavon family own PROLACTO and serve as its directors.  *See* Day 9 P.M. at 82:17–21; Day 10 A.M. at 32:17–35:4; Day 10 P.M. at 36:1–5.

80.     PROLACTO operates primarily through licensees in both Mexico and the United States.  Many of these licensees, including all of the U.S. licensees, according to PROLACTO, are members of the Andrade Malfavon family, and they separately own and operate storefront paleterias using trademarks and equipment from PROLACTO.  *See* Day 10 A.M. at 40:15–47:13; Day 10 P.M. at 78:3–81:9.

81.     In the United States, PROLACTO conducts business primarily through licensees who are members of the Andrade Malfavon family and own and operate paleterias.  Until relatively recently, PROLACTO has not directly owned any paleterias in the United States or directly sold its products to consumers in the United States.  *See* G. Andrade Malfavon Dep. Tr. (July 31, 2012), Pls.' Ex. 259, at 62:23–63:1; Day 11 P.M. at 46:5–12 (explaining that

PROLACTO formed a company called Prolacto Mich Florida, LLC that took over some stores in Florida).

82.     In the United States, PROLACTO, primarily through its licensees that separately own paleterias, currently operates in—and has only operated in—the following states, in chronological order:  Florida, Texas, California, and North Carolina.  *See, e.g.*, Def.'s Ex. 19 and 19A (licensing agreement in Florida); Def.'s Ex. 53 at 1–5 (licensing agreement in Texas); Def.'s Ex. 56 (licensing agreement in California); C. Gonzalez Dep. Tr. (Aug. 20, 2015), Pls.' Ex. 308, at 26:15–17 (testimony concerning arrangement in North Carolina).

## 2.  History and Business in Mexico

83.     Although PROLACTO was not founded until 1992, its founders, members of the Andrade Malfavon family, trace their family origins in the paleta business to the 1940s. PROLACTO's founders assert themselves to be descendants of a man named Rafael Andrade Malfavon, who, they claim, was the original creator of the paleta and the original owner of the first paleteria called "La Michoacana" in Tocumbo, a town located in the Mexican state of Michoacán.

84.     PROLACTO, either directly or through licensees, owns and operates paleterias in various cities and states in Mexico.  *See* Day 10 A.M. at 46:20–47:13.

85.     At some point roughly between 1992 and 1995, PROLACTO began displaying an Indian Girl design, similar to the design shown below in Defendant's Exhibit 4, in some of its stores and licensees' stores in Mexico.  PROLACTO made some changes to its Indian Girl design over time.  *See* Day 11 P.M. at 65:14–67:10.



86.     The paleterias in Mexico owned or operated by PROLACTO and/or the family members that own, direct, manage, and operate the company do not use and have not used all the same trademarks.  Some have used the words "La Michoacana" alone, others "La Michoacana Natural" or "La Flor de Michoacan."  Some have used designs containing an Indian Girl, others a design of a butterfly or no design at all.  The differences in uses between paleterias may be so great that it is difficult to recognize the stores as being affiliated with each other.  *See* Day 11 P.M. at 60:3–64:11; *see also* Def.'s Ex. 64 (photographs of various locations in Mexico appearing different from each other and displaying different marks).

87.     There are innumerable paleterias throughout Mexico named "La Michoacana" or that have a name that incorporates the term "Michoacana," and at least a significant portion of them are not affiliated with PROLACTO.  For example, Marco Antonio Andrade Malfavon, a member of the Andrade Malfavon family and part-owner of PROLACTO, testified that he has "no idea how many" paleterias in Mexico are named "La Michoacana," but that there could be more than 2,000 and that the family does not own or control all of them.  *See* Day 10 P.M. at 86:8–88:19.  Similarly, Jorge Leon, PROLACTO's Mexican counsel, testified as to his belief that there is a paleteria named "La Michoacana" in nearly every town in Mexico and that there could be thousands.  *See* Day 10 A.M. at 62:16–73:23.  He estimated that 30% of paleterias in

Mexico named "La Michoacana" are not within PROLACTO's control, though the basis for his estimation was far from clear. *See id.* at 72:2–3.

88.     PROLACTO is not the exclusive user of an Indian Girl in Mexico.  Some paleterias in Mexico that are not affiliated with PROLACTO use an Indian Girl in their stores without permission from PROLACTO.  *See* Day 10 A.M. at 75:11–16.

89.     PROLACTO asserts the right to use its Indian Girl mark, as well as various other marks, in Mexico through Mexican trademark registrations in the name of Marco Antonio Andrade Malfavon, a part-owner of PROLACTO and member of the Andrade Malfavon family. PROLACTO has pursued infringement actions in Mexico on this basis.  *See* Day 9 P.M. at 87:14–88:14, 116:15–119:3; Day 10 P.M. at 37:19–38:15; *see also* Def.'s Ex. 59.

### 3.  Trademark Registrations and Applications in the United States

90.     PROLACTO is the owner of the two registered trademarks that appear below.



91.     PROLACTO filed its application for the first LA FLOR DE MICHOACAN mark shown above (Reg. No. 2,830,401) with the USPTO on April 18, 2001, and the mark was registered on April 6, 2004.  *See* Def.'s Ex. 184.  The mark became "incontestable" pursuant to 15 U.S.C. § 1065 on July 30, 2009 upon PROLACTO's filing of a Section 15 affidavit with the USPTO.

92.     PROLACTO filed its application for the second LA FLOR DE MICHOACAN mark shown above (Reg. No. 3,249,113), which contains a swirl design, paleta, and butterfly, on December 8, 2005, and the mark was registered on June 5, 2007.  *See* Def.'s Ex. 185; Pls.' Ex. 45.

93.     As part of its application for its LA FLOR DE MICHOACAN mark (Reg. No. 2,830,401), PROLACTO submitted the images of cups that appear below, among others, as specimens.  Unchallenged expert testimony at trial showed that the images of the LA FLOR DE MICHOACAN mark that appear on the cups were not actually present on the cups when the photographs were taken; the marks were electronically added after the photographs were taken. The underlying photographs are the same photographs that PROLACTO later used in specimens submitted as part of its application to register the Indian Girl mark, as discussed below.  There is no evidence that PROLACTO or its licensees ever used these cups, as they appear in the specimens, in the United States or Mexico.  *See* Day 1 P.M. at 34:25–44:20.



94.     PROLACTO has also filed applications to register the four marks that appear below.



95.     PROLACTO filed its application for the first LA MICHOACANA NATURAL

mark shown above (Serial No. 76,244,918), which contains a paleta and butterfly, on April 18,

2001.  The USPTO deemed the application to have been abandoned on January 31, 2003.[28]

96.     PROLACTO filed its application for the Indian Girl mark shown above (Serial

No. 78,771,243) on December 12, 2005.  The application has been suspended in light of this

action.  *See* Pls.' Ex. 41.

97.     As part of its application for the Indian Girl mark (Serial No. 78,771,243),

PROLACTO submitted the images of cups that appear below, among others, as specimens.

Unchallenged expert testimony at trial showed that the images of the Indian Girl marks that

---

[27]     PROLACTO did not provide a title for this mark with its application but described the
mark as consisting of "a Mexican girl holding an ice-cream cone in her right hand (logo colored
pink, black and white)."  For ease of reference, the Court refers to this mark as PROLACTO's
"Indian Girl" mark.

[28]     *See* Trademark Status & Document Retrieval, available at
http://tsdr.uspto.gov/#caseNumber=76,244,918&caseSearchType=US_APPLICATION&caseTy
pe=DEFAULT&searchType=documentSearch (last visited Apr. 21, 2016).

appear on the cups were not actually present on the cups when the photographs were taken; the marks were electronically added after the photographs were taken.  The underlying photographs are the same photographs that PROLACTO previously used as specimens submitted as part of its application to register its LA FLOR DE MICHOACAN mark, as discussed above.  PROLACTO also submitted an image of a wrapper that also appears below.  Unchallenged expert testimony at trial showed that the Indian Girl mark did not appear on the wrapper when the photograph was taken; the mark was electronically added after the photograph was taken.  There is no evidence that PROLACTO or its licensees ever used these cups or the wrapper, as they appear in the specimens, in the United States or Mexico.  *See* Day 1 P.M. at 34:25–48:10.



98.     PROLACTO filed its application for the second LA MICHOCANA NATURAL mark shown above (Serial No. 78,954,490), which contains a swirl, butterfly, and paleta, on August 17, 2006.  The application has been suspended in light of this action.[29]

99.     PROLACTO filed its application for the LA MICHOACANA (words only) mark shown above (Serial No. 85,405,347) on August 23, 2011.  PLM opposed registration of the mark, and the application has been suspended in light of this action.  *See* Pls.' Ex. 43.

100.    As part of its application for the LA MICHOACANA (words only) mark (Serial No. 85,405,347), PROLACTO submitted the image of a truck that appears below, among others, as a specimen.  *See* Pls.' Ex. 43.  Unchallenged expert testimony at trial showed that the image of the LA MICHOACANA (words only) mark that appears on the truck was not actually present on the truck when the photograph was taken; the mark was electronically added after the photograph was taken.  There is no evidence that PROLACTO or its licensees ever used the truck, as it appears in the specimen, in the United States or Mexico.  *See* Day 1 P.M. at 48:11–50:21.



---

[29]     *See* Trademark Status & Document Retrieval, available at http://tsdr.uspto.gov/#caseNumber=78,954,490&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch (last visited Apr. 21, 2016).

#### 4. Business and Trademark Use in Florida

*a. The Homestead Location*

101.    As early as March 2000, a PROLACTO licensee named Rigoberto Fernandez began operating a paleteria in Homestead, Florida located at 334 Washington Avenue.  This was the first PROLACTO licensee to operate in the United States.  As early as March 2000, the PROLACTO licensee displayed PROLACTO's Indian Girl mark previously used in Mexico surrounded by the words "LA MICHOACANA es . . . natural" throughout the store, as shown below in a cropped photo admitted as part of Defendant's Exhibit 5.



**Def.'s Ex. 5 at 1**

The question of when PROLACTO's first licensee began operating in the United States was a matter of great dispute between the parties.  The resolution of this dispute is frustrated by significant evidence presented to the TTAB that conflicts with live testimony at trial.

The TTAB found that PROLACTO, through its licensees Rigoberto Fernandez and Jorge Malfavon, began using its Indian Girl in Florida in April 2001.  *See* TTAB Decision at **9–10.

The TTAB reached this conclusion after considering two written trademark license agreements dated March 3, 2001, one between PROLACTO and Jorge Malfavon on behalf of El Michoacana Natural, Inc. and one between PROLACTO and Rigoberto Fernandez, and deposition testimony given by both men.[30]  *See id.* at *9 & n.41.  Indeed, Mr. Fernandez testified consistently during two separate depositions during the TTAB proceeding that his first store in the United States was a store located at 636 Belvedere Road in West Palm Beach, Florida and that he had been in the ice cream business since 2001.  *See, e.g.*, R. Fernandez Dep. Tr. (Sept. 9, 2009) at 6:1–3, 6:22–7:1, 12:5–14, TTAB Dkt. 48.

This was in accordance with PROLACTO's consistent position throughout the TTAB proceeding that its first use in the United States of the marks at issue was in 2001 or at least as early as 2001.  *See, e.g.*, Pet. Cancellation ¶¶ 3–4, TTAB Dkt. 1 (asserting first use dates at least as early as April 20, 2001 and February 10, 2002); M. Antonio Andrade Malfavon Dep. at 34 ¶ 95, 36 ¶ 102, TTAB Dkt. 43 (providing March 2001 as date of license agreement with Rigoberto Fernandez).  PROLACTO took a similar position in its Answer to PLM's Second Amendment Complaint in this action.  *See* Ans. 2d Am. Compl. & Countercls. at 7 ¶ 20, 17 ¶ 3.

Beginning during discovery and at summary judgment, PROLACTO now takes the position that Rigoberto Fernandez opened his first paleteria in the United States in Homestead, Florida in December 1999 with a verbal license from PROLACTO and that he sold his interest in the store in 2001.  PROLACTO presented evidence in support of this proposition at trial, including the photograph admitted as part of Defendant's Exhibit 5 and shown above.  Cesar

---

[30]     The TTAB also considered images of a menu, cup, hat, and shirt showing the Indian Girl mark that Jorge Malfavon and Rigoberto Fernandez discussed during their depositions "as representative of the use of the Indian girl design since 2001," including the photograph that the Court has found was digitally altered.  TTAB Decision at *9.

Gonzalez, who has worked for PROLACTO since 1992 or 1993, was responsible for designing PROLACTO's signage in Mexico, and currently manages numerous PROLACTO-affiliated paleterias in Florida, testified that he visited the Homestead paleteria, which he identified as Rigoberto Fernandez's store, at the end of 1999 and identified the photographs in Exhibit 5 as an accurate representation of how it appeared at the time. *See* Day 11 P.M. at 58:8–59:24. Miguel Chavez testified that he moved to the United States from Mexico in March 2000 and began working at Mr. Fernandez's Homestead paleteria the day after his arrival.[31] *See* Day 12 P.M. at 83:9–84:12. He also identified the photographs in Exhibit 5 as an accurate representation of how the store appeared when he started working in March 2000 and identified Mr. Fernandez in one photograph behind the counter. *See id.* at 84:13–92:18. Mary Fernandez, Rigoberto's sister, also testified that she helped her brother set up the store in 2000 and that the photographs in Exhibit 5 were an accurate representation of how it appeared at the time. *See* Day 11 A.M. at 45:14–49:17. PROLACTO also submitted a document showing a business license issued to Rigoberto Fernandez on December 6, 1999 for a store named "La Michoacana" located at 334 Washington Avenue in Homestead, Florida. *See* Def.'s Ex. 6 at 1–2.

PLM strenuously disputes PROLACTO's factual assertion. PLM argues, among other things, that Rigoberto Fernandez never operated any store in Homestead and first became involved in the business in the United States in 2001, when he opened a store in West Palm Beach, Florida, and that PROLACTO's licensees did not use an Indian Girl in Florida until 2012. *See* Pls.' Br. at 58–85. PLM observes that PROLACTO first identified the Homestead store as having used the Indian Girl in 1999 during discovery in this action. *See id.* at 69 ¶ 44. PLM also

---

[31]     This is consistent with his deposition testimony, designated by PLM. *See* M. Chavez Bermudez Dep. Tr. (July 24, 2013) at 13:18–14:5, Pls.' Ex. 258 (stating that he worked for Rigoberto Fernandez at "La Michoacana" in Homestead in 2000).

cites portions of Mr. Fernandez's deposition during discovery in this action in which he did not

initially identify the Homestead store in response to direct questions about which stores he had

been involved with in the United States.  *See* R. Fernandez Dep. Tr. (July 23, 2013) at 175:22–

24, Pls.' Ex. 257.[32]  PLM also observes that although Mr. Fernandez was present for part of the

trial and on PROLACTO's witness list, PROLACTO did not call him to testify.  *See* Day 9 A.M.

at 32:7; Day 10 A.M. at 40:19–21; Day 11 P.M. at 126:13–15.  PLM also argues that even if Mr.

Fernandez had operated a store in Homestead from 1999 to 2001 using the Indian Girl, he did not

do so pursuant to a licensing agreement with PROLACTO.

The fact that neither PROLACTO nor Rigoberto Fernandez mentioned the existence of

the Homestead store using the Indian Girl prior to 2001 until discovery in this action, after this

dispute had been pending for years between the parties, is indeed strange.  But this is a strange

case.  Both parties have asserted facts in this litigation that they did not raise before the TTAB,

as the Lanham Act permits them to do.  PROLACTO argues that the difference between first use

1999 and 2001 was immaterial before the TTAB, because PLM asserted a first use date of its LA

INDITA MICHOACANA mark in 2005 and did not raise a tacking argument.  PROLACTO also

argues that Mr. Fernandez has owned numerous paleterias in Florida and could have had

difficulty remembering one that he had sold more than ten years earlier.  These are at least

plausible explanations, but the Court need not determine why it took so long for this now-

---

[32]     One week after filing its opposition to PLM's proposed findings of fact and conclusions
of law, PROLACTO moved to designate additional deposition testimony, including portions of
Mr. Fernandez's deposition testimony.  The most relevant portions of Mr. Fernandez's
deposition proffered by PROLACTO, in which he stated that he forgot about his Homestead
location that opened in 1999, were already designated by PLM.  *See* Pls.' Dep. Designations,
Joint Pretrial Statement Ex. E, ECF No. 182 (designating 175:22–182:24).  PROLACTO's
motion as to deposition testimony concerning the Homestead store is moot, particularly in light
of the Court's finding of fact, and it will be denied.

important fact to come out during the litigation. The Court found the three witnesses' live testimony as to the accuracy of the photograph admitted as Defendant's Exhibit 5 as of the 1999 or 2000 time frame to be credible and persuasive. The Court found Miguel Chavez's testimony to be the most credible of the three, and, combined with Mary Fernandez's testimony that she helped establish the store in 2000, finds that PROLACTO has shown that, at least as early as March 2000, there was a paleteria operating in Homestead, Florida that used the Indian Girl mark as shown in Defendant's Exhibit 5. The Court also rejects PLM's argument that the store did not use the Indian Girl mark with the permission of PROLACTO. Based on the close relationship between PROLACTO's owners and the three witnesses and the Court's understanding from trial as to how PROLACTO conducts its business, the Court finds that the store operated with the permission of PROLACTO.

102.    Rigoberto Fernandez is the brother of Mary Fernandez and Teresita Fernandez, both of whom are also currently PROLACTO licensees in the United States, and the cousin of Guillermo Andrade Malfavon. *See* Day 10 A.M. at 40:15–41:13; Day 10 P.M. at 104:2–6.

103.    On March 3, 2001, PROLACTO entered into written trademark licensing agreements, including one with Rigoberto Fernandez to use PROLACTO's trademarks in Florida. The written agreement with Mr. Fernandez provided that, among other things, Mr. Fernandez was required to produce and sell products bearing the marks with the same quality as those produced by PROLACTO in accordance with PROLACTO's instructions. The agreement also required Mr. Fernandez to pay royalties to PROLACTO as a percentage of net sales. *See* Def.'s Ex. 19 and 19A (translation); *see also* Day 10 A.M. at 79:21–86:23.

104.    At some point around 2007 or 2008, the Homestead store moved from its original location at 334 Washington Avenue to its current location, on the same block, at 344 Washington Avenue.  *See* Day 12 P.M. at 109:20–115:3.

105.    On November 7, 2012, David Andrade signed a written licensing agreement with PROLACTO on behalf of La Supreme Michoacana, Inc., located at 344 Washington Avenue in Homestead, that referenced a prior agreement effective since at least the year 2001.  This agreement required La Supreme Michoacana, Inc. to, among other things, "observe the Quality Control regulations according to the guidelines established by" PROLACTO and permitted PROLACTO to "verify quality of the products and services provided by [La Supreme Michoacana, Inc.] anytime without prior notice."  The agreement stated that it was "fully-paid and royalty-free."  Def.'s Ex. 35; Pls.' Ex. 159; *see also* Day 10 P.M. at 9:16–10:5.

106.    From March 2000 to the present, the Homestead store—at both its locations—has continuously used an Indian Girl mark surrounded by the words "LA MICHOACANA ES NATURAL."  It has used the mark, among other places, throughout the interior of the store on signage and on its employees' uniforms, as shown in photographs admitted as part of Defendant's Exhibit 7, to which Miguel Chavez testified, and photographs taken by PLM's private investigator in March 2012.  *See* Def.'s Ex. 5 at 1; Day 12 P.M. at 92:6–14; Def.'s Ex. 7 at 2; Day 12 P.M. at 97:19–99:10; Pls.' Ex. 238 at 75; Day 3 A.M. at 56:23–60:10.

### b.  Other Locations in Florida

107.    Beginning in approximately April 2001, and after the opening of the Homestead location, various PROLACTO licensees, including Rigoberto and Mary Fernandez, opened a number of other paleterias in Florida, including locations in West Palm Beach, Fort Myers, Lake

Worth, Naples, and Bradenton.[33]  Most of these locations remain open today.  *See, e.g.*, Pls.' Ex. 238 at 25–34 (photographs of location in Lake Worth); Pls.' Ex. 238 at 35–39 (photographs of location in Naples); Def.'s Ex. 17 at 1 (photograph of location in Bradenton); Def.'s Ex. 37 (certificate of registration for location in West Palm Beach); Def.'s Ex. 39 (invoice dated October 8, 2001 for radio advertisement for store located in West Palm Beach); Pls.' Ex 155 (licensing agreement dated February 9, 2012 with El Michoacana Natural, Inc. for location in Lake Worth); R. Fernandez Dep. Tr. (Sept. 9, 2009) at 6:8–21, TTAB Dkt. 48 (testimony concerning ownership of West Palm Beach, Naples, and Fort Myers locations).

108.    From the time that PROLACTO licensees began opening other Florida locations in April 2001 until the present, PROLACTO has used, through its licensees, its LA FLOR DE MICHOACAN (Reg. No. 3,249,113) and its two LA MICHOACANA NATURAL marks (Serial Nos. 78,954,490 and 76,244,918) as shown below in connection with selling paletas.  *See* Def.'s Ex. 11; Pls.' Ex. 162 at 2; Day 2 P.M. at 84:7–87:7; Pls.' Ex. 238 at 18–24; Day 2 P.M. at 97:16–101:22; Pls.' Ex. 238 at 25–34; Day 2 P.M. at 106:20–110:12; Pls.' Ex. 238 at 35–36.[34]

---

[33]    PROLACTO has not presented the Court with a clear record of exactly which individuals or entities owned or operated the various Florida locations at which times or precisely when the stores opened or closed.  These issues are immaterial to the Court's findings and decision, and PLM does not argue otherwise.

[34]    In many of these photographs there are some minor, immaterial discrepancies between the marks as in use and the marks reproduced above.  For example, Plaintiff's Exhibit 238 at 30 shows the LA MICHOACANA NATURAL (U.S. Serial No. 76,244,918) mark with swirls surrounding it and the butterfly positioned on the left, rather than right, side of the mark.  These minor discrepancies are immaterial to the Court's analysis.





| LA FLOR DE MICHOACAN U.S. Reg. No. 3,249,113 | LA MICHOACANA NATURAL U.S. Serial No. 78,954,490 | LA MICHOACANA NATURAL U.S. Serial No. 76,244,918 |

109.   In addition to the Homestead location, PROLACTO's licensees in other Florida locations have used and continue to use an Indian Girl design in connection with selling paletas, including on their signage, product packaging, and employee unfirms.  There is no credible evidence, however, that these other locations used an Indian Girl prior to July 2012.

The Court makes this finding of fact primarily on the basis of photographs taken by Zachary Fechheimer, a private investigator retained by PLM, of various Florida locations and his live testimony at trial concerning those photographs and his observations, which the Court found to be extremely credible.[35]  Mr. Fechheimer visited the Lake Worth, West Palm Beach, and Naples locations in March 2012, and, according to his credible testimony and numerous photographs that he took during his visits, none of the stores displayed an Indian Girl whatsoever.[36]  See Day 2 P.M. at 84:7–87:7 (West Palm Beach location); Pls.' Ex. 238 at 18–24

---

[35]   The Court also notes that Mr. Fechheimer also visited the Homestead location in March 2012 and testified that the Indian Girl mark was present at that location.  See Day 3 A.M. at 56:23–57:4.  This enhanced his credibility.

[36]   In its opposition to PLM's proposed findings of fact and conclusions of law, PROLACTO asserts that Mr. Fechheimer stated that, during each of his visits in March 2012, he observed plastic containers featuring the Indian Girl mark and that the employees at the store told him that they were "for display only."  See Def.'s Opp'n at 51 ¶ 39 (citing Day 3 P.M. at 42:14–24).  But in the cited exchange, PROLACTO's counsel did not ask Mr. Fechheimer when this occurred, though the question before it concerned his March 2012 visit and his testimony that he showed an image of the Indian Girl mark to an employee of one store.  The Court did not understand Mr. Fechheimer to be stating that he observed the Indian Girl containers during his

(photographs of West Palm Beach location); Day 2 P.M. at 97:16–101:22 (Lake Worth location);

Pls.' Ex. 238 at 25–34 (photographs of Lake Worth location); Day 2 P.M. at 106:20–110:12

(Naples location); Pls.' Ex. 238 at 35–36 (photographs of Naples location). Instead, Mr.

Fechheimer only observed other PROLACTO marks during his March 2012 visit, most

significantly PROLACTO's mark containing a swirl, paleta, and a butterfly with the words LA

FLOR DE MICHOACAN, which is consistent with his photographs. When Mr. Fechheimer

returned to these locations in July 2012, however, he observed that the Indian Girl mark was

displayed in each of the three locations, which, again, is consistent with his photographs. *See*

Day 2 P.M. at 92:1–95:14 (West Palm Beach location); Pls.' Ex. 239 at 46–74 (photographs of

West Palm Beach location); Day 2 P.M. at 103:7–105:19 (Lake Worth location); Pls.' Ex. 239 at

15–44 (photographs of Lake Worth location); Day 2 P.M. at 111:4–114:14 (Naples location);

Pls.' Ex. 239 at 139–49 (photographs of Naples location). Other undated photographs of these

locations in Florida also show that the Indian Girl mark was not always used. *See, e.g.*, Def.'s

Ex. 11; Pls.' Ex. 162 at 2.

    The Court finds the limited evidence presented regarding use of the Indian Girl in

locations other than Homestead prior to July 2012 to be unpersuasive and not credible. For

---

March 2012 visit. Indeed, his earlier – and much clearer – testimony was that he only observed
the containers with the Indian Girl in July 2012 and that it was during that visit that an employee
told him that they were for display only. *See* Day 2 P.M. at 92:6–95:14. Incidentally, during
trial, PROLACTO objected to testimony concerning statements made by employees of these
stores on hearsay grounds, arguing that, as employees of licensees, they did not fall within Rule
801(d)(2)(D) of the Federal Rules of Evidence, and the Court stated that it would take the issue
under advisement. *See, e.g.*, Day 2 P.M. at 88:6–89:20. By relying on the employee's statement
in its post-trial brief, PROLACTO has either conceded or waived the issue. The reported
statements of the licensees' employees, as a matter of fact, all support the notion that these stores
only started using the Indian Girl mark at some point between Mr. Fechheimer's two visits in
March and July 2012. *See, e.g.*, Day 2 P.M. at 89:24–90:5 (statement in March 2012 that some
stores did not use the Indian Girl); *id.* at 102:18–22 (statement in March 2012 that he had never
seen the Indian Girl mark before).

example, Mary Fernandez testified that the Indian Girl was used in several Florida locations between 2000 and 2002 after viewing a variety of undated photographs of unknown origin.  *See, e.g.*, Day 11 A.M. at 62:1–5; *id.* at 68:7–9; Def.'s Ex. 28 at 5.  As explained below with respect to her Houston locations, generally speaking, the Court did not find Mary Fernandez's testimony to be very credible for a variety of reasons.  The Court did not find her credible on this specific issue in particular.  Among other reasons, her repeated and unequivocal testimony as to the appearance of the stores between 2000 and 2002 runs counter to PROLACTO's own position in this case that the stores did not open until 2001.  *See* Def.'s Br. at 4 ¶ 12; *see also* Day 11 P.M. at 36:14 ("I really am bad with dates.").

110.    On February 9, 2012, Rigoberto Fernandez entered into another written licensing agreement with PROLACTO that referenced their previous agreement in 2001.  This agreement required Mr. Fernandez to, among other things, "observe the Quality Control regulations according to the guidelines established by" PROLACTO and permitted PROLACTO to "verify quality of the products and services provided by [Mr. Fernandez] anytime without prior notice."  The agreement stated that it was "fully-paid and royalty-free."  Pls.' Ex. 156.  Jorge Malfavon signed a separate, but identical, agreement with PROLACTO the same day on behalf of El Michoacano Natural, Inc.  Pls.' Ex. 155.

111.    In August or September 2013, PROLACTO formed an affiliated entity, purchased Rigoberto Fernandez's Florida stores from him, and began operating those stores.  As of the time of trial, PROLACTO owned and operated seven stores in Florida.  *See* Day 11 P.M. at 81:11– 82:8; *id.* at 122:8–25.

112.    PROLACTO's Florida licensees purchase a variety of inventory from PROLACTO, including cups, containers, uniforms, and equipment used to make their products. *See* Day 11 A.M. at 82:17–86:13; Def.'s Ex. 40 (invoices).

### 5.  Business and Trademark Use in Texas

113.    Mary Fernandez is the only PROLACTO licensee that has ever operated in Texas. She currently owns and operates at least three paleterias in the Houston area:  a store located at 3802 Avenue H in Rosenberg; a store located at 8230 Long Point Road in Houston; and a store located on Highway 6 in Houston.[37]  *See* Day 11 A.M. at 42:23–43:6; *id.* at 87:21–89:14; *id.* at 119:5–7; Day 11 P.M. at 4:12–5:1; *id.* at 28:5–15.

114.    Mary Fernandez opened her first paleteria, the Rosenberg store, in October 2002. *See* Day 11 A.M. at 89:13–16; Day 11 P.M. at 4:12–20.

115.    Mary Fernandez opened her Texas stores pursuant to a verbal license from PROLACTO.  *See* Day 11 A.M. at 128:6–11.

116.    Mary Fernandez entered into her first written licensing agreement with PROLACTO on March 11, 2012.  The agreement was retroactively effective from 2001 and contained, among other things, a provision requiring Ms. Fernandez to "observe the Quality Control regulations according to the guidelines established by [PROLACTO]" and permitted PROLACTO to "verify quality of the products and services provided by [Ms. Fernandez] anytime without prior notice."  The agreement stated that it was "fully-paid and royalty-free." Guillermo Andrade Malfavon, PROLACTO's general manager and Ms. Fernandez's cousin,

---

[37]    Mary Fernandez has operated several other paleterias in the Houston area.  The record is unclear as to which of them remain open and their precise locations.  *See, e.g.*, Day 11 A.M. at 117:2–124:3.

signed the agreement on behalf of PROLACTO.  Def.'s Ex. 53 at 1–5; *see also* Day 11 A.M. at 127:13–128:21.

117.    Mary Fernandez entered into a second written licensing agreement with PROLACTO on December 5, 2012 after she had incorporated her business as Michoacana Natural, Inc.  This agreement was substantially similar to the March 11, 2012 agreement, except that this agreement stated that a royalties fee was "to be determined."  It also contained a quality control provision.  Def.'s Ex. 53 at 6–10; *see also* Day 11 A.M. at 128:22–129:23.

118.    At least as early as July 2003, the awning on the exterior of Mary Fernandez's store in Rosenberg, Texas displayed the words "LA MICHOACANA," as displayed below in a photograph of the exterior of the store that appeared in a newspaper article in July 2003 and was admitted as Defendant's Exhibit 44.  *See* Def.'s Ex. 44; Day 11 A.M. at 90:24–91:8; *id.* at 92:5–7.



**Def.'s Ex. 44**

119.    Mary Fernandez currently uses an Indian Girl mark in connection with her Houston area businesses, but she did not start doing so until after PLM entered the Houston market in 2005.

The parties strongly dispute the factual issue of when Mary Fernandez began using an Indian Girl mark in connection with her business in the Houston area.  PROLACTO, and Ms. Fernandez herself, claim that she has always used the mark, beginning with her Rosenberg store in October 2002.[38]  PLM, on the other hand, contends that Ms. Fernandez did not begin using the Indian Girl until sometime in 2012.  The Court finds, based upon its review of the record and its observance of the live witness testimony during trial, that, although Ms. Fernandez may have used the Indian Girl mark prior to 2012, there is no credible evidence that she used the mark before PLM entered the Houston market in 2005.  There is limited evidence in support of the proposition that Ms. Fernandez used an Indian Girl mark in the Houston area prior to 2005, and the Court does not find that evidence to be credible.  PROLACTO essentially relies on two sources:  Ms. Fernandez's testimony at trial, and designated deposition testimony of an employee of the Rosenberg store, Juana Morales.  For clarity, the Court will briefly explain its credibility determinations.

For a variety of reasons, the Court did not find Ms. Fernandez to be a credible witness.  These reasons include the Court's observation of her demeanor during her testimony, the nature of the questions posed to her by PROLACTO's counsel, which the Court found to be leading and suggestive, and her answers to those questions, which the Court did not feel to be genuine.  In addition, throughout her testimony, Ms. Fernandez displayed poor memory, even by her own admission, as her testimony was internally inconsistent and, in some instances, in conflict with established facts.  *See, e.g.*, Day 11 A.M. at 104:21–23 (stating that she opened the Long Point

---

[38]     In its objections and responses to PLM's interrogatories during discovery in this action, PROLACTO identified five stores in the Houston area and their asserted first uses of the Indian Girl mark.  Of these, the only store in which PROLACTO claimed to have used the Indian Girl mark prior to 2005 was the Rosenberg store.  *See* Pls.' Ex. 5 at 6–7.

store "between 2004 or before that.  I am not absolutely 100 percent.  I don't remember."); *id.* at

120:6–9 (difficulty remembering when her store inside HEB opened); Day 11 P.M. at 5:18–20

(stating that the Long Point store opened after Hurricane Katrina, which occurred in August

2005); *id.* at 8:23–9:19 (initially stating that she changed the awning to her Rosenberg store

before May 2011 and then conceding, "I don't know the exact date to be honest with you"); *id.* at

36:14 ("I really am bad with dates.").

  Ms. Fernandez testified that she has used the Indian Girl in a variety of ways, including

on employee uniforms and on stickers placed throughout the stores.  *See, e.g.*, Day 11 A.M. at

71:25–77:5; *id.* at 105:13–107:23.  But most of this testimony was not date-specific, and, to the

extent it was, either did not establish any use before 2005 or was not credible.  She testified as to

the accuracy of representations in certain photographs but PROLACTO did not provide the

Court with any context for many of these photographs, such as who took them, when, where, or

for what purpose.  *See, e.g.*, Day 11 A.M. at 71:25–77:5; Def.'s Ex. 32 at 1–6, 8–11.[39]  The

Court also observes that photographs taken by Patti James, a private investigator retained by

PLM, in August 2012 and her testimony concerning her visit indicate that the Indian Girl

appeared on the awning of the Rosenberg store and on employee uniforms but did not appear on

stickers throughout the store.  *See, e.g.*, Pls.' Ex. 212; Pls.' Ex. 241 at 14; Pls.' Ex. 241 at 23;

Day 2 A.M. at 9:24–14:21; *id.* at 22:10–24:8; *id.* at 33:13–41:18.  Photographs taken by Zachary

Fechheimer in February 2013 show the addition of Indian Girl stickers and other images

---

[39]  The Court observes that the photographs in this exhibit appear to have been taken at
different times and at different locations, though neither PROLACTO's counsel nor Ms.
Fernandez provided an explanation.  For example, at least one of these photos displays a uniform
for the Homestead, Florida store.  *See* Def.'s Ex. 32 at 6.  Moreover, neither Ms. Fernandez nor
PROLACTO's counsel could even identify another photograph in the exhibit containing an
Indian Girl design on an ice cream cone holder, *see* Day 11 A.M. at 73:14–19; Def.'s Ex. 32 at 7,
and that photograph was not admitted into evidence, *see* Day 11 A.M. at 130:20–24.

throughout the store.  *See* Pls.' Ex. 242 at 7–33; Day 2 P.M. at 117:3–21; *id.* at 125:3–126:7.
The difference in appearance between August 2012 and February 2013 casts further doubt on
Ms. Fernandez's testimony.

One major point of contention at trial concerned the awning at Ms. Fernandez's
Rosenberg store and when an Indian Girl first appeared on it.  Specifically, Ms. Fernandez and
PROLACTO maintain that an Indian Girl appeared on the store's first awning, which appears
above, and on its second awning, which she installed after the original awning was damaged
during Hurricane Katrina in August 2005.  *See* Day 11 A.M. at 89:17–91:16.  An image of the
second awning, admitted as an exhibit for both PLM and PROLACTO, appears below.



**Def.'s Ex. 43; Pls.' Ex. 242 at 4**

Specifically, Ms. Fernandez contended that the Indian Girl appeared in the far right
corner of the awning and is therefore not visible in this photograph.  *See* Day 11 A.M. at 90:15–
91:13.  She claimed that the Indian Girl appeared in the same location on the first awning as
well.  *See* Day 11 A.M. at 91:9–91:16.  The Court does not find this contention to be credible.
First, Ms. Fernandez's recollection at trial of her various awnings over time was demonstrably

poor. *See, e.g.*, Day 11 A.M. at 99:18–20; Day 11 P.M. at 7:9–9:21. Second, Ms. Fernandez

used a nearly identical version of the second awning at her Long Point store, and that awning

indisputably did not have an Indian Girl, as pictured below in Defendant's Exhibit 48.[40] *See* Day

11 P.M. at 6:5–8:3. Finally, Ms. Fernandez gave similarly non-credible answers regarding the

angles of other photographs obscuring the presence of the Indian Girl in other contexts.[41] *See,*

*e.g.*, Day 11 A.M. at 147:5–7.



**Def.'s Ex. 48 at 2**

Both parties rely on the deposition testimony of Juana Morales, an employee of Ms.

Fernandez at her Rosenberg store, to support opposite conclusions. PLM claims that Ms.

Morales "testified that the Rosenberg store did not use an Indian Girl design before 2012." Pls.'

Br. at 69 ¶ 48. This is plainly incorrect, as Ms. Morales testified at various points as to her

recollection that the Indian Girl was in use on employee uniforms and on the awning prior to

---

[40]     The Court did not find Ms. Fernandez's explanation that the smaller space for the Long Point awning did not allow her to include the Indian Girl to be credible. *See* Day 11 P.M. at 6:22–25.

[41]     PLM also moved the Court to take judicial notice of various images taken from Google's Maps "Street View" purporting to show the Rosenberg store at various points over time. *See* Pls.' Req. Judicial Notice at 7–8, ECF No. 248. The Court has made its finding of fact without considering these purported images and therefore will deny the motion as moot.

2012.[42]  *See, e.g.*, J. Morales Dep. Tr. (Mar. 26, 2013), Pls.' Ex. 253, at 51:2–6; *id.* at 66:2–12.

Ms. Morales's deposition testimony does not, however, change the Court's finding of fact for a

variety of reasons.  Most importantly, Ms. Morales did not begin working at the Rosenberg store

until approximately 2008, years after PLM had entered the Houston market.  *See id.* at 14:12–

15:14.  Her testimony concerning the time period before PLM entered the market is limited to

her recollection of visiting the store as a small child when her focus was likely on getting ice

cream and not on trademarks.  *See id.* at 37:11–12; *id.* at 56:24–57:7.  Overall, her answers were

equivocal at best and incoherent at worst, and she frequently gave conflicting answers to

questions without providing any explanations.[43]  *See, e.g., id.* at 37:6–39:7; *id.* at 40:5–12; *id.* at

49:17–51:6; *id.* at 66:10–12.

      The Court also notes that Teresita Fernandez, Mary Fernandez's sister, also testified that

she saw an Indian Girl during her first visit to the Rosenberg store on the employees' uniforms.

*See* Day 10 P.M. at 117:9–119:14.  For a variety of reasons, including the Court's observation of

her demeanor during her testimony, the Court did not find this testimony to be credible evidence

that could alter the Court's finding of fact.  Among other reasons, Ms. Fernandez was unable to

---

[42]     PROLACTO's motion for leave to supplement its deposition designations seeks to designate additional portions of Ms. Morales's deposition to disprove PLM's claim as to her testimony.  *See* Def.'s Add'l Deposition Designations at 3, ECF No. 316-2.  Inexplicably, however, the majority of the relevant testimony was already designated by PLM or PROLACTO and sufficiently disproves PLM's claim as to the substance of Ms. Morales's testimony.  The Court will therefore deny this portion of PROLACTO's motion as moot.

[43]     The Court also notes that Ms. Morales gave her explanation that the Indian Girl was at the far right corner of the awning immediately after PROLACTO's counsel interjected: "Excuse me.  There's no Indian girl depicted in the photograph of the awning on the side in the photograph.  That doesn't mean – because, quite frankly, you can't see the entire awning on the left or the right."  J. Morales Dep. Tr. (Mar. 26, 2013), Pls.' Ex. 253, at 61:14–24.  Counsel's objection was improper and further damaged the credibility of the witness's testimony.  The Court also notes that Ms. Fernandez gave her generally consistent deposition testimony concerning the awning the next day.  *See* M. Fernandez Dep. Tr. (Mar. 27, 2013), Pls.' Ex. 254, at 157:19–158:7.

recall when she first visited the store, stating that it was "early in 2000." *Id.* at 117:19. The Rosenberg store did not open until October 2002.

120. Mary Fernandez currently uses PROLACTO's LA MICHOACANA NATURAL marks (Serial Nos. 78,954,490 and 76,244,918) in connection with her Houston area businesses, but she did not start doing so until after PLM entered the Houston market in 2005.

For the same reasons explained on the question of Ms. Fernandez's first use of the Indian Girl, the Court finds her testimony on this issue to be not credible.

Photographs taken by PLM's private investigators at two separate points in time bolster the Court's credibility determination. As explained above, Patti James visited the Rosenberg store in August 2012. Though she documented and testified to limited usage of the Indian Girl mark, her photographs do not show that the LA MICHOACANA NATURAL marks were used at the time. *See* Pls.' Ex. 212; Pls.' Ex. 241. When Zachary Fechheimer visited in February 2013, however, the marks appeared prominently, on a large sticker on the counter and on employee uniforms. *See, e.g.*, Pls.' Ex. 242 at 16; *id.* at 23. As with the Indian Girl, the difference in appearance casts further doubt on Ms. Fernandez's testimony.

The Court's factual finding and credibility determination is also supported by Juana Morales's deposition testimony in March 2013. When initially shown an image of PROLACTO's LA MICHOACANA NATURAL mark (Serial No. 78,954,490), Ms. Morales, who had worked at the store for over four years at that point, either did not recognize it at all or was, at the very least, confused about it. *See* J. Morales Dep. Tr. (Mar. 26, 2013), Pls.' Ex. 253, at 35:15–36:16. When counsel for PROLACTO later showed Ms. Morales various photographs of the store that showed the mark on uniforms and on a large sticker on the interior of the store, she acknowledged the accuracy of the photos as representing the appearance of the store at the

time of her deposition but said that it appeared on "new uniforms."  *See, e.g.*, *id.* at 78:19–86:6; *id.* at 93:4–95:10.

Finally, the Court also notes that although PROLACTO denies PLM's factual claim that "PROLACTO has not proven that it currently uses any of these asserted marks in any geographic market area in which PLM does business" (and thus, implicitly, that Ms. Fernandez did not use these marks before 2005), Pl.'s Br. at 128 ¶ 203, PROLACTO fails to provide any citation or explanation for its denial, *see* Def.'s Opp'n at 79 (disputing the conclusion and stating, without citation, that PROLACTO has proven it currently uses the asserted marks in Texas and California).

121.    For a period of approximately three years after 2005, Ms. Fernandez operated a store inside of an HEB supermarket in the Houston area in which she used an Indian Girl design. PLM's products were sold at the same HEB in close proximity to the store, and, as a result, customers were confused as to whether PLM and PROLACTO's products had the same origin. *See* Day 11 A.M. at 119:24–125:12.

### 6. Business and Trademark Use in California

122.    Teresita Fernandez is the only PROLACTO licensee that has ever operated in California.  She currently owns and operates two paleterias in northern California:  one located in Sonoma, California and another located in Novato, California.  *See* Day 10 P.M. at 93:19–20.

123.    Teresita Fernandez is the sister of Rigoberto Fernandez and Mary Fernandez. Like her brother and sister, she frequently visited their father's paleteria in Mexico as a child and worked in his paleteria while growing up.  *See* Day 10 P.M. at 95:5–96:9.

124.    On July 29, 2009, Teresita Fernandez opened her first paleteria in California, located in Sonoma.  It remains open today.  When she opened her store, her store used a sign that

featured an Indian Girl mark and the words "MICHOACANA NATURAL ICE CREAM."  A

photograph of the sign, which was admitted as part of Defendant's Exhibit 55, appears below.

*See* Day 10 P.M. at 93:24–95:4; Def.'s Ex. 55.



**Def.'s Ex. 55**

125.    At some point before the fall of 2012, Teresita Fernandez changed the sign that

appears outside her Sonoma store to one that features an Indian Girl mark in front of a paleta and

the words "La Michoacana Natural Fruit Bars & Ice Cream," as shown below in a photograph

admitted as part of Defendant's Exhibit 55A.  This is the way that the store currently appears.

*See* Day 10 P.M. at 102:12–103:2; Def.'s Ex. 55A.



**Def.'s Ex. 55A**

126.    On November 7, 2012, Teresita Fernandez and Guillermo Andrade Malfavon on

behalf of PROLACTO signed a licensing agreement.  The agreement stated that Ms. Fernandez

had previously operated the business "since July 2009 under an informal license agreement."

The agreement provided, among other things, that Ms. Fernandez "must observe the Quality Control regulations according to the guidelines established by [PROLACTO]" and permitted PROLACTO to "verify quality of the products and services provided by [Ms. Fernandez] anytime without prior notice." *See* Def.'s Ex. 56; Day 10 P.M. at 112:21–114:2.

127.    In the fall of 2012, likely around the same time that Teresita Fernandez entered into her written licensing agreement with PROLACTO, Guillermo Andrade Malfavon, Cesar Gonzalez, and Stephen Anderson, PROLACTO's lead counsel at trial, visited Ms. Fernandez's Sonoma store.  During this visit, they inspected Ms. Fernandez's products for quality, gave recommendations to Ms. Fernandez and one of her employees on making the products, and inspected documents.  They also documented their visit with several photos.  This was the first such visit to the store, although her sister, Mary Fernandez, helped her to open the store in 2009. *See* Day 10 P.M. at 104:7–109:22; Day 11 P.M. at 104:2–105:22; Def.'s Ex. 55A.

128.    Teresita Fernandez has received two letters from PLM's counsel demanding that she cease and desist her use of the Indian Girl mark and the words LA MICHOACANA at her Sonoma store:  one in October 2009 and another in 2014.  Ms. Fernandez did not respond to the letters and continues to use an Indian Girl mark and LA MICHOACANA today. *See* Day 11 A.M. at 20:20–22:23.

129.    On February 14, 2014, Teresita Fernandez opened her second paleteria, located in Novato, California.  From its opening until the present, the store displays an Indian Girl mark and the words LA MICHOACANA, similar to the current version of the sign outside her Sonoma store, as shown below in a photograph taken on the day of the store's opening and admitted as part of Defendant's Exhibit 57A. *See* Day 10 P.M. at 110:2–8; *id.* at 114:24–115:2.



**Def.'s Ex. 57A**

130.    Teresita Fernandez purchases a variety of inventory for her stores from
PROLACTO, including cups, bags, aprons, sticks, and uniforms for her employees.  *See* Day 11
A.M. at 39:5–17.

131.    At the time that she opened her first store in Sonoma in 2009, Teresita Fernandez
was aware that PLM sold its products using an Indian Girl mark and the words LA
MICHAOCANA, as well as its LA INDITA MICHOACANA mark.  See Day 11 A.M. at 12:24–
13:20.

132.    Teresita Fernandez testified that, since opening her first store in Sonoma in 2009,
she has received numerous calls from people apparently attempting to reach PLM about
shipments and deliveries.  She also testified that she sees PLM's delivery trucks passing by her
store on a monthly basis.  *See* Day 10 P.M. at 110:9–112:17.

**7.  Business and Trademark Use in North Carolina**

133.    Shortly after PROLACTO bought out Rigoberto Fernandez's stores in Florida,
Mr. Fernandez moved to North Carolina and, by August 2014, opened a paleteria in Charlotte.
*See* C. Gonzalez Dep. Tr. (Aug. 20, 2015), Pls.' Ex. 308, at 26:15–17; *id.* at 164:10–19.

134.    PROLACTO permitted Rigoberto Fernandez to take freezers and other equipment
from his former Florida stores to use in his North Carolina store.  *See* Day 11 P.M. at 102:11–19.

135.     Rigoberto Fernandez hired contractors to design, create, and install an exterior sign for his Charlotte store with the words "Michoacana Natural Ice Cream" and an Indian Girl surrounded by the words "La Michoacana es Natural."  *See* C. Larach Dep. Tr. (Aug. 20, 2015), Pls.' Ex. 307, at 16:4–18:22; Pls.' Ex. 273; Pls.' Ex. 275; Def.'s Ex. 157.[44]

## C.  Meaning of "LA MICHOACANA"

136.     There is no material difference between the terms "MICHOACANA," "LA MICHOACANA," and "LA MICHOACANA NATURAL" when used in connection with selling ice cream and other frozen treats.

137.     In connection with selling ice cream and other frozen treats in the United States, the terms "MICHOACANA" and "LA MICHOACANA" are descriptive of a type of product that is understood in the minds of consumers to have originated in the Mexican state of Michoacán, and it is not primarily associated with PROLACTO or any other single source.

Courts have identified four general, somewhat amorphous categories for classifying marks:  (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful.  *See Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1039 (D.C. Cir. 1989). Categorization of a mark is a factual question.  *See Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004) (citing *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 215 (2d Cir. 2003)); *see also Towers v. Advent Software, Inc.*, 913 F.2d 942, 944 (Fed. Cir. 1990) ("Whether a mark is descriptive is a question of fact." (citing *In re Bed & Breakfast Registry*,

---

[44] PLM's proposed finding of fact on this issue states that Fernandez hired contractors to design and install the sign on or about July 14, 2014, *see* Pls.' Br. at 101 ¶ 140, but the relevant deposition testimony and accompanying exhibits seem to indicate that the request was made in November 2013, *see* C. Larach Dep. Tr. (Aug. 20, 2015), Pls.' Ex. 307, at 15:19–16:18; Pls.' Ex. 275 (sign estimate dated November 5, 2013).  In any event, PROLACTO does not contest PLM's proposed finding of fact, *see* Def.'s Br. at 73 ¶ 140, and the date is immaterial to the Court's analysis.

791 F.2d 157, 160 (Fed. Cir. 1986))).  The Tenth Circuit has offered a useful description of each

category:

> A mark is generic if it is a common description of products [or
> services] and refers to the genus of which the particular product [or
> service] is a species.  A mark is descriptive if it describes the
> product's [or service's] features, qualities, or ingredients in ordinary
> language or describes the use to which the product [or service] is
> put.  A mark is suggestive if it merely suggests the features of the
> product [or service], requiring the purchaser to use imagination,
> thought, and perception to reach a conclusion as to the nature of the
> goods [or services].  An arbitrary mark applies a common word in
> an unfamiliar way.  A fanciful mark is not a real word at all, but is
> invented for its use as a mark.

*Donchez*, 392 F.3d at 1216 (quoting *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192

F.3d 337, 344 (2d Cir. 1999)).  These categories "reflect both the eligibility for protection and

the degree of protection accorded" to a particular mark.  *Id.* (quoting *Lane Capital*, 192 F.3d at

344).  But as this Circuit has recognized, "[t]hese categories, like tones in a spectrum, tend to

blur at the edges and merge together.  The labels are more advisory than definitional, more like

guidelines than pigeonholes.  Not surprisingly, they are somewhat difficult to articulate and to

apply."  *Blinded Veterans Ass'n*, 872 F.2d at 1039 (citation and quotation omitted).

"The fact-finder is not the designated representative of the purchasing public, and the

fact-finder's own perception of the mark is not the object of the inquiry.  Rather, the fact-finder's

function is to determine, based on the evidence before it, what the perception of the purchasing

public is."  *Lane Capital*, 192 F.3d at 344; *see also Bayer Co. v. United Drug Co.*, 272 F. 505,

509 (S.D.N.Y. 1921) (L. Hand, J.) ("The single question, as I view it, in all these cases, is merely

one of fact: What do the buyers understand by the word for whose use the parties are

contending?").

At the summary judgment stage, it was unclear which category the parties believed was

applicable to the marks at issue, and the Court interpreted their focus on the issue of secondary

meaning to mean that "they both agree that the marks are not inherently distinctive and instead are better defined as geographically descriptive." *PLM I*, 69 F. Supp. 3d at 210. The Court then turned to the issue of secondary meaning and held that substantial questions of material fact existed. *See id.* at 211–12.

PROLACTO now makes clear its position that, other than representing the place where the Andrade Malfavon family started in business, the term "Michoacana," along with other variations of the term including "La Michoacana," is "in no way descriptive" of the goods at issue in this case and is, therefore, "arbitrary and protectable." Def.'s Br. at 23. PROLACTO likens the name to other "well-known marks that are arbitrary yet still contain some geographical significance," including Amazon. *Id.* PLM, by contrast, argues that the phrase "La Michoacana" "standing alone *may* be descriptive in the United States" and that "'Michoacana' in the U.S. *may* signify a Mexican style of product" and likens its usage in connection with ice cream to terms like "Philly Cheese Steak" and "New York Cheesecake," among others. Pls.' Opp'n at 32 (emphasis added). PLM argues that "Michoacana" is essentially to Mexican-style ice cream what "gelato" is to Italian ice cream or "mochi" is to Japanese ice cream. *See id.* PLM's equivocation, though not ideal in a post-trial briefing, is understandable. This is admittedly a difficult factual question to answer. The TTAB could not reach a clear conclusion, stating that the term "has some significance suggesting a connection with 'Michoacan'" but that its meaning and usage in the United States were unclear.[45] TTAB Decision at *14.

---

[45]     The TTAB stated that "[n]either party has introduced any evidence regarding the meaning or renown of the term 'Michoacana' in the United States when used in connection with ice cream." TTAB Decision at *14. Given the lack of evidence before the TTAB on this issue, its analysis is entitled to little, if any, deference.

If the marks are descriptive, then PROLACTO must establish secondary meaning.  Here,

the same evidence that would be required to establish secondary meaning would also resolve

whether "Michoacana" is arbitrary or descriptive.  Establishing secondary meaning requires

"proof that the public recognizes only one source of the product or service."  *Blinded Veterans*,

872 F.2d at 1040.  "[A] term has acquired secondary meaning when 'the primary significance of

the term in the minds of the consuming public is not the product but the producer.'"  *Id.* (quoting

*Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938)); *see also Fernandez v. Jones*, 653 F.

Supp. 2d 22, 29-30 (D.D.C. 2009) ("'The prime element of secondary meaning is a mental

association in buyers' minds between the alleged mark and a single source of the product.'"

(quoting 2 *McCarthy on Trademarks* § 15:5 (4th ed. 2009)).  "To acquire a secondary meaning in

the minds of the buying public, a labelled product, when shown to a prospective customer, must

prompt the reaction, 'That is the product I want because I know that all products with that label

come from a single source and have the same level of quality.'"  *Id.* at 30 (citation omitted); *see*

*also* 2 *McCarthy on Trademarks* § 15:11 (4th ed. 2009).  In this Circuit, commonly considered

evidence for ascertaining whether secondary meaning has attached to a mark includes survey

evidence, the length and manner of use of the name, the nature and extent of advertising and

promotion of the name, the volume of sales, and instances of actual confusion.  *See Miski*, 889 F.

Supp. 2d at 155.

The Court's consideration of the evidence submitted at trial and the live testimony

presented leads it to find that these factors compel against a finding of arbitrariness or secondary

meaning.  PROLACTO offered little evidence on this issue at trial, and the limited evidence that

it did offer was unconvincing.  For example, PROLACTO offered some evidence of advertising

on the part of its licensees, but the scale of that advertising, particularly in Houston, appears to

have been minimal at best.  *See, e.g.*, Day 11 P.M. at 24:2–26:17 (testimony by Mary Fernandez

that she had not engaged in any television, radio, or newspaper advertising, though she had

engaged in some advertising through her children's sports teams, schools, and a church

calendar).  And although PROLACTO's licensees have been selling their products for over a

decade using the name "La Michoacana," PROLACTO offered no evidence that consumers in

any market identify the licensees or PROLACTO as the sole source of products bearing that

name.

      As for actual confusion, while there was clear evidence of actual confusion in Northern

California and Texas, there is no indication that the source of that confusion was the name "La

Michoacana," rather than the parties' common use of an Indian Girl or some other visual

element, which seems far more likely.  In an attempt to prove other instances of actual confusion,

PROLACTO called three witnesses that claimed to have either purchased or tasted PLM's

products.  The Court has discussed its finding that these witnesses lacked credibility due to their

close family relationship with PROLACTO's lead counsel.[46]  *See* Day 9 A.M. at 37:10

("brother-in-law"); Day 9 P.M. at 7:1 ("my uncle Steve Anderson"); *id.* at 53:8–11 (Mr.

Anderson's nephew).  In addition, much of the questioning of these witnesses was highly leading

and suggestive, a common theme of PROLACTO's direct examinations at trial.  *See, e.g.*, Day 9

---

[46]    Notably, however, these witnesses gave some testimony suggesting that they did *not* view "La Michoacana" as referring to a single source but, rather, a type of product.  *See, e.g.*, Day 9 A.M. at 47:2–3 ("I'm not a brand picker, but the kind that – I know my favorite places to eat ice cream."); *id.* at 47:6–10 ("Q.  And what's the store?  Does that have a name or a name on it?  A. No.  There's La Michoacana, I remember, through the – on the freezer of the store.  And they also sell *aguas frescas*, which are natural water . . . ."); *id.* at 91:7–9 ("I wasn't aware that they were owned by the same business or the same owner, but the look, the signage, is what was consistent."); Day 9 P.M. at 27:22–29:10; *id.* at 36:10–20 (viewing a sign that she read as "Paleterias La Michoacan Es Natural" and stating that she would not be able to associate it with any particular producer).

P.M. at 13:11–21.  PROLACTO's expert witness, Dr. Jacob Jacoby, also testified as to the results of his consumer survey, but he did not test for secondary meaning.  *See* Day 12 P.M. at 57:4–9; *see also id.* at 59:15–19 (stating that his survey did not ask respondents if they believed the product could have come from more than one place).

Upon consideration of the entire record, and the Court's observation of the witnesses' live testimony, the Court finds that the term "Michoacana," when used in connection with ice cream, is merely descriptive of the type of product sold and has not achieved secondary meaning in the minds of the relevant consumers.  The Andrade Malfavon family may, in fact, be responsible for the popularization of the term through their decades of use in Mexico and their family origins in the state of Michoacán, assuming their historical claims are accurate.  But this does not mean that consumers in the United States identify the term with any one manufacturer of the product, any more than they do not primarily identify a "Waldorf salad" with The Waldorf-Astoria Hotel in New York or a "Philly cheesesteak" with Pat's King of Steaks in Philadelphia.

## IV.  CONCLUSIONS OF LAW

Having established and explained its findings of fact, the Court now provides its conclusions of law.  Before turning to its conclusions as to each pending claim and counterclaim, the Court first provides its legal conclusions on two overarching issues in this case:  first, PROLACTO's argument that PLM has no rights in any of the marks at issue in this case because it adopted them in "bad faith"; and second, PLM's argument that PROLACTO has no rights in any of the marks at issue in this case because it engaged in "naked licensing."

## A. PLM's Good Faith Adoption of the Marks at Issue

The Court begins by addressing an important issue that PROLACTO has raised in connection with nearly every facet of this case, namely, PLM's good faith or bad faith adoption of the marks at issue.

Throughout this litigation, PROLACTO has consistently taken the position that PLM adopted its marks, including the name "La Michoacana" and the Indian Girl, with not only knowledge of PROLACTO's prior use of those marks in Mexico but also with the specific "intent to capitalize on the fame and reputation that PROLACTO and its founders and predecessor have achieved in Mexico and in the United States among consumers for the parties' goods, by drawing an association with a product under a brand that [Ignacio and Patricia Gutierrez] knew were previously well-known and indeed famous in Mexico." Def.'s Br. at 29. PROLACTO argues that PLM's bad faith is clear from a range of evidence introduced at trial such as certain advertising statements, including, most importantly, the Tocumbo Statement. *See id.* at 30–34. PROLACTO argues that, in light of this extraordinary bad faith, PLM has no rights in any of the marks at issue in this case. *See id.* at 34–35.

At the summary judgment stage, the Court left open the issue of PLM's good faith or bad faith adoption of the marks. *See PLM I*, 69 F. Supp. 3d at 208 n.10. Following the Pretrial Conference, the Court asked the parties to submit briefing on the legal question of whether a party who adopts a mark in the United States with the knowledge of another party's foreign use and attempts to falsely associate itself with that party's foreign use can be found to have acted in "good faith." *See* Order, ECF No. 221. The parties submitted extensive briefing on the issue in response. *See* Pls.' Supp. Mem., ECF No. 222; Def.'s Supp. Mem., ECF No. 223. The parties have also addressed this issue on factual and legal grounds in their post-trial briefing. *See, e.g.*,

Def.'s Br. at 38–47; Pls.' Opp'n at 12–41.  A review of the relevant case law on this topic, including the precedent upon which PROLACTO relies, is helpful to framing the issue.

As background, it is important to establish the territorial nature of American trademark law.  In its summary judgment opinion, the Court explained:  "It is axiomatic that under United States trademark law, a party establishes valid ownership of a mark by being the first to use that mark in commerce" and it is "a basic tenet of American trademark law that foreign use of a mark creates no cognizable right to use that mark within the United States."  *PLM I*, 69 F. Supp. 3d at 201 (citations omitted).  This "territoriality principle" means that "[p]riority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world."  5 *McCarthy on Trademarks* § 29:2.  The Court explained that the so-called "famous mark" doctrine, which the Ninth Circuit has adopted and the Second Circuit has rejected, may function as a narrow exception to the territoriality principle, but that, even if the Court chose to recognize the doctrine, it would be inapplicable to PROLACTO, because PROLACTO had not "come close" to establishing the requisite level of fame in the United States in any market.[47]  *See PLM I*, 69 F. Supp. 3d at 202–03; *see also PLM II*, 79 F. Supp. 3d at 66–71.

The Court also explained that, with respect to unregistered trademarks, the party that first uses a mark in commerce in the United States does not automatically obtain a nationwide right to use the mark.  Rather, the first party to use the mark in the United States, referred to as the "senior user," acquires rights only for those territories in which it uses its mark and into which it might naturally expand.  *See PLM I*, 69 F. Supp. 3d at 206.  Under the *Tea Rose-Rectanus* doctrine, named after two landmark Supreme Court cases, "[t]he national senior user of an unregistered mark cannot stop the use of a territorially 'remote' good faith national junior user

---

[47]     PROLACTO did not offer any evidence at trial to alter the Court's prior conclusion.

who was first to use the mark in that territory."  5 *McCarthy on Trademarks* § 26:2; *see also PLM I*, 69 F. Supp. 3d at 206 ("Good faith junior users who later use the same or similar mark on alike products or services also may establish rights to the mark provided there is no competitive overlap with the senior user.").

Here, the Court has made a factual determination that PLM is the national senior user of "La Michoacana" and an Indian Girl and that it is PROLACTO who is the junior user.  It would seem, then, that the *Tea Rose-Rectanus* doctrine, along with its "good faith" qualification, is entirely inapplicable to PLM's adoption of its marks.  But PROLACTO presents a different argument.  It argues that PLM engaged in the hallmark of bad faith:  it adopted its marks with the intention of benefitting from PROLACTO's goodwill and reputation in Mexico by deceiving consumers as to the true origin of their products and that it did this not only through its use of PROLACTO's foreign marks but through its adoption of advertising statements meant to deceive consumers.  PROLACTO argues that courts have unanimously held that a party cannot acquire rights in a mark that it adopts with the intention of benefitting from a prior user's goodwill and reputation and whether the prior use was in the United States or not is immaterial.  *See, e.g.*, Def.'s Supp. Mem. at 2.

Courts have differed in their interpretations and application of the "good faith" requirement.  When applying the *Tea Rose-Rectanus* doctrine to the usual circumstance of a national junior user, "[t]he majority of case law and commentary adopt the view that proof of the junior user's knowledge of the senior user's mark at the critical date is sufficient to destroy the 'good faith' element of the territorial defense."  5 *McCarthy on Trademarks* § 26:9; *see also Pike v. Ruby Foo's Den, Inc.*, 232 F.2d 683, 686 (D.C. Cir. 1956) ("The Federal cases are virtually unanimous against a knowing junior user.").  More recently, however, that view "appears to be

losing ground to a growing body of cases adopting the view that the junior user's knowledge is not determinative, but is merely the first step in an enquiry into 'bad faith.'" 5 *McCarthy on Trademarks* § 26:10. For example, the Tenth Circuit, which has followed this emerging minority view and which PROLACTO relies upon in its briefing, has held that "[w]hile a subsequent user's adoption of a mark with knowledge of another's use can certainly support an inference of bad faith, . . . mere knowledge should not foreclose further inquiry. The ultimate focus is on whether the second user had the intent to benefit from the reputation or goodwill of the first user." *GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir.), *cert. denied*, 498 U.S. 998 (1990) (citations omitted). Under either the broad majority view or the narrower minority view, it is clear that adopting a mark with intention of benefitting from the reputation and goodwill of the prior user is quintessential bad faith. *See also Pike*, 232 F.2d at 686 n.2 ("It is also worthy of note concerning the rights of the junior user that if he imitates the other's trade-mark or trade name knowingly and acts in other ways to convey the impression that his business is associated with the other, the inference may reasonably be drawn that there are prospective purchasers to be misled.") (internal quotation omitted); *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006) ("The inquiry into willfulness or bad faith 'considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product.'") (quoting *Savin Corp. v. Savin Group*, 391 F.3d 439, 460 (2d Cir. 2004)).

While this remains the definition of "bad faith," PROLACTO has not been able to provide, nor can the Court locate, any case in which a court has denied a national senior user rights in a mark because the mark was previously used outside of the United States and the national senior user adopted the mark in bad faith. Indeed, one leading treatise states: "In

general, United States law grants United States mark-rights to a mark's first United States user even when such user is intentionally imitating a mark used by another in a foreign country."  3 Louis Altman & Malla Pollack, *Callman on Unfair Competition, Trademarks and Monopolies* § 20:13 (4th ed. 2014).  Nevertheless, a very small number of courts appear to have at least considered the *possibility* that a national senior user could not obtain rights in a mark that the user adopted in bad faith based upon another party's foreign use of the mark.

Most notably, in *Person's Co. v. Christman*, 900 F.2d 1565 (Fed. Cir. 1990), the Federal Circuit addressed a case in which an American visited a retail outlet in Japan, purchased several clothing items bearing the Japanese retailer's logo and, on his return to the United States, began his own clothing line that directly copied the Japanese retailer's designs and used the Japanese retailer's logo.  The American was the first to use the mark in the United States but, shortly after he started selling his products, the Japanese retailer began plans to expand into the United States. *See Person's*, 900 F.2d at 1567.  In that case, as here, the prior foreign user "vigorously assert[ed] that [the national senior user's] adoption and use of the mark in the United States subsequent to [its] adoption in Japan [was] tainted with 'bad faith' and that priority in the United States obtained thereby [was] insufficient to establish rights superior to those arising from [the foreign user's] prior adoption in a foreign country." *Id.* at 1569.  The court stated, however, that "an inference of bad faith requires *something more* than mere knowledge of prior user of a similar mark in a foreign country." *Id.* (emphasis added).  The court also acknowledged that "there is some case law supporting a finding of bad faith where (1) the foreign mark is famous here or (2) the use is a nominal one made solely to block the prior foreign user's planned expansion into the United States" but stated that neither of those circumstances were present in the case. *Id.* at 1570.  On this basis, the Court concluded that the national senior user's "conduct

in appropriating and using [the foreign user's] mark in a market where he believed the Japanese manufacturer did not compete can hardly be considered unscrupulous commercial conduct." *Id.* The court added: "'[t]he law pertaining to registration of trademarks does not regulate all aspects of business morality.'" *Id.* (quoting *Selfway, Inc. v. Travelers Petroleum, Inc.*, 579 F.2d 75, 79 (C.C.P.A. 1978)) (alteration in original).

The two cases cited by the Federal Circuit were *Vaudable v. Montmartre, Inc.*, 193 N.Y.S.2d 332 (N.Y. Sup. Ct. 1959), and *Mother's Restaurants Inc. v. Mother's Other Kitchen, Inc.*, 218 U.S.P.Q. 1046, 1983 WL 51992 (T.T.A.B. 1983). *See Person's*, 900 F.2d at 1570 n.23. In *Vaudable*, a New York court decided that, under New York's common law, the defendants' "wrongful attempt to suggest an association or connection of some sort" with an internationally-famous Parisian restaurant through use of the restaurant's name in the United States was "sufficient to warrant relief to prevent confusion in the public mind as well as dilution of plaintiffs' trade name." *Vaudable*, 193 N.Y.S.2d at 335 (citations omitted). *Vaudable* has no real bearing on this case, as the New York Court of Appeals has since explained that *Vaudable* did not concern "any famous or well-known marks doctrine" but rather, it "fit logically and squarely within [New York's] time-honored misappropriation theory." *ITC Ltd. v. Punchgini, Inc.*, 880 N.E.2d 852, 859 (N.Y. 2007). In *Mother's*, the TTAB declined to hold that a Canadian restaurant's promotional activities in Canada that reached American consumers "resulted in superior rights" to certain marks subsequently used by another party in the United States. *Mother's*, 1983 WL 51992, at *2. The TTAB stated:

> [I]t is our view that prior use and advertising of a mark in connection with goods or services marketed in a foreign country (whether said advertising occurs inside or outside the United States) creates no priority rights in said mark in the United States as against one who, *in good faith*, has adopted the same or similar mark for the same or similar goods or services in the United States prior to the foreigner's

first use of the mark on goods or services sold and/or offered in the
United States.

*Id.* (emphasis added).

Two other cases are worth mentioning.  First, in *West Indian Sea Island Cotton Ass'n Inc.*
*v. Threadtex, Inc.*, the district court addressed a defendant's affirmative defense of laches on a
motion for summary judgment by considering whether the defendant had engaged in good faith
or bad faith.  *See* 761 F. Supp. 1041, 1051 (S.D.N.Y. 1991).  The court found that the record
"permit[ted] a reasonable inference that defendants purposefully have acted to deceive the public
as to the quality and origin of their products" by adopting a foreign mark along with words
telling consumers that they should "[b]eware of impostors!"  *Id.*  In a footnote, the court also
distinguished *Person's* on the basis that that case would only apply to trademark infringement
and not to "allegations of deceptive and false description of defendants' products."  *Id.* at 1051
n.6.  The court stated that *Person's* reasoning "does not apply to allegations of patently false
statements concerning defendants' products."  *Id.*  Finally, in *Buti v. Impressa Perosa, S.R.L.*, the
district court found—prior to the New York Court of Appeals' clarification of *Vaudable*, that a
national first user who adopted the name of an Italian restaurant in New York did not fall within
the so-called "*Vaudable* exception" to *Mother's* and *Person's*, because the foreign restaurant was
not a "famous" mark in the United States.  935 F. Supp. 458, 473 (S.D.N.Y. 1996).

The upshot of the Court's review of these cases (and others cited by PROLACTO and not
mentioned here)[48] is that PROLACTO has asked the Court to enter uncharted waters.  If the

---

[48]     PROLACTO also cites the Fourth Circuit's decision in *International Bancorp, LLC v.*
*Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359 (4th Cir. 2003),
*cert. denied*, 540 U.S. 1106 (2004), claiming that the Fourth Circuit in that case "supported the
TTAB's holding [in *Person's*] *i.e.*, that bad faith requires showing that the copying was [done]
with the intent of trading upon the good will or reputation of another."  Def.'s Br. at 42 ¶ 10.  But
*International Bancorp* had little, if anything, to do with bad faith.  Although the facts in that case
were similar to PROLACTO's factual claims here—that the defendant used the plaintiff's

Court were to hold that PLM was not entitled to any rights in its marks on the basis of bad faith, despite the fact that it was first to use its marks in the United States, it would appear that the Court would be the first to do so in the history of American trademark law.  Though it is dubious of the legal validity of PROLACTO's proffered theory, the Court will, for purposes of its analysis, assume, without deciding, that the following is valid:  if a party adopts a mark in the United States that has been previously used in a foreign country and engages in various forms of advertising with the intention of benefitting from the foreign user's goodwill and reputation by deceiving consumers as to the true origin of its products—even if the foreign user has never used the mark in commerce in the United States and even if the foreign mark does not meet the requisite level of "fame" under the famous mark doctrine—then the party cannot obtain rights to the mark.

On the Court's findings of fact, this legal theory is inapplicable.  The Court has found that although the Gutierrez brothers adopted the name "La Michoacana" because they had seen the name in Mexico, they did not believe that the term denoted a single source of product in Mexico.  The Court has also found that, in the United States, the name does not, in fact, denote a

---

foreign-registered mark along with images of the plaintiff's business—the Fourth Circuit's consideration of that evidence was limited to its brief discussion of the likelihood of confusion, with no reference to bad faith.  *See Int'l Bancorp*, 329 F.3d at 382.  The Fourth Circuit, in fact, *distinguished Person's* on the ground that, in *Person's*, unlike the case before it, "no evidence whatsoever was proffered that the company had in any way used or displayed its mark to advertise or sell its product to United States consumers." *Id.* at 374.  The focus of the court's opinion in *International Bancorp* was the "use in commerce" necessary to achieve protection for service marks, which are not at issue in this case, and the court held that, in order to merit protection, a mark owner must both "render services in foreign commerce" and "use or display a mark in the sale or advertising of services to consumers." *Id.* at 373.  Though it is unclear, it seems possible that PROLACTO refers to the *dissenting* opinion's discussion of *Person's* and *Mother's*, which itself barely mentioned good faith or bad faith.  *See id.* at 386 n.5 (Gribbon Motz, C.J., dissenting).  There, however, the dissent argued *against* the concept that "use of a foreign mark in a foreign country somehow grants the foreign holder of the mark *priority* over one who uses the mark first in the United States." *Id.* at 385.

single source of product.  The Court has found that although Ignacio Gutierrez copied PLM's Indian Girl mark from similar marks that he had seen in Mexico and adopted it because he thought PLM's target consumers would recognize the mark, he did not believe that, in Mexico, the mark denoted a single source of product, but, rather, believed that the mark was used indiscriminately by a variety of paleterias in Mexico.  The Court has also found that although Ignacio Gutierrez adopted the Tocumbo Statement because he had seen similar, if not identical, language on packaging in Mexico, he believed that various, separately-owned paleterias in Mexico used the language on their product packaging even though it was not literally true as applied to each of them.  Finally, the Court also found the absence of any credible evidence that any of PLM's advertising statements at issue influenced consumers' decisions to purchase or not purchase PLM's products or caused consumers to falsely believe that PLM's products were actually PROLACTO's products.

On these facts, the Court cannot find any legal basis to hold, without precedent, that PLM, as the national senior user, has no rights in its marks.  No matter how unethical PLM's actions may seem to an outside observer, as the Federal Circuit recognized in *Person's*, the Lanham Act does not regulate all aspects of business morality.

## B.  PROLACTO's Licensing and Control

PLM argues, in turn, that it is PROLACTO that does not have any rights in any of its purported marks in the United States, because it abandoned any rights by engaging in so-called "naked licensing."  *See* Pls.' Br. at 123–26.  The Court briefly addressed this argument in its summary judgment opinion, holding that there was a genuine dispute of fact to be resolved at trial as to whether PROLACTO engaged in naked licensing.  *See PLM I*, 69 F. Supp. 3d at 207 n.9.

An owner of a trademark may lose its rights in the mark through abandonment.  *See* 15 U.S.C. §§ 1115(b)(2), 1127.  An owner can abandon a mark "by engaging in naked licensing— that is, by allowing others to use the mark without exercising 'reasonable control over the nature and quality of the goods, services, or business on which the [mark] is used by the licensee.'"  *Eva's Bridal Ltd. v. Halanick Enters., Inc.*, 639 F.3d 788, 789 (7th Cir. 2011) (quoting *Restatement (Third) of Unfair Competition* § 33 (Am. Law Inst. 1995)) (alteration in original); *see also Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006) ("[L]icensing arrangements are permissible so long as the license agreement provides for adequate control by the licensor of the nature and quality of the goods or services."); *see generally John C. Flood of Va., Inc. v. John C. Flood, Inc.*, 642 F.3d 1105, 1107–08 (D.C. Cir. 2011) (acknowledging the naked licensing doctrine); *Pike v. Ruby Foo's Den, Inc., of Md.*, 232 F.2d 683, 685 (D.C. Cir. 1956).

"It is difficult, if not impossible to define in the abstract exactly how much control and inspection is needed to satisfy the requirement of quality control over trademark licensees."  3 *McCarthy on Trademarks* § 18:55.  As the Seventh Circuit has aptly explained:

> How much control is enough?  The licensor's self-interest largely determines the answer.  Courts are apt to ask whether "the control retained by the licensor [is] sufficient under the circumstances to insure that the licensee's goods or services would meet the expectations created by the presence of the trademark." . . .  How much authority is enough can't be answered generally; the nature of the business, and customers' expectations, both matter.

*Eva's Bridal*, 639 F.3d at 790–91 (quoting *Restatement (Third) of Unfair Competition* § 33 cmt. a).  The Restatement recognizes that "[a]s a general matter, courts are reluctant to interfere with the marketing arrangements adopted by trademark owners, and minimal control over the quality of a licensee's goods or services is often sufficient" to avoid abandonment through naked licensing.  *Restatement (Third) of Unfair Competition* § 33 cmt. c.  Courts will generally find

abandonment through naked licensing only in extreme cases in which the trademark owner

exercises no control whatsoever.  *See Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*,

549 F.2d 368, 387 (5th Cir. 1977) ("Retention of a trademark requires only minimal quality

control, for in this context we do not sit to assess the quality of products sold on the open market.

We must determine whether [the owner] has abandoned quality control; the consuming public

must be the judge of whether the quality control efforts have been ineffectual."); *Slep-Tone

Entm't Corp. v. Coyne*, --- F. Supp. 3d. ----, 2015 WL 5821695, at *8 (N.D. Ill. Sept. 30, 2015)

(quoting *Eva's Bridal*, 639 F.3d at 791).

 PLM faces a steep mountain to climb, as courts place a stringent burden on a party

asserting abandonment on a theory of naked licensing.  *See, e.g.*, *Doeblers' Pa. Hybrids*, 442

F.3d at 824 ("To the extent that plaintiff may rely on a naked licensing theory, its burden is

high."); *Barcamerica Int'l USA Trust. v. Tyfield Imps., Inc.*, 289 F.3d 589, 596 (9th Cir. 2002)

("[T]he proponent of a naked license theory 'faces a stringent standard' of proof.") (quoting

*Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992)); *Creative Gifts, Inc. v. UFO*,

235 F.3d 540, 548 (10th Cir. 2000) ("Because naked licensing if established is treated as an

abandonment of the trademark, which triggers the loss of trademark rights against the world,

anyone attempting to show such abandonment via naked licensing faces a stringent burden of

proof."); *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991) (stating

that the party asserting naked licensing "faces a stringent standard because finding a 'naked

license' signals involuntary trademark abandonment and forfeits protection"), *aff'd* 505 U.S. 763

(1992); *Restatement (Third) of Unfair Competition* § 33 cmt. c ("[C]ourts impose a heavy burden

on the person asserting a lack of reasonable control by a licensor."); 3 *McCarthy on Trademarks*

§ 18:48 ("[C]ourts have required that a high degree of proof be made before a court declares that all rights in the mark are lost.").

PROLACTO's quality control efforts certainly leave much to be desired.  For example, some of its U.S. licensees opened and initially operated with only either a verbal or implied license from PROLACTO, though they entered into written agreements later.  Currently, the licensees are not required to pay PROLACTO any royalties for using the marks.  *See* G. Andrade Malfavon Dep. Tr. (July 31, 2013), Pls.' Ex. 259, at 143:7–144:2; *see also* Day 11 A.M. at 29:5–20.  PROLACTO's quality control inspections are infrequent and irregular, and it seems to provide its licensees fairly wide latitude in determining the visual appearance of their stores. PROLACTO also appears to have made a concerted effort to increase its level of control during the pendency of this litigation by entering into written licensing agreements and conducting inspections, including at least one documenting the visit with photographs seemingly for the purpose of this litigation with its trial counsel present.  *See* Day 10 P.M. at 104:7–109:22; Def.'s Ex. 55A.  These flaws, however, are not fatal.

The Court concludes that PROLACTO has satisfied the minimal level of control necessary to avoid abandonment through naked licensing.  The Court has found facts that demonstrate that PROLACTO has the authority to control the quality of its licensees' products and that it has exercised that authority in various ways.  For example, PROLACTO has entered into written licensing agreements requiring its licensees to meet PROLACTO's standards for quality and permitting PROLACTO to conduct inspections at any time, and PROLACTO has conducted some formal inspections.  PROLACTO's licensees also purchase their inventory, including employee uniforms displaying the marks at issue in this case and equipment for making and serving paletas to customers, directly from PROLACTO.

Perhaps most importantly, PROLACTO's licensees are closely related to PROLACTO's directors and owners. They are all members of the Andrade Malfavon family, and they regard their businesses as being part of a family tradition that stretches back generations. The licensees testified that they had grown up visiting their family members' paleterias and learning their trade. Courts have broadly held that, with these types of "special relationships," the formalistic quality control standards that would normally be required are relaxed, and some courts have even permitted licensors to rely entirely on their licensees to ensure consistent quality. *See Doeblers' Pa. Hybrids*, 442 F.3d at 824–25; *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 872 (10th Cir. 1995), *abrogated on other grounds by Lexmark Int'l Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014); 3 *McCarthy on Trademarks* §§ 18:57–58. As the Fifth Circuit has explained:

> Where the particular circumstances of the licensing arrangement persuade us that the public will not be deceived, we need not elevate form over substance and require the same policing rigor appropriate to more formal licensing and franchising transactions. Where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, we would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities.

*Taco Cabana*, 932 F.2d at 1121. PLM has offered the Court little, if any, evidence of a differentiation in quality between the products offered by the various PROLACTO licensees or consumer deception.

This is not the "extreme case" presented to the Seventh Circuit in *Eva's Bridal*. *Eva's Bridal*, 639 F.3d at 791. In that case, which also involved licensing arrangements with family members, the licensors "did not retain *any* control—not via the license agreement, not via course of performance" and "had, and exercised, *no* authority over the appearance and operations of [the licensees'] business, or even over what inventory to carry or avoid." *Id.* at 790–91. As the Court

111

has explained, PROLACTO has retained and exercised authority over its licensees, even if it has done so with less rigor than might be expected in a typical licensing arrangement or considered ideal. It has not abandoned any rights through naked licensing.

## C. Complaint Count I

As discussed above, the TTAB granted PROLACTO's petition to cancel PLM's LA INDITA MICHOACANA mark after concluding that PROLACTO had established priority of use and likelihood of confusion with respect to four of its marks. *See* TTAB Decision at \*\*9–16. Count I of PLM's Second Amended Complaint seeks reversal of the TTAB's decision and denial of PROLACTO's cancellation petition pursuant to 15 U.S.C. § 1071(b).

PLM argues that the Court should find in its favor on Count I for multiple reasons. *See* Pls.' Br. at 52–104. In addition to challenging the merits of the TTAB's decision and PROLACTO's cancellation petition, PLM raises two affirmative defenses, arguing that PROLACTO is estopped from challenging PLM's registration and that PROLACTO is barred by the doctrine of unclean hands. *See* Pls.' Br. at 91–104. The Court addresses these two arguments as a preliminary matter, as well as the proper allocation of burdens, before turning to the merits of cancellation.

### 1. Judicial Estoppel

PLM argues that PROLACTO is estopped from challenging PLM's registration of its LA INDITA MICHOCANA mark based on likelihood of confusion (and from arguing likelihood of confusion at all in this litigation) due to a statement that it made to the USPTO in connection with its application to register its own Indian Girl mark in December 2006. *See* Pls.' Br. at 91–97.

Judicial estoppel is a well-established rule that "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation omitted). "Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." *Id.* at 750 (internal quotations omitted). The Supreme Court has enumerated three non-exhaustive factors that inform the Court's decision of whether to invoke the rule: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750–51 (internal quotations omitted).

As discussed in the Court's findings of fact above, on December 12, 2005, PROLACTO filed an application with the USPTO to register its asserted Indian Girl mark (Serial No. 78,771,243). *See* Pls.' Ex. 41. On June 14, 2006, the USPTO issued an Office Action refusing registration of PROLACTO's Indian Girl mark based on a likelihood of confusion with PLM's two registered Indian Girl Design marks (i.e., Indian Girl with Paleta and Indian Girl with Cone) and PLM's earlier-filed, then-pending application for its LA INDITA MICHOACANA mark. *See id.* On December 13, 2006, PROLACTO filed with the USPTO a response to the Office Action, in which PROLACTO's attorney identified claimed differences between PROLACTO's mark and PLM's marks, contending that there is no likelihood of confusion and that the parties'

claimed marks were "totally different from each other."[49]   *Id.*  PLM argues that, by taking this position in its filing with the USPTO, PROLACTO is estopped from seeking cancellation of PLM's LA INDITA MICHAOCANA mark on the basis of likelihood of confusion with its Indian Girl mark or otherwise arguing that there is a likelihood of confusion between the two marks.  The Court disagrees.

In determining whether to exercise its discretion to invoke judicial estoppel, the Court considers the three *New Hampshire* factors.  The first factor is clearly in PLM's favor, because PROLACTO has, in fact, taken the opposite position here than the one that it asserted to the USPTO as part of the application process.  As for the second factor, whether PROLACTO succeeded in persuading a tribunal of its prior position, PLM concedes that "the USPTO Examining Attorney did not act on PROLACTO's representations one way or another before PROLACTO asserted its contradictory position," but argues that, on this basis, "the second factor is irrelevant."  Pls.' Br. at 94–95.  On the contrary, this factor is determinative.  The Supreme Court explained in *New Hampshire* that the *purpose* of the judicial estoppel doctrine is to "prevent[] a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *New Hampshire*, 532 U.S. at 749 (internal quotation mark omitted) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)).  PROLACTO's statement to the USPTO, however unwise or contradictory, had no impact on the USPTO or any other tribunal.  For the same reason, the third factor also counsels against invoking judicial estoppel.  Because the statement had no impact, PLM cannot demonstrate any

---

[49]   The parties dispute whether, as a matter of law, the statement can be attributed to PROLACTO based on the USPTO's rules of admission for foreign attorneys.  *See* Pls.' Br. at 95 n.41; Def.'s Opp'n at 68–70 ¶ 113.  The Court assumes, without deciding, that the statement can be legally attributed to PROLACTO.

way in which it would suffer from unfairness.  The Court also notes that PROLACTO's current position on likelihood of confusion is essentially the same as PLM's position:  they have each filed actions claiming infringement of the same marks.

Judicial estoppel in this case is neither applicable nor appropriate.

### 2.  Unclean Hands

PLM next argues that PROLACTO's cancellation petition, as well as all of its counterclaims, are barred under the doctrine of "unclean hands."  *See* Pls.' Br. at 97–104.

The unclean hands defense "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief" and originates from "the equitable maxim that 'he who comes into equity must come with clean hands.'"  *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).  It is not, however, "a rigid formula which 'trammels the free and just exercise of discretion.'"  *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).  Essentially, the doctrine "really just means that in equity as in law the plaintiff's fault, like the defendant's, may be relevant to the question of what if any remedy the plaintiff is entitled to."  *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985).  "[T]he doctrine does not exclude all wrongdoers from a court of equity nor should it be applied in every case where the conduct of a party may be considered unconscionable or inequitable."  *Houston Oilers, Inc. v. Neely*, 361 F.2d 36, 42 (10th Cir. 1966).

PLM argues three grounds for the Court to find that PROLACTO acted with unclean hands.  The Court will briefly address them.

First, PLM points to the digitally-altered photographs of cups and a truck that PROLACTO submitted to the USPTO as specimens as part of its applications to register its LA

FLOR DE MICHOACAN, Indian Girl, and LA MICHOACANA (words only) marks.  Though

PLM acknowledges that, in order to establish a defense of unclean hands, it must demonstrate

that PROLACTO acted knowingly and intentionally, *see* Pls.' Br. at 97 ¶ 128 (citing *Abraham v.

Alpha Chi Omega*, 708 F.3d 614 (5th Cir. 2013)), PLM did not present any evidence to the Court

indicating who was responsible for these images or their intentions in submitting them to the

USPTO.  Moreover, the Court notes that PLM challenged the TTAB's use of these photographs

in its motion for reconsideration before the TTAB (though it did not raise the digital alteration

issue), and the TTAB explained that it considered the photographs to be "representative" and

"illustr[ative]" and that it did not make its finding of fact "based solely on the undated

photographs."  TTAB Dkt. 115 at 10.  The Court takes no position on whether the USPTO can or

should consider the Court's findings of fact about these photographs in future proceedings

concerning PROLACTO's trademark registrations, but the Court does not find them particularly

relevant in this case.

The Court addresses the second and third grounds together.  PLM points to the fact that

Teresita Fernandez opened her Sonoma and Novato, California stores while this dispute was

pending before the TTAB and this Court with knowledge of PLM's use of the Indian Girl mark

and PROLACTO's permission.[50]  PLM also points to the issues concerning Rigoberto

Fernandez's North Carolina store.  The Court is aware of these issues and has considered them in

making its findings of fact and conclusions of law, along with PLM's own actions prior to and

during these proceedings.  The Court does not consider these issues alone or together sufficiently

---

[50]     PLM also argues that Rigoberto Fernandez and Mary Fernandez adopted the Indian Girl mark during the pendency of this action in 2012.  The Court has found differently in its findings of fact.

significant to merit exercising its discretion to bar any of PROLACTO's claims on these grounds.

### 3. Burdens of Production and Persuasion

Before the Court can turn to the merits of the TTAB's decision cancelling the registration of PLM's LA INDITA MICHOACANA mark, it must first resolve a dispute between the parties concerning the proper allocation of burdens in a claim challenging a TTAB's registration or cancellation decision in district court pursuant to § 1071(b).

A party seeking to cancel a registered mark must prove the grounds for cancellation and overcome the statutory presumption of validity that attaches to a registered mark by a preponderance of the evidence. *See Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1358 (Fed. Cir. 2009); 3 *McCarthy on Trademarks* § 20:64; *see also Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 146 F.3d 983, 990 (D.C. Cir. 1998). PLM argues that PROLACTO bears the same burden here that it did during the cancellation proceeding before the TTAB.[51] *See* Pls.' Opp'n at 56–57. PROLACTO, on the other hand, argues that PLM's mark is not entitled to any presumption of validity because its registration has already been cancelled and argues that "PROLACTO has no burden to again prove by a preponderance of the evidence that PROLACTO used a confusingly similar mark in the U.S. before PLM used its trademark." Def.'s Opp'n at 42 ¶ 15.

PLM is correct. As the Court has explained, under the Supreme Court's decisions in *Kappos* and *B & B Hardware*, this § 1071(b) action challenging the TTAB's decision is a *de novo* action. The D.C. Circuit has recognized that when a district court reviews a TTAB

---

[51]     As the Court noted above, PLM has, however, conceded that it bears the burden of proving the applicability of the tacking doctrine. *See* Pls.' Br. at 86 ¶ 94 (citing *Navistar*, 1998 WL 911776, at *3).

decision *de novo*, the party seeking review of the decision "ha[s] the burden of going forward, that is, of submitting to the court evidence or argument to counter the decision of the TTAB," but the party that had the burden of proof before the TTAB "must bear the burden of persuasion in district court."[52]  *Material Supply*, 146 F.3d at 990–91.  Here, of course, PLM has submitted evidence and arguments to counter the TTAB's decision.  The burden of persuasion in this *de novo* review, however, lies with PROLACTO, just as it did before the TTAB.

### 4.  Grounds for Cancellation

The Court now finally turns to the merits of Count I.  The TTAB concluded that the registration for PLM's LA INDITA MICHOACANA mark should be cancelled pursuant to § 2(d) of the Lanham Act because PROLACTO had established priority of use and likelihood of confusion with respect to its own Indian Girl design, as well as its LA MICHOACANA (words only), LA MICHOACANA NATURAL (words only), and LA MICHOACANA NATURAL and design marks.[53]  *See* TTAB Decision at **9–16.  The relevant marks are shown below.

---

[52]     The D.C. Circuit's decision in *Material Supply* was pre-*Kappos* and therefore discussed, in an earlier part of the opinion, the hybrid standard of review that was typically used by courts in § 1071(b) actions before *Kappos*.  *See Material Supply*, 146 F.3d at 989–90.  The Circuit held, however, that a district court should apply a *de novo* standard to decisions made by the TTAB on summary judgment.  *See id.* at 990.  Its explanation of the burden of proof in a *de novo* review of a TTAB decision on summary judgment is equally applicable here, because both reviews are *de novo*.

[53]     The TTAB also found that PROLACTO's two LA FLOR DE MICHOACAN marks (Reg. Nos. 3,249,113 and 2,830,401) were not grounds for cancelling PLM's LA INDITA MICHAOCANA mark because they were not confusingly similar.  *See* TTAB Decision at *14–16.  In this action, PROLACTO brought a counter-claim against PLM for infringement, challenging the TTAB's determination.  At summary judgment, the Court entered judgment in favor of PLM, affirming the TTAB's findings.  *See* First Revised Order ¶ 1; *PLM I*, 69 F. Supp. 3d at 196–200.

In its post-trial briefing, PLM also argues that its use of "Michoacana" is not "geographically deceptively misdescriptive" and that its registration is not subject to cancellation pursuant to 15 U.S.C. § 1052(e)(3).  Pls.' Opp'n at 52–54.  PLM makes this argument in response to a statement in PROLACTO's proposed findings of fact and conclusions of law that related to PROLACTO's false advertising claim and did not mention § 1052(e)(3), an entirely



| PLM's Registered Mark | | |
|---|---|---|
| LA INDITA MICHOACANA<br>Reg. No. 3,210,304 | | |
| **PROLACTO's Marks** | | |
| Indian Girl<br>Serial No.<br>78,771,243 | LA MICHOACANA<br>(words only) | LA MICHOACANA<br>NATURAL<br>(words only) | LA MICHOACANA<br>NATURAL<br>Serial No. 78,954,490 |

For the reasons that follow, the Court affirms the TTAB's decision to cancel the registration for PLM's LA INDITA MICHAOCANA mark on modified grounds.

### a. Legal Standard

A cancellation petition, just like an opposition petition, must be founded on a statutory ground that negates the registrant's right to registration. *See Young v. AGB Corp.*, 152 F.3d 1377, 1380 (Fed. Cir. 1998); *see also* 3 *McCarthy on Trademarks* § 20:52. The most common ground for cancelling a mark's registration is § 2(d) of the Lanham Act, which provides that a mark cannot be registered if another owner has prior use of a mark or trade name that is likely to cause confusion with the asserted mark. 15 U.S.C. § 1052(d); *see also* 3 *McCarthy on Trademarks* § 20:53.

---

separate basis for cancellation that the TTAB did not find. *See* Def.'s Br. at 24 ¶ 73. The Court notes, however, that its finding of fact regarding the meaning of the term "Michoacana" would appear to foreclose this alternate ground for cancellation.

### b. Cancellation on the Basis of Unregistered Marks

A petitioner may seek cancellation of a registration under § 2(d) on the basis of the petitioner's prior use of an unregistered mark, but only if the petitioner can demonstrate that its mark has distinctiveness, either through inherent distinctiveness or descriptiveness with secondary meaning.  *See Towers*, 913 F.2d at 946 ("Section 2(d) bars registration, or serves as a basis for cancellation, if there is a likelihood of confusion as to source. As to an unregistered term, such a likelihood of confusion results when there are trade identity rights in the prior user's term. Those trade identity rights arise when the term is distinctive, either inherently or through the acquisition of secondary meaning."); 3 *McCarthy on Trademarks* § 20:53 ("In an opposition or cancellation proceeding, the plaintiff relying on an unregistered designation and raising the ground of likelihood of confusion under § 2(d) must prove distinctiveness, either by inherent distinctiveness or acquired distinctiveness through secondary meaning.").

Here, the Court has found that, as a factual matter, when used in connection with selling ice cream and other frozen treats in the United States, the terms "LA MICHOACANA" and "LA MICHOACANA NATURAL" are descriptive of a type of product that is understood in the minds of consumers to have originated in the Mexican state of Michoacán, and it is not primarily associated with PROLACTO or any other single source.  This factual finding forecloses PROLACTO from petitioning for cancellation of any mark solely on the basis of its use of those terms.  Thus, PROLACTO may only use its asserted Indian Girl mark and LA MICHOACANA NATURAL design mark to support its petition for cancellation.

### c. Priority

"To establish priority, the petition must show proprietary rights in the mark that produce a likelihood of confusion."  *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1162 (Fed.

Cir. 2002) (citing *Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 1320 (C.C.P.A. 1981)).  "These proprietary rights may arise from a prior registration, prior trademark or service mark use, prior use as a trade name, prior use analogous to trademark or service mark use, or any other use sufficient to establish proprietary rights." *Id.* (citations omitted).

The TTAB found that PROLACTO began using all of the relevant marks in 2001 and specifically found that PROLACTO began using its Indian Girl mark in April 2001.  *See* TTAB Decision at **9–11.  It did not specify a particular month in 2001 for the other marks.  *See id.*  In its findings of fact, the Court has found, after considering new evidence introduced at trial, that by March 2000, a PROLACTO licensee was using the Indian Girl mark surrounded by the words "LA MICHOACANA es . . . natural" in his paleteria in Homestead, Florida.  The Court also found that PROLACTO's other Florida licensees began using its LA MICHOACANA NATURAL marks in April 2001.

As for PLM, the TTAB used February 21, 2005 as the operative first use date, because it was the first use date provided by PLM for its LA INDITA MICHOACANA mark in its application for registration.  *See* TTAB Decision at *9.  In this action, PLM has maintained February 21, 2005 as its first use of the mark but argues that the priority date should be advanced from February 2005 to the first use of its Indian Girl with Paleta mark and its first use of its Indian Girl with Cone mark, both of which occurred prior to March 2000 based on the tacking doctrine.  *See* Pls.' Br. at 85–91. The Court has found that PLM has not met the high standard for tacking the first use of those marks to its first use of the LA INIDTA MICHAOCANA mark.  Therefore, PLM's relevant priority date remains February 21, 2005.[54]

---

[54]   In its proposed findings of fact and conclusions of law, PLM argues that "even without applying the tacking doctrine," it has priority of use for an Indian Girl design, citing its Indian Girl with Paleta mark.  Pls.' Br. at 85 ¶ 90; *see also id.* at 59 ¶ 19 ("PLM has priority in both the

Because, in the absence of tacking, PROLACTO has established priority over PLM's LA

INDITA MICHOACANA mark with respect to its Indian Girl and LA MICHOACANA

NATURAL marks, the Court moves to the likelihood of confusion analysis.

*d.  Likelihood of Confusion*

The likelihood of confusion inquiry under a cancellation petition brought under § 2(d) of

the Lanham Act requires the same type of analysis in the trademark infringement context.  *See 3*

*McCarthy on Trademarks* § 20:53 ("[T]he test under § 2(d) is one of likelihood of confusion.

This test is, of course, the same as that employed in trademark infringement litigation.").  As the

Court previously explained in its summary judgment opinion, courts in this Circuit consider

approximately seven factors to evaluate the likelihood of consumer confusion.[55]  *See PLM I*, 69

---

Indian Girl Design and in 'Michoacana.'  Thefore [sic], the registration for LA INDITA
MICHOACANA + Design should not be cancelled and PLM should prevail on its First Claim
for Relief.").  The Court has indeed found that PLM used its Indian Girl with Paleta and Indian
Girl with Cone marks before PROLACTO used its Indian Girl mark in the United States, and the
Court considers those findings with respect to the infringement claims in this action.  With
respect to this count, however, PLM does not provide the Court with any legal basis to deny
PROLACTO's cancellation petition on the basis of PLM's earlier use of *other* marks in the
absence of tacking—even if PLM's earlier marks are confusingly similar to PROLACTO's
asserted mark.  Instead, PLM offers only the conclusive statements quoted above without any
citations or further explanation.  In the absence of any substantive legal argument, the Court
cannot find grounds on its own to consider PLM's earlier use of other marks outside the context
of the tacking doctrine.

[55]     As the Court also explained in its summary judgment opinion, the TTAB may utilize a set
of factors to determine likelihood of confusion that is different from the factors that
courts use.  *See Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1561 (11th
Cir. 1991) ("Although the TTAB need not utilize th[e] multi-factor analysis to be upheld by a
district court … we do require the district court to analyze the confusion issue via the multifactor
analysis to determine if the result comports with that of the TTAB.");  *Coryn Grp. II, LLC v. O.C.
Seacrets, Inc.*, No. CIV. 08-2764, 2011 WL 3240456, at *3 (D. Md. July 27, 2011) (explaining
that "[a]lthough the TTAB analyzes the likelihood of confusion under a different set of factors
than the jury will use for [defendant's] counterclaims, on review this Court will use the same
factors as the jury, and determine if the result under those factors comports with the TTAB's
conclusion").

F. Supp. 3d at 198 (citing *Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1, 48 (D.D.C. 2006)). The *Globalaw* court explained:

> These factors include:  (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) evidence of actual confusion; (5) the defendant's purpose or reciprocal good faith in adopting its own mark; (6) the quality of defendant's product; and (7) the sophistication of the buyers.

*Globalaw*, 452 F. Supp. 2d at 48 (citations omitted).  None of these factors are individually determinative, and the Court need not give each of them each equal weight or even consider all of them.  *See id.*  Moreover, the Court's ultimate inquiry is to compare the marks from the perspective of consumers in light of what happens in the marketplace.  *See id.* at 49 (quoting *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001)).  "Courts must take into account all the factors that potential purchasers are likely to perceive and remember."  *Id.* (citing *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 581 (2d Cir. 1991)).

The Court begins with PROLACTO's LA MICHOACANA NATURAL mark and finds no basis to cancel PLM's registration on likelihood of confusion grounds.  As the Court has found, the terms "MICHOACANA" and "LA MICHOACANA NATURAL" are descriptive and, alone, not entitled to protection. The marks' common usage of the term "MICHOACANA" is the *only* similarity between the two marks, which strongly counsels against a finding of likelihood of confusion.  The importance of that factor is heightened in the absence of any evidence of actual confusion between the marks or any consumer survey studies indicating a likelihood of confusion between the marks.  The Court thus finds that PLM's registration for its LA INDITA MICHOACANA mark is not subject to cancellation due to PROLACTO's LA MICHOACANA NATURAL mark.

PROLACTO's Indian Girl mark is a very different story.  The likelihood of confusion between these two marks is patently obvious, as the TTAB correctly recognized.  *See* TTAB Decision at \*13 ("The Indian girl designs are virtually identical.").  The TTAB was also correct in its reasoning that "[i]n view of the identity of the products and the impulse nature of ice cream purchases, the word portion of [PLM's] mark is not sufficient to distinguish the marks."  *Id.* That finding is supported by the expert testimony of Dr. Jacob Jacoby and his consumer survey using a variation of the LA INDITA MICHOACANA mark.  *See* Def.'s Ex. 130; Day 12 A.M. at 12:23–13:4 (testifying that there was "a considerable amount of confusion" and that "it was at high level").  Most importantly, this is not an issue of dispute between the parties.  Both sides agree that these marks are highly confusing and have each accused the other of infringement.

PROLACTO has demonstrated that it used its Indian Girl mark before PLM used its LA INDITA MICHOACANA mark, and PLM has failed in its efforts to achieve an earlier priority date for its LA INDITA MICHOACANA mark under the tacking doctrine.  The parties' marks are nearly identical.  For these reasons, under § 2(d) of the Lanham Act and on the legal grounds argued to the Court, cancellation of the registration of PLM's mark is warranted.  The Court will therefore enter judgment in favor of PROLACTO on Count I.

### D.  Complaint Count II

Count II of PLM's Second Amended Complaint seeks a declaration from the Court that there is no likelihood of confusion between its LA INDITA MICHOACANA mark and three of PROLACTO's marks containing the term "MICHOACANA" due to the overlap of the term:  LA MICHOACANA (words only), LA MICHOACANA NATURAL (words only), and LA

MICHOACANA NATURAL.  *See* Second Am. Compl. at 14 ¶¶ 49–51.  The relevant marks are shown below.[56]



| PLM's Mark |
|---|
| LA INDITA MICHOACANA<br>Reg. No. 3,210,304 |

| PROLACTO's Marks | | |
|---|---|---|
| LA MICHOACANA<br>(words only) | LA MICHOACANA NATURAL<br>(words only) | LA MICHOACANA NATURAL<br>Serial No. 78,954,490 |

### 1. Burden of Proof

Before the Court can turn to the merits of the issue, the Court must first address a dispute between the parties concerning the burden of proof.  In its proposed findings of fact and conclusions of law, PROLACTO argues that PLM's claim should be "dismiss[ed] with

---

[56]  In its proposed findings of fact and conclusions of law, PLM provided a different visual representation that contained different marks.  *See* Pls.' Br. at 108.  The visual representation contained PROLACTO's LA FLOR DE MICHOACAN mark (Reg. No. 3,249,113) and two alternate versions of PROLACTO's LA MICHOACANA NATURAL mark, one containing a spiral swirl and another that appears identical to the version shown above (Serial No. 78,954,490) except in different colors and with some Spanish text at the bottom.  *See id.*; *see also* Pls.' Opp'n at 55.  Though it is not entirely clear from PLM's brief, it appears that PLM included these images to illustrate its argument on the merits of the claim.  Count II of the Second Amended Complaint referred specifically to the three marks that appear in the chart above and only those marks.  *See* Second Am. Compl. at 14 ¶ 51.  Nevertheless, the inclusion of the variations of the LA MICHOACANA NATURAL mark that appear in PLM's brief would not make any material difference on the Court's findings and conclusions.

prejudice" because PLM "failed to produce any evidence during trial . . . to suggest that there is no likelihood of confusion between the respective parties' marks" and thus, "failed to meet its burden to show no likelihood of confusion." Def.'s Br. at 28. PLM counters that, because it is the party seeking a declaratory judgment, the burden of proof lies with PROLACTO as the "would-be-plaintiff." Pls.' Opp'n at 54–55.

PLM is correct. PROLACTO fails in its argument to acknowledge the procedural uniqueness of a declaratory judgment in the trademark infringement context. "The usual orientation of the rights holder as plaintiff and the accused infringer as defendant is reversed in a declaratory judgment. But this does not change the normal rule that the party claiming intellectual property rights has the burden to prove infringement." 6 *McCarthy on Trademarks* § 32:50; *see also* 3 Anne Gilson LaLonde, *Gilson on Trademarks* § 11.04 (2016) ("In general, this role reversal will not shift the burdens of proof from what they would be in a straightforward infringement . . . lawsuit, where the trademark holder bears the burden of proving that the mark is valid and that the other party's conduct is infringing . . . ."). In the analogous patent context, where declaratory judgments are more common, the Supreme Court held that "when a licensee seeks a declaratory judgment against a patentee to establish that there is no infringement, the burden of proving infringement remains with the patentee." *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 846 (2014). The Court explained that that the Declaratory Judgment Act is "only procedural, leaving substantive rights unchanged" and that "burden of proof is a substantive aspect of a claim." *Id.* at 849 (internal quotations omitted). The reasoning applies with equal force in trademark infringement actions. *See* 6 *McCarthy on Trademarks* § 32:50 ("The *Medtronic* patent case is applicable to trademark declaratory judgment cases. The

normal rule in trademark infringement litigation is that it is always the trademark owner who must prove infringement.").

Thus, PROLACTO has the burden to prove a likelihood of confusion between PLM's mark and its marks due to the common use of the term "MICHOACANA."

## 2. Analysis

PLM does not seek a declaration of complete non-infringement. Rather, PLM's claim is narrowly focused: PLM asks this Court only to declare that the common use of the term "MICHOACANA" in its LA INDITA MICHOACANA mark and PROLACTO's three marks does not create a likelihood of confusion. *See* Second Am. Compl. at 14 ¶¶ 49–51.

The Court has found that in connection with selling ice cream and other frozen treats in the United States, the terms "MICHOACANA" and "LA MICHOACANA" are descriptive of a type of product that is understood in the minds of consumers to have originated in the Mexican state of Michoacán, and it is not primarily associated with PROLACTO or any other single source. In light of this finding, PROLACTO would be unable to pursue an infringement claim solely on the basis of the parties' common usage of the term, because the term itself is not a protectable trademark.[57] The Court will enter judgment for PLM on this count.

## E. Complaint Count III

Count III of PLM's Second Amended Complaint is brought under 15 U.S.C. § 1114 and alleges that PROLACTO's use of its Indian Girl mark (Serial No. 78,771,243) infringes PLM's three registered marks containing an Indian Girl:  Indian Girl with Paleta (Reg. No. 2,905,172),

---

[57]     Indeed, as discussed below, PROLACTO is unsuccessful on its counterclaim for infringement of its asserted "LA MICHOACANA" (words only) mark on this ground.

Indian Girl with Cone (Reg. No. 2,968,652), and LA INDITA MICHOACANA (Reg. No. 3,210,304).  *See* Second Am. Compl. at 14–15 ¶¶ 52–56.  These marks appear below.



"The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers."  *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985).  Infringement of a registered mark is addressed in 15 U.S.C. § 1114(1), which provides, in relevant part:

> Any person who shall, without the consent of the registrant— (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).  Thus, to prevail in an infringement claim under § 1114, a party must prove

"(1) that it has a protectable ownership interest in a mark, and (2) that the alleged infringer's use

of the mark is likely to cause consumer confusion."  *PLM I*, 69 F. Supp. 3d at 197 (citations

omitted).

### 1.  PLM's Ownership of the Registered Marks

As the Court has previously recognized, and as PROLACTO does not dispute, Paleteria

La Michoacana (Sub), Inc. is the registered owner of the Indian Girl with Paleta, Indian Girl with

Cone, and LA INDITA MICHAOCANA marks at issue in Count III.

Registration of a trademark entitles the mark's owner to certain advantages in an

infringement suit.  The Lanham Act provides that registration of a mark "shall be prima facie

evidence of the validity of the registered mark . . . of the registrant's ownership of the mark, and

of the registrant's exclusive right to use the registered mark in commerce or in connection with

the goods or services specified in the registration."  15 U.S.C. § 1115(a).  Furthermore, if a mark

has become "incontestable" pursuant to § 1065, then "the registration shall be conclusive

evidence of the validity of the registered mark and of the registration of the mark, and of the

registrant's ownership of the mark, and of the registrant's exclusive right to use the registered

mark in commerce."  *Id.* § 1115(b).  This means, among other things, that an incontestable mark

is conclusively presumed to be distinctive or to have secondary meaning and that the registrant's

ownership of the mark cannot be challenged on the theory that it is inferior in priority to a

previously used mark.[58]  *See* 6 *McCarthy on Trademarks* § 32:148; *see also* 2 *McCarthy on*

*Trademarks* § 11:44.

---

[58]     Despite the Lanham Act's use of the term "incontestable," the statute provides that the
conclusiveness of these issues is subject to an enumerated list of affirmative defenses, including
a defense that the registration was obtained fraudulently and a so-called "limited territory

PLM's registrations for its Indian Girl with Paleta and Indian Girl with Cone have become incontestable pursuant to § 1065.  The validity of the marks and PLM's exclusive right to use them cannot be challenged here.  PROLACTO's various arguments contesting the validity of the marks and PLM's ownership of them are largely irrelevant.  Nevertheless, for the sake of the parties' clarity, the Court will briefly address them.

PROLACTO's primary arguments are that PLM did not use the Indian Girl marks until years after PROLACTO first used its Indian Girl mark and that PLM has no rights in any of its marks because it adopted them in bad faith.  The Court has already rejected these arguments on factual and legal grounds.  PROLACTO also argues that PLM's use of the marks on shipping boxes was insufficient to establish priority, because "no evidence was ever offered that would suggest that any consumer of any of the PLM entities['] goods would ever come into contact with or otherwise observe its outer corrugated cardboard boxes used for packaging and shipping their products."  Def.'s Opp'n at 10 ¶ 21.  On the contrary, Ruben Gutierrez, PROLACTO's own witness, testified that he saw the Indian Girl mark on a PLM shipping box in the marketplace.[59]  *See* Day 8 A.M. at 91:7–93:5.

---

defense" for intermediate junior users.  *See* 15 U.S.C. § 1115(b)(1)–(9).  These defenses "must be affirmatively pleaded or they will be deemed waived."  *Dakota Indus., Inc. v. Ever Best Ltd.*, 28 F.3d 910, 913 (8th Cir. 1994) (citing *Philip Morris, Inc. v. Imperial Tobacco Co.*, 251 F. Supp. 362, 379 (E.D. Va. 1965), *aff'd* 401 F.2d 179 (4th Cir. 1968), *cert. denied* 393 U.S. 1094 (1969)); *see also* 6 *McCarthy on Trademarks* § 32:149 ("The burden is on the challenger to plead and prove one or more of the statutory exceptions to incontestability:  they are affirmative defenses not put in issue by a general denial.").  In its Answer to the Second Amended Complaint, PROLACTO did not plead any of the affirmative defenses enumerated in § 1115(b). *See* Ans. 2d Am. Compl. & Countercls. at 12–14 ¶¶ 1–14.  Nor does PROLACTO attempt to belatedly assert or cite any of the enumerated defenses to incontestability in its proposed findings of fact and conclusions of law, though it "disputes" the incontestability of PLM's marks without providing any explanation.  Def.'s Opp'n at 77 ¶ 167; Pls.' Br. at 114–15 ¶¶ 167–69.

[59]     The Court also notes that the Lanham Act provides that a mark is deemed to be "in use in commerce" when "it is placed in any manner on the goods *or their containers* . . . and . . . the goods are sold or transported in commerce."  15 U.S.C. § 1127 (emphasis added); *see also* 2

In light of the Court's disposition of Count I affirming the TTAB's decision to cancel PLM's registration for the LA INDITA MICHOACANA mark, PLM cannot maintain a claim for infringement of that mark under § 1114(1), which applies only to registered marks.[60]  The Court will therefore dismiss this portion of Count III as moot.

The ownership and validity of PLM's registered Indian Girl with Paleta and Indian Girl with Cone marks having been established, the Court turns to likelihood of confusion.

### 2. Likelihood of Confusion

As the Court explained above, courts in this Circuit consider approximately seven factors to evaluate the likelihood of consumer confusion.[61]  *See PLM I*, 69 F. Supp. 3d at 198 (citing *Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1, 48 (D.D.C. 2006)). The *Globalaw* court explained:

> These factors include:  (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of

---

*McCarthy on Trademarks* § 16:27; *id.* § 16:28 ("What constitutes use on a 'container' for goods may be stretched to include use on a truck that conveys the goods to customers.") (citing *In re E. A. Miller & Sons Packing Co.*, 225 U.S.P.Q. 592, 1985 WL 72005 (T.T.A.B. 1985)).

[60]    The Lanham Act permits actions alleging infringement of unregistered marks in a separate section, under which PROLACTO has brought its counterclaim for trademark infringement.  *See* 15 U.S.C. § 1125(a); *see also PLM I*, 69 F. Supp. 3d at 200–01.  PLM did not bring a claim in the alternative for infringement of its LA INDITA MICHOACANA mark under § 1125(a) in the event that the Court affirms the TTAB's decision to cancel the mark's registration.

[61]    As the Court also explained in its summary judgment opinion, the TTAB may utilize a set of factors to determine likelihood of confusion that is different from the factors that district courts use.  *See Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1561 (11th Cir. 1991) ("Although the TTAB need not utilize th[e] multi-factor analysis to be upheld by a district court … we do require the district court to analyze the confusion issue via the multifactor analysis to determine if the result comports with that of the TTAB."); *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, No. CIV. 08-2764, 2011 WL 3240456, at *3 (D. Md. July 27, 2011) (explaining that "[a]lthough the TTAB analyzes the likelihood of confusion under a different set of factors than the jury will use for [defendant's] counterclaims, on review this Court will use the same factors as the jury, and determine if the result under those factors comports with the TTAB's conclusion").

the products; (4) evidence of actual confusion; (5) the defendant's purpose or reciprocal good faith in adopting its own mark; (6) the quality of defendant's product; and (7) the sophistication of the buyers.

*Globalaw*, 452 F. Supp. 2d at 48 (citations omitted). None of these factors are individually determinative, and the Court need not give each of them each equal weight or even consider all of them. *See id.* Moreover, the Court's ultimate inquiry is to compare the marks from the perspective of consumers in light of what happens in the marketplace. *See id.* at 49 (quoting *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001)). "Courts must take into account all the factors that potential purchasers are likely to perceive and remember." *Id.* (citing *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 581 (2d Cir. 1991)).

Many of these factors strongly counsel in favor of finding a likelihood of confusion. For example, the Court has found, based on testimony by PROLACTO's licensees, that PLM's products and PROLACTO's products are available in close proximity to each other in the Northern California and Houston markets and even at one point were being sold inside the same store in the Houston area. Both of these licensees also testified that there were numerous instances of actual confusion on the part of customers. It is also clear that, as the TTAB and the Court have previously found, the parties' products are purchased on impulse, without a high degree of care. PROLACTO's expert witness, Dr. Jacob Jacoby, also presented his findings from a consumer survey that he conducted using one of the modified versions of PLM's LA INDITA MICHOACANA marks and photographs of PROLACTO's Homestead, Florida location. *See* Def.'s Ex. 130. Dr. Jacoby concluded that "[w]hen reaching purchase decisions in the marketplace, a large proportion of consumers and prospective consumers of PROLACTO's products bearing the name "La Indita Michoacana" and its Indian girl logo are likely to be confused into thinking that these products emanate from PLM." Def.'s Ex. 130 at 9; *see also*

Day 12 A.M. at 12:23–13:4 (testifying that there was "a considerable amount of confusion" and that "it was at high level").  Although Dr. Jacoby did not specifically test PLM's Indian Girl with Paleta and Indian Girl with Cone marks, the Court finds the high level of confusion to be informative.

Indeed, the visual similarity between the parties' marks, particularly PLM's Indian Girl with Cone, as they appear in the marketplace is striking.  Representative comparisons appear below.



| PLM's Marks | | PROLACTO's Mark |
| --- | --- | --- |
| Pls.' Ex. 108 at 3 | Pls.' Ex. 108 at 1 | Def.'s Ex. 57A |

Most importantly, this is one of the few issues in this case in which the parties do not disagree.  PROLACTO does not defend itself on the ground that its use of the Indian Girl mark is unlikely to cause confusion with PLM's Indian Girl with Paleta and Indian Girl with Cone.  PROLACTO itself brings a counterclaim alleging that PLM's marks at issue here infringe its Indian Girl, referring to the marks as "iterations" of "an identical reproduction of PROLACTO's Indian Girl design."  Def.'s Br. at 10–11 ¶ 37.  PROLACTO instead focuses its defense to Count III on the issues of priority and bad faith, which the Court has addressed and found in PLM's favor.

For these reasons, the Court concludes that PROLACTO's use of PLM's registered, incontestable trademarks constitutes infringement under 15 U.S.C. § 1114(1)(a) and will enter judgment on Count III for PLM accordingly.

## F.  Complaint Count IV

Count IV of PLM's Second Amended Complaint seeks to cancel the registrations of PROLACTO's LA FLOR DE MICHOACAN marks (Registration Nos. 3,249,113 and 2,830,401).  *See* Second Am. Compl. at 15–16 ¶¶ 57–61.  The Complaint states that the claim is brought solely in response to PROLACTO's Counterclaim I, which alleged that PLM had infringed those marks.  *See id.*  At the summary judgment phase, the Court entered judgment for PLM on Counterclaim Count I, finding no likelihood of confusion between the marks at issue. *See PLM I*, 69 F. Supp. 3d at 196–200.  PLM has stated that the claim is now moot, and the Court will dismiss it.

## G.  Counterclaim Count II:  Trademark Infringement

In Count II of its Counterclaim, PROLACTO asserts that PLM violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), through its use of its registered Indian Girl with Paleta, Indian Girl with Cone, and LA INDITA MICHOACANA marks because those marks, PROLACTO alleges, infringe on PROLACTO's use of various unregistered marks containing an Indian Girl and "LA MICHOACANA."  *See* Ans. 2d Am. Compl. & Countercls. at 30–32 ¶¶ 43–52.  The marks at issue in Counterclaim Count II are shown below.[62]

---

[62]     In a pre-trial Order granting in part and denying in part PLM's motion *in limine* to prevent PROLACTO from asserting particular trademarks that were not properly pleaded as part of Counterclaim Count II, the Court clarified which marks were at issue.  *See* Mem. & Order at 7, ECF No. 214.



As the Court explained in its summary judgment opinion, to prevail on a trademark infringement claim brought under 15 U.S.C. § 1125(a), PROLACTO must show that:  (1) it owns a valid trademark; (2) its trademark is distinctive or has acquired secondary meaning; and (3) there is a substantial likelihood of confusion between its mark and PLM's mark.  *See PLM I*, 69 F. Supp. 3d at 201 (citing *Globalaw*, 452 F. Supp. 2d at 26).  The Court further explained that "it is firmly established that the adoption and use of an unregistered trademark in a limited market within the United States does not create exclusive ownership of that mark in all geographic markets."  *Id.* at 206 (citing *Proriver, Inc. v. Red River Grill, LLC*, 27 F. Supp. 2d 1, 4 (D.D.C. 1998)).  Under the *Tea Rose-Rectanus* doctrine, "[g]ood faith junior users who later use the same or similar mark on alike products or services also may establish rights to the mark provided there is no competitive overlap with the senior user."  *Id.* (citing *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1023 (11th Cir. 1989)).  Thus, "a market-by-market analysis is

135

required to determine priority in the potential markets on which PLM could have infringed." *Id.* (citation omitted).

At summary judgment, the Court correctly recognized that there were only three potential markets at issue:  Florida; Sonoma, California; and Houston, Texas.  *See id.*  The Court found that PROLACTO had not provided any evidence demonstrating PLM's commercial use of the marks in Florida and that there was no genuine dispute that PLM used its marks in Northern California before PROLACTO entered that market through Teresita Fernandez.  *See id.* at 207–08.  The Court also held that there were genuine disputes of fact as to priority in the Houston area, as well as on the issue of distinctiveness.[63]  *See id.* at 208–12.  On this basis, the Court limited Counterclaim Count II to the Houston, Texas market.[64]  *See* First Revised Order ¶ 2.

The issues now properly framed, the Court turns to the merits of PROLACTO's infringement claim.

### 1.  Validity:  Prior Use in Houston

In order to be successful on its trademark infringement claim, PROLACTO must first prove that it used its asserted marks in commerce in the Houston area before PLM used its marks in the area.  *See John C. Flood*, 642 F.3d at 1109 ("[A] party establishes ownership of a mark by being the first to use the mark in commerce." (citation omitted)); *see also* 5 *McCarthy on*

---

[63]     The Court did not address the third element of an infringement claim, likelihood of confusion.  *See PLM I*, 69 F. Supp. 3d at 212.

[64]     PROLACTO's motion for involuntary dismissal also asks the Court to reconsider its holding at summary judgment limiting the counterclaim to the Houston, Texas market "[i]n light of the exceptional circumstances in this case related to PLM's bad faith adoption of the marks at issue."  Def.'s Mot. & Mem. Involuntary Dismissal & Recons. Interlocutory Order at 18; *see also* Def.'s Br. at 36 (reiterating the request).  For the reasons stated in this opinion, the Court has found that PLM did not adopt its marks in bad faith and will deny PROLACTO's motion on this basis.  The Court also notes that its findings of fact here only confirm its summary judgment holding that there was no genuine dispute regarding PLM's priority in Northern California or its lack of commercial activity in Florida.

*Trademarks* § 26:52 (explaining that when a claim is brought under § 43(a), "territorial rights should be determined by reference to federal common law").

At summary judgment, the Court found that while it was clear that a PROLACTO licensee opened a store in Rosenberg, Texas (a suburb of Houston) in October 2002 and later opened additional stores, there were open questions of fact as to when the licensee first used the marks at issue in Counterclaim Count II. *See PLM I*, 69 F. Supp. 3d at 208. The Court has now resolved that factual dispute in its findings of fact. Of its four asserted marks, the Court found that PROLACTO's licensee in the Houston area, Mary Fernandez, had only used one, the LA MICHOACANA (words only) mark, prior to PLM's entrance to the Houston area market in 2005. Thus, only this mark survives to the next element of PROLACTO's claim.

## 2. Distinctiveness and Secondary Meaning

The Court explained in its summary judgment opinion that priority of use "alone does not entitle the mark to protection under the Lanham Act." *PLM I*, 69 F. Supp. 3d at 209 (citing *Fernandez v. Jones*, 653 F. Supp. 2d 22, 29 (D.D.C. 2009); *Globalaw*, 452 F. Supp. 2d at 26–28 (D.D.C. 2006)). The party asserting the mark must also demonstrate that "the mark is either inherently distinctive, in which its intrinsic nature serves to identify its particular source, or has acquired a secondary meaning in the minds of consumers." *Id.* (citations omitted). As the Supreme Court has explained, to be entitled to protection, a mark must be sufficiently "distinctive" to distinguish the registrant's goods from others. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

A descriptive mark "may be eligible for protection, but only if it has acquired a 'secondary meaning' in the minds of the public." *U.S. Search*, 300 F.3d at 523; *see also Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079, 1087–88 (C.D. Cal. 2006)

("Descriptive marks, because of their particular placement — one step above 'generic' — on the spectrum of distinctiveness, require proof of secondary meaning in order to be protectable." (internal quotation omitted)).

At the summary judgment stage, the Court found that "substantial questions of material fact exist regarding the secondary meaning issue." *PLM I*, 69 F. Supp. 3d at 212. The Court has now answered those questions as to PROLACTO's asserted LA MICHOACANA (words only) mark, the only mark for which it has priority in the Houston area. The Court has found that in connection with selling ice cream and other frozen treats in the United States, the terms "MICHOACANA" and "LA MICHOACANA" are descriptive of a type of product that is understood in the minds of consumers to have originated in the Mexican state of Michoacán, and it is not primarily associated with PROLACTO or any other single source.

Lacking distinctiveness and secondary meaning, PROLACTO's use of "LA MICHOACANA" (words only) is not entitled to trademark protection, and PROLACTO cannot, therefore, maintain a claim of infringement. The Court will enter judgment for PLM on PROLACTO's Counterclaim Count II for trademark infringement.[65]

## H. Counterclaim Count II:  False Designation, Passing Off, False Association, and Unfair Competition

In its Counterclaim Count II, PROLACTO also asserts a theory of false designation, passing off, false association, and unfair competition. *See* Ans. 2d Am. Compl. & Countercls. at 30–31 ¶ 45. This Court has explained that although these claims "may appear to internally allege

---

[65]     In light of the Court's factual findings and legal conclusion, the Court need not reach PLM's affirmative defense of laches, in which it asserts that all of PROLACTO's counterclaims—though it only actually addresses PROLACTO's infringement claim—are barred. *See* Pls.' Br. at 105–107 ¶¶ 148–50.

many different grievances—*i.e.,* trademark infringement, false designation of origin, passing off, and unfair competition—courts have announced that the elements for each of the aforementioned causes-of-action mirror those for a claim of trademark infringement." *Globalaw*, 452 F. Supp. 2d 1, 26 (D.D.C. 2006) (citations omitted). For this reason, the Court entered summary judgment on this theory in the identical manner in which it entered summary judgment on PROLACTO's infringement claim. *See PLM I*, 69 F. Supp. 3d at 212; *PLM III* at 5–8.

Accordingly, in light of the Court's holding that PROLACTO was unable to prove its infringement claim, the Court will enter judgment for PLM on this claim as well.[66]

---

[66]     On May 12, 2016, PROLACTO filed a Notice of Supplemental Authority pointing the Court to a recent Fourth Circuit decision, *Belmora LLC v. Bayer Consumer Care AG*, No. 15-1335, 2016 WL 1135518 (4th Cir. Mar. 23, 2016), that treated a false association claim brought under § 43(a) of the Lanham Act differently from a typical trademark infringement claim. *See* Def.'s Notice of Suppl. Authority, ECF No. 334. In *Belmora*, the Fourth Circuit considered, in relevant part, a false association claim brought by Bayer Consumer Care AG ("BCC"), which used the trademark FLANAX in Mexico, against Belmora LLC, which owned the same mark in the United States. *Belmora*, 2016 WL 1135518, at *1. Both parties sold pain relievers under those marks in their respective countries and, although BCC had not marketed or sold its FLANAX product in the United States, BCC alleged that its product was well known. *See id.* BCC alleged that Belmora had used its U.S. FLANAX mark to "deliberately deceive Mexican-American consumers into thinking they were purchasing BCC's product." *Id.* In resolving BCC's false association claim, the Fourth Circuit held that § 43(a) of the Lanham Act "does not require that a plaintiff possess or have used a trademark in U.S. commerce as an element of the cause of action." *Id.* at *4. The court acknowledged that, in prior cases, it had "appear[ed] to have treated a plaintiff's use of a mark in United States commerce as a prerequisite for a false association claim," and cited cases in which it stated that the elements for a false association claim and a trademark infringement claim are identical. *See id.* at **7–8 (citing, *e.g.*, *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005)). Nevertheless, the court concluded that, in light of the Supreme Court's decision in *Lexmark* concerning statutory standing for a false advertising claim, BCC could state a false association claim notwithstanding its failure to have ever used the mark in U.S. commerce. *Id.* at *7, *8.

*Belmora* appears to be the first case to hold that a foreign plaintiff with no trademark rights in the United States could maintain a false association claim under § 43(a) of the Lanham Act based on a trademark holder's use of marks in the United States. It remains to be seen whether other courts will follow the Fourth Circuit's approach, and the Court need not make that determination here. Even if this Court were to follow *Belmora*, that analysis would not produce a contrary outcome in this case for two reasons.

## I. Counterclaim Count II:  False Advertising

PROLACTO also charges PLM with false advertising in Count II of its counterclaim

pursuant to 15 U.S.C. § 1125(a)(1)(B).[67]

---

First, to the extent that PROLACTO relies on *Belmora* to show that it can succeed on its false association claim based on its use of the Indian Girl or LA MICHOACANA marks in the United States, it is important to note that the Mexican company at issue in *Belmora*, unlike PROLACTO here, had *never* used its mark to market or sell products in the U.S and did not bring a claim for trademark infringement.  The Fourth Circuit therefore did not consider circumstances, like those at issue in this case, where two parties use similar marks in some of the same markets and contest the ownership of the marks at issue.  The Court does not read the Fourth Circuit's analysis to suggest that an *infringing* junior user of a mark in the United States can pursue a false association claim against a mark's senior user based on consumer confusion resulting from the infringing use.  Having already found that PROLACTO's Indian Girl mark infringes on PLM's senior use of similar marks, the Court does not read *Belmora* to suggest that PROLACTO can nevertheless pursue a false association claim in the Houston market or any other market.  And, because the Court has also concluded that PLM's other marks create no likelihood of confusion with PROLACTO's LA MICHOACANA marks, PROLACTO cannot succeed on a false association claim on the basis of any use of its marks in the United States.

Second, even if the Court were to accept *Belmora*'s apparent holding that an owner of a foreign mark can maintain a false association claim based solely on the party's wholly-foreign use of the mark, PROLACTO would be unsuccessful on the merits.  The Fourth Circuit explained in *Belmora* that to come within § 43(a)'s zone of interests a plaintiff must show a commercial injury to its reputation or sales.  2016 WL 1135518, at *5 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014); *see also id.* at 9 (discussing BCC's alleged injury).  At trial, PROLACTO failed to establish any injury to its business in Mexico and failed to establish that any injury suffered was proximately caused by PLM's use of confusingly similar marks in the United States.  PROLACTO offered no evidence, for example, concerning any loss of sales from customers who bought PLM's products in the United States in lieu of PROLACTO's products in Mexico.  Nor did it offer any evidence of consumer confusion in Mexico concerning its products, any credible evidence showing a cross-over of the parties' customers between the United States and Mexico, or any other evidence suggesting that PROLACTO suffered any injury in the Mexican market.  *Cf. Belmora*, 2016 WL 1135518, at **8–9 (explaining that BCC had alleged that its customers had erroneously purchased Belmora FLANAX in the U.S. instead of BCC's product in Mexico, causing the company to suffer lost sales, and that Belmora targeted Mexican-Americans already familiar with the FLANAX mark in Mexico).  Accordingly, *Belmora* has no impact on the outcome of this case.

[67]     The recent Fourth Circuit decision in *Belmora* has no bearing on the Court's resolution of PROLACTO's false advertising claim because, as discussed, the Court analyzes that claim under *Lexmark*, as it did at summary judgment.

### 1. Advertisements at Issue

Over the course of this litigation, PROLACTO has alleged that a number of PLM's advertisements and advertising statements constitute false advertising. Unfortunately, PROLACTO does not provide a complete, well-defined list of the alleged advertisements in its post-trial briefing or many citations in the record in support of its claims. *See* Def.'s Br. at 11–15 ¶¶ 38–54 (referencing various advertisements). In its post-trial briefing, PLM provides a list of the advertisements at issue culled from PROLACTO's pleading, summary judgment briefing, and motions *in limine*.[68] *See* Pls.' Br. at 129–30 ¶ 209. PROLACTO does not challenge this list in its opposition to PLM's brief, and the Court therefore treats the list as comprehensive. The advertisements at issue are as follows:

(1)  "La Indita Michoacana is a family company founded in Tocumbo Michoacán in the 1940's. Since then we've continued to make premium ice cream, fruit bars and drinks that give the flavor and tradition of Mexico. Distinguish us by our logo."

(2)  "La Michoacana is a family company founded in Tocumbo, Michoacan in the 1940's. Since then, we've continued to make premium ice cream, fruit bars and drinks that give the flavor and tradition of Mexico. Distinguish us by our logo."

(3)  "La Michoacana is a tradition that was born in Tocumbo, Michoacan in the 1940's. In 1991 Ignacio Gutierrez was continuing with the tradition of La Michoacana by introducing it to the United States. La Michoacana is distinguished by its quality and elaboration of the ice cream bars with natural fruits and ingredients of the highest quality."

(4)  Using the name "LA INDITA MICHOACANA" with its ice cream products.

(5)  Using the Indian Girl design with its ice cream products.

(6)  Using "LA MICHOACANA ES NATURAL" and design with its ice cream products.

---

[68]  Though PLM asserts that PROLACTO "expanded" on the advertisements alleged in its pleading and asserted additional advertisements in its pre-trial motion *in limine*, PLM does not argue that the Court should limit the advertisements at issue on that basis. *See* Pls.' Br. at 129–31 ¶¶ 209–10.

(7)    Using the trade name "Paleteria Michoacana" with its ice cream business.

(8)    Including false and misleading indicia of Mexico including pictures of places in Mexico, a PROLACTO-affiliated store in Mexico, a statue in the town of Tocumbo, Mexico, and maps of Mexico in its websites and catalogs.

(9)    Claiming or implying that its goods originated or were made in Mexico, and/or are of the same nature, type and quality as those continuously sold under the famous LA MICHOACANA brand established by PROLACTO's ancestor in the 1940's in Michoacan, Mexico.

(10)    Claiming that it shares its name with and otherwise implying that it is affiliated with 15,000 – 20,000 stores in Mexico.

(11)    Including false and misleading pictures of its products on its packaging.

(12)    PLM's products are "traditional old world *paletas* of Latin American influences" and "ice cream in the style and type made famous in Michoacán."

(13)    PLM's products are "the best *paletas* in the world" and use "the perfect blend of the best ingredients available."

## 2.  Legal Standard

Under § 43(a) of the Lanham Act:

> [A]ny person who . . .uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.[69]

15 U.S.C. § 1125(a)(1)(B).  In order to prevail on a Lanham Act false advertising theory, a party

must show that the advertising at issue was:  "(1) false or misleading; (2) actually or likely

deceptive; (3) material in its effect on buying decisions; (4) connected with interstate commerce;

---

[69]    Although false advertising is proscribed within the same section of the Lanham Act as trademark infringement, it involves separate elements that require independent analysis, unlike false designation of origin, passing off, and unfair competition.  *Cf. Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072 (9th Cir. 2014), *as amended* (Mar. 11, 2014) ("These tests [for false advertising and trademark infringement] are distinct, and the district court abused its discretion when it did not separately consider the false advertisement claim.").

and (5) actually or likely injurious." *See Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 6 (D.D.C. 2010) (citations omitted).

As a threshold matter, however, the party alleging false advertising must demonstrate that it has so-called "statutory standing" to bring a claim by demonstrating, first, that the party falls within the "zone of interests" the statute was designed to protect, and, second, that the party has suffered injuries that were proximately caused by a violation of the statute. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388–91 (2014).

### 3. Summary Judgment Ruling

At summary judgment, the Court addressed the issues of statutory standing under *Lexmark* and all of the elements of PROLACTO's false advertising claim.

The Court found that, at least at the summary judgment stage, PROLACTO had provided "sufficient evidence to demonstrate commercial injury . . . at least insofar as it has offered evidence that i[t] possesses a business reputation and goodwill within the United States that PLM allegedly attempts to usurp for its own benefit, as well as the possibility of lost sales and customers." *PLM I*, 69 F. Supp. 3d at 216. The Court also found that PROLACTO had "provided sufficient evidence from which a reasonable juror could conclude that those injuries, if proven at trial to exist, were proximately caused by PLM's advertisements." *Id.* Accordingly, the Court held that PROLACTO had "provided sufficient facts to survive summary judgment on the standing question." *Id.*

Turning to the elements of PROLACTO's claim, the Court held that because PLM did not make any argument or provide any evidence on the elements of falsity, deceptiveness, and

interstate commerce, PLM had conceded the issues.[70]  The Court next addressed the issue of

materiality, holding that a dispute of material fact remained as to whether PLM's false

advertisements were likely to affect consumers' purchasing decisions.  And, finally, on the

element of injury, the Court stated that because PROLACTO was only entitled to injunctive

relief on its counterclaims, it needed only to show a likelihood of injury, as opposed to actual

injury.  The Court then held that "given the apparent differences between the products, there is

some basis to anticipate that PROLACTO's goodwill and reputation, in addition to potential

sales, may be harmed if consumers are misled by PLM's advertisements into believing they are

buying PROLACTO's fruit-based, handmade product."  *Id.* at 218.  The Court thus entered

judgment for PROLACTO as to the elements on falsity and interstate commerce only.[71]

---

[70]     In its post-trial briefing, PLM argues that PROLACTO failed to prove the element of
falsity at trial and that all of the advertising statements at issue constitute non-actionable puffery.
*See* Pls.' Br. at 131–36 ¶¶ 212–25.  PLM fails to acknowledge the Court's ruling at summary
judgment that PLM had conceded falsity and that the Court has already entered judgment for
PROLACTO on that count.  PLM does not seek reconsideration of that holding, but rather
attempts to ignore it.  The Court sees no reason, especially in the absence of any argument from
PLM, to permit PLM to raise these issues now after finding that PLM conceded them at
summary judgment.

[71]     The Court also dismissed PROLACTO's claim entirely as to one advertisement at issue
and included as the first advertisement on PLM's post-trial list ("La Indita Michoacana is a
family company . . . ."), after finding that it was undisputed that PLM no longer used the
advertisement.  *See PLM I*, 69 F. Supp. 3d at 213 n.13.  The Court reasoned that, because
PROLACTO was only entitled to injunctive relief and "because injunctive relief would have no
effect as a remedy against PLM's discontinued advertisement, this aspect of PROLACTO's
claim" was moot.  *Id.*  PROLACTO has subsequently challenged that reasoning, arguing that
without injunctive relief, PLM would not be prevented from using the advertisement again.  The
Court has found that PLM is no longer using any variations of the Tocumbo Statement in its
advertising or product packaging.  PLM does not, however, argue that the Court should dismiss
PROLACTO's claims as to those advertisements as moot.  Because the Court finds that PLM is
entitled to judgment on the entirety of PROLACTO's false advertising claim, it has no occasion
to revisit its reasoning at summary judgment here.

#### 4.  "Statutory Standing" under *Lexmark*

PLM argues that PROLACTO lacks "statutory standing" to assert a false advertising claim under the Supreme Court's *Lexmark* test.  *See* Pls.' Opp'n at 58.

As discussed, the *Lexmark* test has two parts.  First, the plaintiff must claim to have suffered an injury within the "zone of interests" protected by the statute.  The Supreme Court held in *Lexmark* that "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Lexmark*, 134 S. Ct. at 1390.  Next, the plaintiff must prove that the injury was proximately caused by the defendant's unlawful conduct.  *See id.* at 1390.  The Supreme Court stated that "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff."  *Id.* at 1391; *see also* 5 *McCarthy on Trademarks* § 27:30 ("[P]roximate causation means that the plaintiff can trace its economic or reputational damage directly to the defendant's misrepresentation.").

The D.C. Circuit has explained that "statutory standing 'is itself a merits issue'" and "is not really about standing at all."  *United States v. Emor*, 785 F.3d 671, 677 (D.C. Cir. 2015) (quoting *United States v. Oregon*, 671 F.3d 484, 490 n.6 (4th Cir. 2012)).  Indeed, here, the Court's resolution of the *Lexmark* standing question turns on its findings of fact regarding whether PROLACTO has suffered or will likely suffer an injury and the causal connection between that injury, if any, and PLM's false advertising.  *See PLM I*, 69 F. Supp. 3d at 215 n.14 (stating that "the merits of PROLACTO's false advertising claim . . . overlap[] significantly with resolving the standing question").

The Court previously held that PROLACTO had provided sufficient evidence of potential injuries in the form of a damaged reputation and loss of sales and customers and that those injuries, "if proven at trial to exist, were proximately caused by PLM's advertisements." *Id.* at 216. While PROLACTO may have been able to survive summary judgment, it did not meet its burden at trial. The Court has found that PROLACTO failed to show that it had suffered or would likely suffer any injury—either in the form of loss of reputation or loss of sales—and that it had even failed to show that PLM's advertisements had any impact on consumers' decisions whether to buy PLM's products at all.

In light of these findings, the Court must conclude that PROLACTO has failed to meet *Lexmark*'s test for maintaining a false advertising claim under the Lanham Act.[72] The Court will therefore enter judgment in favor of PLM on the entirety of PROLACTO's false advertising counterclaim.

## V.  REMEDIES

Having determined the outcome of PLM's claims and PROLACTO's counterclaims, the Court must now determine the appropriate remedies.

### A.  Cancellation of PLM's LA INDITA MICHOACANA Mark

For the reasons provided in the Court's conclusions of law, the Court will enter judgment for PROLACTO on Count I of PLM's Second Amended Complaint and affirm the TTAB's decision to cancel the registration for PLM's LA INDITA MICHOACANA mark (Reg. No. 3,210,304) pursuant to 15 U.S.C. § 1052(b).

---

[72]    Even if PROLACTO could proceed to the elements of its claim, the Court's findings of fact regarding materiality and injury—the two elements that were at issue at trial—would also result in judgment for PLM.

## B.  Declaratory Judgment of Non-Infringement

For the reasons provided in the Court's conclusions of law, the Court will enter judgment

for PLM on Count II of PLM's Second Amended Complaint and declare that there is no

likelihood of confusion between PLM's LA INDITA MICHOACANA mark and PROLACTO's

LA MICHOACANA (words only), LA MICHOACANA NATURAL (words only), and LA

MICHOACANA NATURAL marks solely on the basis that the marks commonly use the term

"MICHOACANA" in connection with selling ice cream and related products.

## C.  Permanent Injunction

As the remedy for its infringement claim, Count III, PLM requests that the Court order a

permanent injunction.  For the reasons provided below, the Court will grant permanent injunctive

relief with a narrower scope than PLM requests.

Rule 65 of the Federal Rules of Civil Procedure provides that "[e]very order granting an

injunction . . . must:  (A) state the reasons why it issued; (B) state its terms specifically; and (C)

describe in reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).

In accordance with the Rule, the Court first addresses the appropriateness of an injunction and

then turns to issues concerning its scope.

### 1.  Appropriateness of a Permanent Injunction

The Lanham Act provides that the Court "shall have [the] power to grant injunctions,

according to the principles of equity and upon such terms as the court may deem reasonable."  15

U.S.C. § 1116(a).  In *eBay Inc. v. MercExchange, L.L.C.*, the Supreme Court stated:

> According to well-established principles of equity, a plaintiff
> seeking a permanent injunction must satisfy a four-factor test before
> a court may grant such relief. A plaintiff must demonstrate:  (1) that
> it has suffered an irreparable injury; (2) that remedies available at
> law, such as monetary damages, are inadequate to compensate for
> that injury; (3) that, considering the balance of hardships between

the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

547 U.S. 388, 391 (2006).[73]  Under these principles, incorporated through § 1116(a), a district court does not categorically grant or deny injunctive relief.  *See id.* at 393–94.  Rather, "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that . . . discretion must be exercised consistent with traditional principles of equity."  *Id.* at 394.  The Court's consideration of the four factors in *eBay* leads it to conclude, in its equitable discretion, that a permanent injunction in this case is warranted.

PLM has suffered an irreparable injury due to PROLACTO's infringement of its marks and will continue to suffer one absent a permanent injunction.  The Court has found above that there is a high degree of likelihood of confusion between PLM's marks and PROLACTO's infringing marks.  That conclusion was based, in part, on evidence demonstrating instances of actual confusion between the parties' products in Northern California and in Houston, as well as

---

[73]     In its post-trial briefing, PLM observes "confusion . . . as to the test to apply in issuing permanent injunctions" since the Supreme Court's decision in *eBay*.  Pls.' Br. at 137 ¶ 230.  PLM notes that some district courts in this Circuit have, after *eBay*, applied a four-factor test enunciated in *American Civil Liberties Union v. Mineta*, 319 F. Supp. 2d 69 (D.D.C. 2004), when determining whether to issue a permanent injunction as relief for trademark infringement.  *See, e.g.*, *AARP v. Sycle*, 991 F. Supp. 2d 224, 230 (D.D.C. 2013); *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 151 (D.D.C. 2011); *Wondie v. Mekuria*, 742 F. Supp. 2d 118, 123 (D.D.C. 2010); *Breaking the Chain Found., Inc. v. Capitol Ed. Support, Inc.*, 589 F. Supp. 2d 25, 30 (D.D.C. 2008).  In this formulation of the test, in contrast with the formulation in *eBay*, courts consider "whether the plaintiffs *will* suffer irreparable injury absent an injunction." *Mineta*, 319 F. Supp. 2d at 87 (emphasis added).  PLM also notes that at least some district courts in this Circuit have assumed the existence of irreparable harm in cases of trademark infringement.  *See, e.g.*, *Wondie*, 742 F. Supp. 2d at 123.  Other Circuits have held that approach to be incorrect in light of *eBay*.  *See, e.g.*, *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 216 (3d Cir. 2014) ("[W]e hold that there is no presumption of irreparable harm afforded to parties seeking injunctive relief in Lanham Act cases.").  The Court need not opine on this issue or the propriety of the *Mineta* test post-*eBay*, because, for the reasons discussed, the Court has found that PLM has, in fact, suffered an irreparable injury and will suffer an irreparable injury absent an injunction.

consumer survey evidence.  Monetary relief, which PLM does not seek, would be inadequate to cure the harm that PLM has suffered and will suffer absent an injunction.  *See* 5 *McCarthy on Trademarks* § 30:1 ("Like trying to un-ring a bell, trying to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute a just or full compensation.  This distinguishes trademark cases from the neighboring areas of patent and copyright law.").  Indeed, the injury here is not primarily monetary; it is reputational, and given PLM's natural growth, as evidenced by it expanding its range from just one state in 1991 to now over 30 states, will only grow accordingly over time absent an injunction.  The hardships here also weigh in PLM's favor.  As the Court has found, PROLACTO has, for many years, operated and grown its business even without use of the Indian Girl mark using other trademarks not at issue in PLM's infringement claim.  PLM, on the other hand, has used its Indian Girl marks on all of its products and appears to have made the mark a central part of its identity.  Finally, the public interest weighs heavily in favor of granting a permanent injunction.  As McCarthy has aptly explained, "[i]f a court were to permit the infringer to continue its infringing activities, the result would be a judicially imposed compulsory license given to an infringer.  This would permit the likelihood of confusion to continue and deprive the consuming public of a truthful marketplace."  5 *McCarthy on Trademarks* § 30:1.

The Court is also mindful that "a permanent injunction is the standard remedy in trademark infringement cases."  5 *McCarthy on Trademarks* § 30:1; *see also SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1336 (11th Cir. 1996) (stating that in "ordinary trademark infringement actions . . . complete injunctions against the infringing party are the order of the day."); *cf. eBay*, 547 U.S. at 395 (Roberts, C.J. concurring) ("[T]here is a difference between exercising equitable discretion pursuant to the established four-factor test and writing on

an entirely clean slate. . . .  When it comes to discerning and applying [the] standards, in this area

as others, 'a page of history is worth a volume of logic.'" (quoting *N.Y. Trust Co. v. Eisner*, 256

U.S. 345, 349 (1921) (Holmes, J.))).

Accordingly, the Court finds it appropriate to enter a permanent injunction as a remedy

for PROLACTO's infringement.  The scope of that injunction requires further explanation.

## 2.  Scope of the Injunction

"The law requires that courts closely tailor injunctions to the harm that they address."

*ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 972 (D.C. Cir. 1990).  PLM seeks an

extremely broad injunction in its post-trial briefing:

> PROLACTO and its licensees, employees, agents, and all persons acting in concert with PROLACTO should be enjoined from infringing PLM's trademarks and from using an Indian Girl Design everywhere in the U.S., including the states where PLM and PROLACTO each do business, i.e., California and Texas, and in states where PLM is not yet selling, including Florida and North Carolina.

Pls.' Opp'n at 62–63.[74]  For the reasons provided below, the Court disagrees with PLM as to the

appropriate scope of the injunction.  The Court addresses the various elements of PLM's request

separately.

---

[74]    In its opposition to PROLACTO's proposed findings of fact and conclusions of law, PLM specified the scope of its requested injunction in a way that it did not do in its proposed findings of fact and conclusions of law.  For example, though PLM stated in its opening brief that it sought an injunction barring PROLACTO from "future infringement of PLM's trademarks and from using an Indian Girl Design," Pls.' Br. at 136 ¶ 227, PLM did not specify or explain that it sought to include use of the term "Michoacana" in the injunction until its opposition brief, *see* Pls.' Opp'n at 65.  Similarly, though PLM referenced "licensees" in its opening brief, it did not provide any legal argument or detail concerning the Court's authority to enjoin PROLACTO's licensees until its opposition brief.  This was improper, as PROLACTO was not permitted an opportunity to respond to PLM's new arguments.  Nevertheless, for the reasons provided, the Court rejects these additional arguments on their merits.

*a.  Marks at Issue*

PLM seeks an injunction barring PROLACTO from using an Indian Girl and also, in certain locations, from using "Michoacana." *See* Pls.' Opp'n at 65–67.

The permanent injunction should certainly bar PROLACTO from using an Indian Girl, which the Court found to be an infringement of two of PLM's registered marks in Count III of PLM's Complaint.  There is absolutely no basis, however, for barring PROLACTO from using the term "Michoacana."  The request itself is puzzling, to say the least.  PLM did not bring an infringement claim against PROLACTO on the basis of its use of "Michoacana."  On the contrary, PLM sought a declaration of non-infringement based on their common use of that term, which the Court has determined to grant.  PLM's infringement claim was limited to PROLACTO's use of an Indian Girl, and the remedy will be limited accordingly.[75]

*b.  Geographic Scope*

PLM also seeks an injunction that is nationwide in scope.  *See* Pls.' Br. at 136; Pls.' Opp'n at 64–67.  It is clear that PLM is entitled to enjoin PROLACTO's infringing use of the Indian Girl in Northern California and the Houston area, because PLM sells its products in those markets.  The Court must determine, however, whether PLM can enjoin PROLACTO's infringing use in Florida and North Carolina, markets where PLM does not currently operate, and whether PLM can obtain an injunction for other markets in which neither party currently operates.

In a landmark ruling in 1959, which the D.C. Circuit has adopted, the Second Circuit explained that "[u]nder the Lanham Act, a federal registrant is entitled to enjoin a remote junior

---

[75]     Of course, the Court has also found that the term "Michoacana" is descriptive, has not attained secondary meaning, and is therefore not entitled to protection.  This alone is a sufficient basis to deny PLM's request.

user of the mark if there is a likelihood of the registrant's entry into the disputed area." *Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 640 (D.C. Cir. 1982) (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 362 (2d Cir. 1959)); *see also* 5 *McCarthy on Trademarks* § 26:33 ("Under the *Dawn Donut* rule, while a senior federal registrant has superior priority, there is no confusion for a court to enjoin unless and until the senior user shows a likelihood of entry into the junior user's trade territory."). "In other words, the registrant has a nationwide *right*, but the injunctive *remedy* does not ripen until the registrant shows a likelihood of entry into the disputed territory." 5 *McCarthy on Trademarks* § 26:33. PLM argues that it has established a likelihood of entering North Carolina and Florida and that it is "ready to begin sales" in those states. Pls.' Br. at 107 ¶ 189. The Court disagrees.

PLM cannot simply make a naked assertion that it is "ready to begin sales" in new markets and thereby obtain an injunction against a junior user under the *Dawn Donut* rule. For this proposition, PLM cites *Russell Road Food & Beverage, LLC v. Spencer*, No. 12-cv-01514, 2013 WL 321666 (D. Nev. Jan. 28, 2013). *See* Pls.' Opp'n at 66. But here yet again, PLM conveniently omits key portions of a court's opinion. The *Russell* court did not state that simply asserting that one is ready to begin sales is sufficient; rather, the court stated, in full: "'Likelihood of entry denotes an immediate, impending entry of the federal registrant into the junior user's territory.' For instance, a federal registrant may prove that it has leased premises and is ready to begin sales, or that it has licensed the mark for the disputed territory." *Russell Rd.*, 2013 WL 321666, at *3 (quoting 5 *McCarthy on Trademarks* § 26:34). And in that case, the court held that although the senior user asserted that it had traveled to the junior user's territory, consulted with real estate agents, organized investor meetings, and attempted to establish local relationships, the senior user *still* had not sufficiently demonstrated a likelihood of entry. *See id.*

at **3–4.  Indeed, McCarthy recognizes that "[t]he federal registrant must, in the absence of proof of mark reputation in the disputed area, show some concrete, impending plans for entry." 5 *McCarthy on Trademarks* § 26:34.

PLM has shown no concrete plans or any other indication that it will sell its products in Florida or North Carolina anytime soon.  PLM only argues:  "PLM currently distributes and sells its products in more than 30 states in the U.S., including Hawaii.  PLM sells to national retailers and distributors who have distribution centers throughout the U.S., and thus, is ready to begin sales in additional states in the U.S., including Florida."  Pls.' Opp'n at 66.  Even if this were sufficient—and it is not—the cited evidence does not support PLM's assertion.  PLM cites only Patricia Gutierrez's testimony about the states in which PLM distributes its products.  *See* Day 6 P.M. at 84:3–87:15.  But Ms. Gutierrez only testified that PLM currently distributes its products in "30-plus states," including Hawaii and Illinois, and she was unable to recall whether PLM distributed in states such as Ohio and Kentucky.  *See id.* at 84:3–85:15.  While she also explained Wal-Mart's distribution system, she gave no testimony that PLM had made any plans to distribute its products to Florida or North Carolina or even to expand its distribution at any time soon.  *See id.* at 85:16–86:7.  It is not even clear from the record exactly in which states PLM currently distributes product.[76]  Without evidence showing that PLM has concrete plans to enter a market in which PROLACTO operates in Florida or North Carolina, PLM is not entitled to injunctive relief in those states.

---

[76]     From the Court's review of the record, it appears that the most eastern region to which Ms. Gutierrez testified was Illinois.  *See* Day 6 P.M. at 84:3–87:15.  The Court notes that while PLM's counsel asserted in her opening at trial, using a map as a demonstrative, that PLM currently distributes its products in states on the East Coast, *see* Day 1 A.M. at 80:10–16, PLM did not introduce evidence to support those assertions.

The Court must also address PLM's request for injunctive relief in regions in which neither it nor PROLACTO does business.  While PLM argues that the scope of the injunction should be "nationwide," PLM makes no specific argument concerning these regions.  "It is well-settled that the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation, and 'to mould each decree to the necessities of the particular case.'"  *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997) (quoting *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 806 (2d Cir. 1981)) (internal citation omitted).  Here, PLM has not asserted—and the Court has not found—any injury or likelihood of confusion in any market other than Northern California and Houston.  PLM has not asserted that PROLACTO is infringing its marks in any market in which it does not currently distribute product other than North Carolina and Florida, and it does not offer any evidence of any concrete plans to enter any new markets.

In light of the limitations of PLM's claims and injuries, and in light of the D.C. Circuit's command that the Court must "closely tailor injunctions to the harm that they address," *ALPO Petfoods*, 913 F.2d at 972, the Court will limit the geographic scope of its injunction to the specific markets in which it has found infringement:  Northern California (which includes Sonoma and Novato) and the Houston, Texas area (which includes Rosenberg and the city of Houston).

### *c.  Licensees*

Finally, PLM also asks the Court to enjoin PROLACTO's U.S. licensees, in addition to PROLACTO, arguing that the Court has the authority to enjoin the licensees pursuant to Rules 65 and 71 of the Federal Rules of Civil Procedure.

Rule 65 of the Federal Rules of Civil Procedure provides that an injunction "binds only the following who receive actual notice of it by personal service or otherwise:  (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)."  Fed. R. Civ. P. 65(d)(2).  Rule 71 simply provides that the procedure for enforcing an order of relief against a non-party is the same procedure as enforcing an order of relief for a party, and it adds nothing to the Court's analysis here.  *See* Fed. R. Civ. P. 71.

By asking the Court, at this juncture, to determine that PROLACTO's licensees fall within the ambit of Rule 65(d) and to specifically name them in the injunction, PLM plainly misunderstands the Rule and the limitations of the Court's jurisdiction.

"It is elementary that one is not bound by a judgment *in personam* resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969).  "In *Zenith Radio* the Supreme Court reiterated the general rule that a court may not issue an injunction against a person over which the court ha[s] not acquired jurisdiction by service of process."  *Nat'l Spiritual Assembly of the Baha'is of the U.S. under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of the Bahai's of the U.S., Inc.*, 628 F.3d 837, 853 (7th Cir. 2010).  While it is true that individuals and entities that are "agents" of PROLACTO or are "in active concert or participation" with PROLACTO will be bound by an injunction directed towards PROLACTO, whether a particular individual or entity falls within the ambit of Rule 65(d) "is a decision that may be made only after the person in question is given notice and an opportunity to be heard."  *Lake Shore Asset Mgmt. Ltd. v. Commod. Futures Trading Comm'n*, 511 F.3d 762, 767 (7th Cir. 2007); *see also Zenith Radio*, 395 U.S. at 112 (explaining that "a

nonparty with notice cannot be held in contempt until shown to be in concert or participation" and that it was error to enter an injunction against a party's corporate affiliate "without having made this determination in a proceeding to which [the affiliate] was a party").

 PLM recognizes, quoting *National Spiritual Assembly*, that part of the underlying consideration in applying Rule 65(d) to a non-party is whether "it is fair to conclude that he had his day in court when the injunction was issued." *Nat'l Spiritual Assembly*, 628 F.3d at 854. But, oddly enough, PLM skips over the Seventh Circuit's explanation on the previous page of its opinion that "the 'day in court' at issue . . . refers to the nonparty's opportunity to contest whether he acted in concert with a party contemnor or was in privity and therefore bound by the injunction." *Id.* at 853. The proper procedure under *Zenith Radio* is to serve any non-parties with process and for the Court to subsequently hold, if necessary, "an evidentiary hearing offering them ample and complete opportunity to contest whether they c[o]me within Rule 65(d)[]." *Id.* at 853 n.5.

The Court will address PROLACTO, the only named defendant in this case, in its permanent injunction. The injunction will apply to others, to the extent that they fall within the ambit of Rule 65(d), and those individuals or entities "act at their peril if they disregard the commands of the injunction, for, if the [Court] ultimately determines that they are in concert with [PROLACTO], then they will be [held] in contempt of court. But that is an issue for another day . . . ." *Lake Shore*, 511 F.3d at 767.

### D. PROLACTO's Trademark Registration Applications

In addition to a permanent injunction, PLM also asks the Court to refuse PROLACTO's currently pending applications to register LA MICHOACANA (words only) (Serial No.

85,405,347) and its Indian Girl mark (Serial No. 78,771,243) pursuant to the Court's authority 15
U.S.C. § 1071(b)(1).  *See* Pls.' Opp'n at 71–73.

      This is the first time that PLM has made such a request.  It was not included in its Second
Amended Complaint.  *See* Second Am. Compl. at 17.  Nor was it included in the parties' Joint
Pretrial Statement.  *See* Joint Pretrial Stmt. at 41–42, ECF No. 182.  PLM, in fact, raised this
issue for the first time in its opposition to PROLACTO's proposed findings of fact and
conclusions of law, denying PROLACTO the opportunity to even address it.  *See* Pls.' Opp'n at
71–73.  It is far too late for PLM to make a request for relief such as this one, and the Court will
not entertain it here.  The Court takes no position on whether the USPTO can or should take the
Court's findings of fact and conclusions of law in this case into consideration when determining
the outcome of PROLACTO's applications for registration.

## VI.  CONCLUSION

      For the foregoing reasons, the Court will:  enter **JUDGMENT** in favor of PROLACTO
on Complaint Count I; enter **JUDGMENT** in favor of PLM on Complaint Count II; enter
**JUDGMENT** in favor of PLM on Complaint Count III as to the Indian Girl with Paleta (Reg.
No. 2,905,172) and Indian Girl with Cone (Reg. No. 2,968,652) marks and **DISMISS** Complaint
Count III as moot as to LA INDITA MICHOACANA (Reg. No. 3,210,304); **DISMISS AS
MOOT** Complaint Count IV; enter **JUDGMENT** in favor of PLM on Counterclaim Count II;
**DENY** PROLACTO's Motion for Involuntary Dismissal and Reconsideration (ECF No. 283);
**DENY** PROLACTO's Motion for Exclusion and Spoliation Sanctions (ECF No. 290); **GRANT**
PLM's Motion for Leave to File Document Under Seal (ECF No. 307); **DENY** PROLACTO's
Motion Seeking Leave to File Additional Deposition Designations (ECF No. 316); **DENY**
PLM's Request for Judicial Notice (ECF No. 248); **DENY** PLM's Request for Judicial Notice

No. 2 (ECF No. 263); **DENY** PLM's Request for Judicial Notice No. 3 (ECF No. 277); and

**DENY** PLM's Request for Judicial Notice No. 4 (ECF No. 282).


Dated:  May 27, 2016                                          RUDOLPH CONTRERAS
                                                             United States District Judge